1    JEFFREY, D. DINTZER, SBN 139056
     JDintzer@gibsondunn.com
2    PATRICK W. DENNIS, SBN 106796
     PDennis@gibsondunn.com
3    KIMBERLY A. NORTMAN, SBN 260264
     KNortman@gibsondunn.com
4    GIBSON, DUNN & CRUTCHER LLP
     333 South Grand Avenue
5    Los Angeles, California 90071-3197
     Telephone: (213) 229-7000
6    Facsimile: (213) 229-7520

7    Attorneys for GOODRICH CORPORATION

8    PHILIP C. HUNSUCKER, SBN 135860
     phunsucker@hgnlaw.com
9    BRIAN L. ZAGON, SBN 142403
     bzagon@hgnlaw.com
10   ERIK S. MROZ, SBN 229241
     emroz@hgnlaw.com
11   HUNSUCKER GOODSTEIN & NELSON PC
     3717 Mt. Diablo Boulevard, Suite 200
12   Lafayette, California 94549
     Telephone:  (925) 284-0840
13   Facsimile:  (925) 284-0870

14   DAVID C. SOLINGER, SBN 73833
     dsolinger@hgnlaw.com
15   HUNSUCKER GOODSTEIN & NELSON PC
     333 S. Grand Avenue, 25th Floor
16   Los Angeles, California 90071
     Telephone: (213) 943-1370
17   Facsimile: (213) 402-3939

18   Attorneys for PYRO SPECTACULARS, INC.

19   IGNACIA S. MORENO
     Assistant Attorney General
20   Environment & Natural Resources Division

21   MICHAEL C. AUGUSTINI (D.C. Bar No. 452526)
     michael.augustini@usdoj.gov
22   LESLIE M. HILL (D.C. Bar No. 476008)
     leslie.hill@usdoj.gov
23   KIM SMACZNIAK (N.Y. Bar No. 4782637)
     kim.smaczniak@usdoj.gov
24   Environment & Natural Resources Division
     Environmental Defense Section
25   U.S. Department of Justice
     P.O. Box 23986
26   Washington, DC 20026-3986
     Telephone: (202) 616-6519
27   Facsimile: (202) 514-8865

28   *Attorneys for Defendant United States Department of Defense*

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

1

2              UNITED STATES DISTRICT COURT

3             CENTRAL DISTRICT OF CALIFORNIA

4                   WESTERN DIVISION

5

6   CITY OF COLTON, a California          CASE NO. ED CV 09-01864PSG (SSx)

7   municipal corporation,               [Consolidated with Case Nos. CV 05-
                                          01479 PSG (SSx), CV 09-6630 PSG
8                                         (SSx), CV 09-06632 PSG (SSx), CV 09-
            Plaintiff,                    07501 PSG (SSx), CV 09-07508 PSG
9                                         (SSx), and CV 10-824 PSG (SSx)]

10      v.

11                                        **DISCOVERY MATTER**
                                          **(Referred to Special Master)**
12  AMERICAN PROMOTIONAL
    EVENTS, INC., et al.                  **JOINT STIPULATION RE:**
13                                        **GOODRICH CORPORATION'S AND**
                                          **PYRO SPECTACULARS, INC.'S**
14          Defendants.                   **NOTICE OF MOTION AND MOTION**
                                          **TO COMPEL SUPPLEMENTAL**
15                                        **RESPONSES TO**
                                          **INTERROGATORIES**
16

17

18                                        **[DECLARATION OF PATRICK W.**
                                          **DENNIS FILED HEREWITH]**
19                                        **[DECLARATION OF JAMES G.**
                                          **GENTRY FILED HEREWITH]**
20                                        **[DECLARATION OF STANLEY**
                                          **BAUER FILED HEREWITH]**
21

22

23                                        Date:      November 22, 2011
                                          Time:      11:00 a.m.
24                                        Location:  First Resolution
25                                                   633 W. Fifth Street
                                                     28th Floor
26                                                   Los Angeles, CA 90017
27                                        Judge:     Hon. Venetta Tassopulos
28
                                          Discovery Cut-Off:   February 29, 2012

1          Trial Date:              March 25, 2013

2
   AND CONSOLIDATED ACTIONS
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, at 11:00 a.m. on November 22, 2011, Goodrich Corporation ("Goodrich") and Pyro Spectaculars, Inc. (collectively, the "Moving Parties") will move the Court for an Order compelling the United States Department of Defense to supplement and properly verify responses to Interrogatories 1, 2, 13, 14, 15, and 16 in Astro Pyrotechnics, Inc.'s Interrogatories, Set One (the "Interrogatories") and to reimburse Goodrich's reasonable fees and costs associated with proving that the responses given on February 2, 2011 were inadequate and inaccurate.

This Motion is made following two meet and confer teleconferences between counsel for the Moving Parties and the United States' counsel on June 7, 2011 and October 4, 2011 pursuant to Rule 37-1 of the Local Rules of the United States District Court for the Central District of California. The meet and confers did not resolve the issues underlying this Motion.

This Motion is based upon this Notice, the attached written Joint Stipulation of Contentions and Points and Authorities pursuant to Local Rule 37-2, the Declaration of Patrick W. Dennis, the pleadings and other papers on file in this action, and such other evidence as may be presented at or prior to the hearing on this matter.

Dated: November 1, 2011

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: _____/s/_____
        Patrick W. Dennis

Attorney for Defendant
GOODRICH CORPORATION

1

Dated:  November 1, 2011          HUNSUCKER GOODSTEIN & NELSON PC

2

3

4                                         By: _____/s/_____

5                                              David C. Solinger

6                                         Attorneys for Defendant
                                          PYRO SPECTACULARS, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL UNITED STATES' WAIVER OF BOILERPLATE OBJECTIONS

1

# TABLE OF CONTENTS

2   I.    THE MOVING PARTIES' INTRODUCTORY STATEMENT .......................1

3   II.   THE UNITED STATES' INTRODUCTORY STATEMENT ...........................2

4   III.  THE MOVING PARTIES' STATEMENT OF FACTS ...................................8

5         A.    Nature of Discovery at Issue in the Interrogatories ..................................8

6         B.    The Interrogatories and the United States' Responses ...........................11

7         C.    The United States' Conduct in Responding to the Requests for the
                Depositions of Mr. Holmes and Ms. Greco .............................................13
8
9         D.    Depositions of Dean Hiza, Stanley Bauer, and Gerald Vincent .............15

10              1.    Testimony of Dean Hiza ................................................................15

11              2.    Testimony of Stanley Bauer ..........................................................18

12              3.    Testimony of Gerald Vincent ........................................................19

13        E.    Depositions of Carrie Greco and Joshua Holmes ...................................21

14              1.    Testimony of Carrie Greco ............................................................22

15              2.    Testimony of Joshua Holmes .........................................................23

16        F.    The United States' Conduct in Refusing to Supplement its
                Interrogatory Responses ..........................................................................26

17
18        G.    The Production of Unit Rosters, Morning Reports, and Personnel
                Files .........................................................................................................28

19  IV.   THE MOVING PARTIES' ARGUMENT .................................................28

20        A.    Legal Standard .........................................................................................28

21        B.    The Depositions of the Alternative Witnesses and the Verifiers
                Made Clear that the Interrogatory Responses Are Incomplete and
22              Inaccurate. ...............................................................................................31

23              1.    Contrary to the Inaccurate Responses to Interrogatories
                      1 and 2, Mr. Hiza Testified that the United States
24                    Maintains Records that Would Allow It to Identity
                      Servicemembers Based on Unit. ..................................................32
25
26              2.    Mr. Bauer and Mr. Vincent Made Clear That The
                      United States Conducted an Inadequate Investigation
                      in Responding to Interrogatories 13 through 16. .........................35
27
28        C.    Goodrich is Entitled to Its Reasonable Costs Associated with
                Proving that the Responses Were Inadequate and Inaccurate. .............36

i

Gibson, Dunn &
Crutcher LLP

## TABLE OF CONTENTS *(continued)*

Page

V.    THE UNITED STATES' ARGUMENT ..................................................... 37

    A.    DoD'S ANSWERS TO INTERROGATORIES 1 AND 2 COMPLIED WITH RULE 33 AND WERE ACCURATE AT THE TIME OF RESPONSE IN FEBRUARY 2011, BUT WILL BE TIMELY SUPPLEMENTED PER RULE 26(e) TO REFLECT SUBSEQUENT INFORMATION OBTAINED BY DoD. ................... 37

    B.    DoD'S RESPONSES TO INTERROGATORIES 13 THROUGH 16 WERE  ACCURATE WHEN SERVED AND REMAIN ACCURATE, THUS REQUIRING NO SUPPLEMENTATION AT THIS TIME. ....................................................................................... 43

        1.    The Verification Process Employed By DoD To Respond To Interrogatories 13 through 16 Does Not Render The Responses Either Incomplete Or Incorrect. ............. 43

        2.    DoD's Responses to Interrogatories 13 through 16 are not "incomplete or incorrect" in "some material respect." .......................................................................................... 47

    C.    GOODRICH'S POSITION IS INCONSISTENT WITH ITS OWN APPROACH TO ANSWERING INTERROGATORIES. ..................... 49

    D.    DoD COMPLIED WITH THE SPECIAL MASTER'S ORDER REGARDING THE GRECO AND HOLMES DEPOSITIONS, AND GOODRICH HAS NOT ATTEMPTED TO MEET AND CONFER ON ANY PRIVILEGE ISSUES ARISING FROM THOSE DEPOSITIONS. ....................................................................... 50

    E.    THE SPECIAL MASTER SHOULD SUMMARILY REJECT GOODRICH'S EXCESSIVE DEMAND FOR MORE THAN $100,000 IN ATTORNEYS' FEES AND COSTS. ................................ 52

VI.    THE MOVING PARTIES' REQUEST FOR RELIEF ....................... 57

VII.    THE UNITED STATES' CONCLUSION ........................................ 57

# I.

## THE MOVING PARTIES' INTRODUCTORY STATEMENT

Goodrich Corporation ("Goodrich") and Pyro Spectaculars, Inc. ("PSI") (collectively, the "Moving Parties") move for an Order compelling the United States to supplement and properly verify responses to Interrogatories 1, 2, 13, 14, 15, and 16 in Astro Pyrotechnics, Inc.'s Interrogatories, Set One (the "Interrogatories") and to reimburse Goodrich's reasonable fees and costs associated with proving that the responses given on February 2, 2011 were inadequate and inaccurate and the United States and Department of Justice knew, or should have known, of the inadequacies and inaccuracies at that time.

The Moving Parties raised questions about the sufficiency of the responses and the verifications to the Interrogatories from the moment the responses were served on February 2, 2011.  In response, the United States has consistently attempted to block the Moving Parties from obtaining any information regarding the adequacy of the responses and the factual bases for the verifications.  Worse, after completing the fifth and last deposition relating to the adequacy of, and verifications for, the interrogatory responses on September 21, 2011, it became clear that Department of Justice ("DoJ") lawyers knew the responses were evasive and inaccurate, but have attempted to cover up these inadequacies rather than acknowledge them and supplement the responses. Even now, using claims of privilege that are clearly inappropriate, the DoJ attorneys continue to cover up how they obtained identifying information of Army personnel who served at the Rialto Ammunition Back-Up Storage Point ("RABSP") that could lead to the identification of critical eyewitnesses.

The United States' outright refusal to conduct a reasonable investigation and provide complete and accurate responses to the Interrogatories is the latest in a long line of violations of the Federal Rules of Civil Procedure since the stay was lifted on January 24, 2011.  Based on this intentional violation of Rule 33, the Moving Parties

1

Gibson, Dunn &
Crutcher LLP

1  request that the Court grant this Motion to Compel supplemental responses to

2  Interrogatories 1, 2, 13, 14, 15, and 16 and Goodrich's request for reimbursement of its

3  reasonable fees and expenses in developing the facts that demonstrate that (1) the

4  responses were inadequate and inaccurate when made, and (2) the United States and

5  DoJ lawyers knew that when the responses were first given.

## II.

### THE UNITED STATES' INTRODUCTORY STATEMENT

8          The United States Department of Defense's ("DoD" or "United States")

9  responses to Astro Pyrotechnic Inc.'s ("Astro") First Set of Interrogatories were

10 appropriately verified and accurate, based on the information available at the time DoD

11 served the responses in February 2011, as required by Federal Rule of Civil Procedure

12 33.  The individuals who verified the Interrogatory responses on behalf of the Army in

13 February 2011– Carrie Greco and Joshua Holmes – testified that DoD's responses

14 were complete, truthful, and accurate to the best of their knowledge at that time.[1]  See

15 Onofrio v. American Beauty Macaroni Co., 11 F.R.D. 181, 184 (W.D. Mo. 1951) ("A

16 party interrogated may only answer matters of fact within his knowledge, and is not

17 required to express opinions or to make research and compilation of data and

18 information not readily known to him.").  Goodrich Corporation ("Goodrich") and

19 Pyro Spectaculars, Inc.'s ("Pyro")[2] have had ample opportunity to explore DoD's

20 responses and its related defenses through multiple depositions and document

21 discovery.  Their belabored attempts in this motion to find fault with DoD's statements

---

[1] See Declaration of James Gentry In Support of The United States Department of Defense's Opposition ("Gentry Decl."),¶ 6, Ex. F at 38-39, 62-63; and ¶, Ex. G at 55-56, 146-47.

[2] Astro and Pyro are represented by the same counsel.  Astro, however, is not listed as a moving party even though it served the Interrogatories at issue.

2

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

1    in the responses at most reveal factual disputes between the parties, not any

2    insufficiencies in DoD's Interrogatory responses.

3         Contrary to Goodrich's  assertions, DoD conducted a reasonable investigation to

4    confirm the adequacy of the Interrogatory responses and supplied the relevant

5    information in its possession at the time of the response.  See generally Ameripride

6    Services, Inc. v. Valley Industrial Services, Inc., 2011 WL 1321873, at *2 (E.D. Cal.

7    April 1, 2011) ("reasonable inquiry" is limited to persons and documents within the

8    responding party's control).  In providing properly verified responses to Astro's

9    Interrogatories based on the information reasonably available to the agency and

10   consistent with the knowledge of the Army employees responsible for handling this

11   matter, DoD fully complied with Rule 33.

12        Goodrich conceded more than five months ago that DoD responded

13   appropriately and that the discovery they had conducted confirmed that DoD possessed

14   an adequate factual basis for 10 out of the 16 Interrogatories at issue.  See Joint

15   Stipulation Regarding DoD's Motion For Protective Order (Dkt. 707-1) at 15, line 6

16   (Goodrich confirming that the alternative depositions the United States offered have

17   narrowed the dispute and that only the verification of the responses to "Interrogatories

18   1, 2, 13, 14, 15, and 16 are at issue in this motion") (hereafter "May 2011 Joint

19   Stipulation").  Goodrich and Pyro acknowledged that DoD's offer to make Mr. Stanley

20   Bauer of the Army Corps of Engineers available for a deposition was helpful, and that

21   Mr. Bauer's testimony obviated the need to question Ms. Greco and Mr. Holmes

22   regarding the factual basis for their verifying the majority of the Interrogatories at

23   issue.  Goodrich's arguments regarding the remaining six Interrogatory responses are

24   meritless.  Thus, the Special Master should reject Goodrich's false assertion that there

25   has been an "intentional violation" of Rule 33 by DoD or an "outright refusal" to

26   conduct a reasonable investigation for the Interrogatory responses.  See Gentry Decl., ¶

27   9, Ex. I at 1, lines 24, 27, "Joint Stipulation Re: Goodrich Corporation's and Pyro

28

3

Gibson, Dunn &
Crutcher LLP

Spectaculars, Inc.'s Notice of Motion and Motion to Compel Supplemental Responses to Interrogatories" (hereafter "Joint Stipulation").

With regard to Interrogatories 1 and 2, Goodrich dedicates more than 20 pages of argument rehashing the same contentions – almost verbatim – that they made in the May 2011 Joint Stipulation, cluttering the record with dozens of the same exhibits, most of which have no relevance to the motion and none of which undermine the validity of DoD's responses in February 2011.  At bottom, Goodrich complains that additional information has emerged during the course of discovery, including the ongoing production of Army personnel files, that they believe should be reflected in the DoD's responses to Interrogatories 1 and 2.  Goodrich cannot deny, however, that it has been aware of the possibility of obtaining World War II-era personnel information from publicly available sources for more than two years, and that DoD has provided further Army personnel information through depositions and document productions during the months since the Interrogatory responses were served.  In these circumstances, the case law is clear that there is no obligation under Rule 26(e) to supplement discovery with information that is "otherwise made known" during the litigation.  See Westefer v. Snyder, 422 F.3d 570, 584 (7th Cir. 2005) (amending an interrogatory response is not required when additional information was "otherwise" provided in a motion); K&N Eng., Inc. v. Spectre Performance, 2011 WL 4387094, at *16 (C.D. Cal. Sept. 20, 2011) (concluding that there was no violation of Rule 26(e) where a party provided information through deposition testimony) (Phillips, J.); McKesson Information Solutions, Inc. v. Bridge Medical, Inc., 434 F.Supp.2d 810, 813 (E.D. Cal. 2006) (denying a motion to exclude witnesses whose names were not explicitly disclosed, but were identified in the party's document production or discussed at depositions).

Nor does the fact that additional information has become available regarding the names of Army personnel at the Rialto Ammunition Backup Storage Point ("RABSP")

4

Gibson, Dunn &
Crutcher LLP

during World War II establish that the Interrogatory responses were evasive or incorrect when DoD served them in February 2011.  Goodrich's argument depends on the inappropriate use of hindsight, coupled with overblown rhetoric and baseless "cover up" accusations.  The Federal Rules of Civil Procedure recognize that a party's knowledge may evolve as discovery progresses and they endorse a pragmatic approach to supplementation.  See Fed. R. Civ. P. 26(e).  The advisory committee comments to the 1993 Amendments to Rule 26 explain: "Supplementation need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period. . . ."  See Whitlow v. Martin, 2008 WL 4822054, at *1-2 (C.D. Ill. Oct. 28, 2008) (denying motion to strike supplemental disclosures of witnesses).  Goodrich seems to believe that supplementation of Interrogatory responses is required after every deposition and after every document is produced, which is patently unreasonable and contrary to Rule 26(e).

Moreover, Goodrich timed the instant motion to disrupt, not facilitate, DoD's substantial efforts to provide personnel information.  Goodrich mentions only in passing that DoD is "in the middle of a rolling production of unit rosters, morning reports, and personnel files" for the 622nd Ordnance Ammunition Company, the 261st Ordnance Maintenance Company, and the 3183rd Quartermaster Service Corps.  See Gentry Decl., ¶ 9, Ex. I at 2, lines 9-12, Joint Stipulation.  With assistance from the National Archives and Records Administration's ("NARA") National Personnel Records Center in St. Louis, DoD has been collecting and producing information in compliance with the production timetable set forth in the Special Master's September 26, 2011 Order, which contemplates completion by November 4, 2011.  See Gentry Decl., ¶ 10, Ex J, Special Master Venetta Tassopulos' order dated September 26, 2011 (hereafter the "September 26 Order").

Based on the additional information that soon will be forthcoming, DoD made a clear commitment to supplement the response to Astro's Interrogatories 1 and 2 during

5

Gibson, Dunn &
Crutcher LLP

1   the parties' meet and confer session on October 4, 2011. Even so, Goodrich

2   misleadingly contends that DoD "refused" to supplement these responses. <u>See</u> Gentry

3   Decl., ¶ 9, Ex. I at 21, line 25, Joint Stipulation. The October 4 meet and confer

4   transcript demonstrates that DoD's counsel *twice* stated that DoD would supplement

5   Interrogatories 1 and 2 upon completion of the document production in early

6   November. <u>See</u> Gentry Decl. ¶ 11, Ex. K at 8:1-3 ("once that process is complete

7   we're amenable to supplementing the response to one and two to make reference to the

8   materials that are provided"); <u>id</u>. at 12:13-18 ("Now as I said obviously we have more

9   information than we did in February and that's why . . . what I've proposed is to

10  supplement 1 and 2 . . in due course after the production is complete which is going to

11  be under the special master's order ... basically, the first week of November"). <u>See</u>

12  <u>Baxter Healthcare Corp. Fresenius Medical Care Holding, Inc.</u>, 2009 WL 904152, at

13  *3 (N.D. Cal. Apr. 2, 2009) (finding that a party timely supplemented its interrogatory

14  responses after a "flurry of activity" before final discovery deadline).

15      There is no excuse for Goodrich's failure to advise the Special Master of DoD's

16  agreement to provide a supplemental response to Astro's Interrogatories 1 and 2 in

17  their 30 pages of argument. The motion to supplement these Interrogatories was not

18  only unnecessary but appears calculated to distract DoD from collecting responsive

19  information in compliance with the Special Master's deadline. Accordingly, the

20  Special Master should deny the motion with respect to Interrogatories 1 and 2.

21      Similarly, there is no merit to the allegation that DoD's responses to

22  Interrogatories 13 through 16 were evasive, inaccurate, or incomplete. Goodrich's

23  argument hinges on the false accusations that: (1) Mr. Stanley Bauer was not consulted

24  prior to drafting DoD's responses, and (2) Mr. Jerry Vincent, who formulated DoD's

25  responses, did not follow the process Goodrich claims Mr. Bauer would have followed.

26  Mr. Jerry Vincent testified that he was consulted regarding DoD's responses to

27  Interrogatories 13 through 16. Goodrich deposed Mr. Vincent over a period of two

28

6

Gibson, Dunn &
Crutcher LLP

days in May 2011, during which Mr. Vincent explained the process by which he assisted in drafting DoD's responses, including consultation with Mr. Bauer. See Gentry Decl., ¶ 14, Ex. N at 292:6-299:16 ("He [Mr. Bauer] referred me to the areas that discussed engines and trains and ground activities. In other words, there's no reason to read all 7,000 tech manuals on aircraft, aircraft maintenance when there was no aircraft out at Rialto. So he helped me refine the areas that I needed to look at."). Mr. Vincent's participation in the process of developing DoD's responses aligns precisely with Mr. Bauer's. Moreover, Mr. Vincent, who is the Chief of Base Closure and Realignment ("BRAC")/FUDS Section, United States Army Corps of Engineers, Sacramento District, was the appropriate person within DoD to assist in crafting DoD's Interrogatory responses, a conclusion with which Mr. Bauer agrees. See Bauer Decl., ¶ 8.

Because the instant motion to compel supplemental responses should be denied, the Court also must reject Goodrich's demand for attorneys' fees and costs. Goodrich has two attorneys billing at rates of $910 and $515 per hour and alleges to have run up a bill of more than $100,000 in fees and costs, primarily for taking five depositions and drafting previous motions. See Gentry Decl., ¶ 9, Ex. I at 30, Joint Stipulation; see also Declaration of Patrick Dennis ("Dennis Decl.") ¶¶ 48-53. Goodrich's assertion that these are "reasonable" fees is absurd. Notably, Pyro has made no claim for attorneys' fees and expenses in connection with the motion, and it is Astro's Interrogatories that are at issue, not Goodrich's discovery. Goodrich has provided no legal authority for the proposition that it has standing or is otherwise entitled to recover costs associated with Astro's discovery.

In addition, DoD's response to the instant motion to compel demonstrates that its positions are well founded. By contrast, the Special Master already has rejected Goodrich's claims for the requested fees and costs in connection with prior motions. Goodrich failed to note that it previously sought some of the same costs it demands

7

Gibson, Dunn & Crutcher LLP

again here, simply rehashing the same arguments that were previously found insufficient by the Special Master.  Moreover, the fact that Goodrich has aggressively pursued depositions of Army witnesses and has chosen to conduct them as part of its defense in no way justifies shifting Goodrich's excessive litigation costs to the United States.  In sum, the Special Master should reject Goodrich's exorbitant demand for attorneys' fees and costs in its entirety.

## III.

### THE MOVING PARTIES' STATEMENT OF FACTS

**A.     Nature of Discovery at Issue in the Interrogatories**

In the Interrogatories, the Moving Parties sought discovery from the United States regarding the identities of the Army personnel who served at the RABSP when the United States Army used it as a storage facility for ordnance and military fireworks to be shipped from the Los Angeles Port of Embarkation ("LAPE") to the Pacific Theater during World War II.  The men and women who served at the RABSP during World War II are the primary percipient witnesses regarding the activities of the Army at RABSP during World War II, including the Army's use and potential releases of perchlorate and trichloroethylene ("TCE").  Thus, identifying them and obtaining their testimony is critical.  Further, given the age of the men and women who served at the RABSP during World War II, identifying and locating any last surviving Army personnel who served at the RABSP is urgent.

In addition, the Moving Parties sought discovery in the Interrogatories regarding the United States' use and potential releases of TCE at the RABSP.  TCE was commonly used by the United States as a solvent during World War II to clean rifles, which were shipped from manufacturers to places like the RABSP for distribution and came packed in a heavy grease.  (*See* TB 9-850-18 War Department Technical Bulletin: Degreasing of Small Arms, May 1945, at US047738 ("Vapor degreasers

8

Gibson, Dunn &
Crutcher LLP

using trichloroethylene are suitable for cleaning all types of small arms.") (attached as Ex. A to Dennis Decl.); Support Service Operation Report Small Arms and Artillery Materiel Maintenance (CO-16), September 2005, at US050644 (common operations report produced by United States Army Corps of Engineers ("Army Corps") citing to same provision in TB 9-850-18) (attached as Ex. B to Dennis Decl.).)  Veterans who served at the RABSP have testified that they used solvents to clean Cosmoline off guns at the RABSP, and documents from World War II make clear that TCE was one of the solvents used to clean heavy grease off guns during the war.  (*See* 5/27/2010 Deposition of James Bond Volume I, at 30:23-31:1 (attached as Ex. C to Dennis Decl.); 6/2/10 Deposition of Orval Potter Volume I, at 52:15-20 (attached as Ex. D to Dennis Decl.).  *See also* Trichlorethylene and Perchlorethylene, Tentative Supply-Requirements Program for 1944, War Production Board Chemicals Division, January 3, 1944 (showing a requirement of approximately 203,000,000 pounds of TCE for "[m]etals degreasing" in 1944) (attached as Ex. E to Dennis Decl.).)

        In addition, available evidence indicates locomotive maintenance was performed at the RABSP, (*see* General Plot Plan, August 1942, SHR 0771 (map showing a locomotive shop at the RABSP in 1942) (attached as Ex. F to Dennis Decl.)), and locomotive maintenance typically involves solvents such as TCE.  (*See* Site Survey Summary Sheet for DERP-FUDS Site No. J09CA058499, San Bernardino Engineering Depot, San Bernardino, California, July 12, 1993 (noting that "[t]he U.S. Army used solvents in the railcar and tank degreasing operation") (attached as Ex. G to Dennis Decl.); Support Service Operation Report Locomotive Maintenance (CO-20), July 2005, at US051091 (common operations report produced by Army Corps citing to technical manual on locomotives instructing to "[c]lean parts with solvent, dry cleaning or with oil, fuel, Diesel" prior to lubrication) (attached as Ex. H to Dennis Decl.).)

9

Gibson, Dunn &
Crutcher LLP

1    Other activities at the RABSP that could have involved the use of TCE include:

2    (1) motor vehicle maintenance (*see* Support Service Operation Report Vehicle

3    Maintenance (CO-17), February 2005, at US050793-94 (common operations report

4    produced by Army Corps citing to 1943 and 1944 technical manuals instructing that

5    vehicles should be cleaned used dry-cleaning solvents) (attached as Ex. I to Dennis

6    Decl.)); and (2) fire extinguisher operation and maintenance.  (*See* Support Service

7    Operation Report Fire Fighting (CO-6), May 2006, at US049877 (common operations

8    report produced by Army Corps citing to non-military source stating that

9    "[c]ommercial fire-extinguishing fluid with a carbon tetrachloride base contains

10    approximately 10% chloroform or trichloroethylene, which serves to lower the

11    freezing point of the mixture to -50 degrees F") (attached as Ex. J to Dennis Decl.).)

12    Finally, the Moving Parties sought discovery in the Interrogatories regarding the

13    United States' waste handling practices.  Historical documents have referred to

14    damaged material being sent to the RABSP to be "recoopered or destroyed," and

15    veterans who served at the RABSP have referred to white powder, likely from

16    damaged munitions, being swept out of rail cars directly onto the ground at the

17    RABSP.  (*See* Records Reproduced from the Holdings of the National Archives and

18    Records Administration Pacific Region (Laguna Nigel), at US038883 ("Damaged

19    material is sent to Rialto Ammunition Back-Up Storage Area where it is recoopered or

20    destroyed.") (attached as Ex. K to Dennis Decl.); *see also* 5/27/2010 Deposition of

21    James Bond Volume I, at 28:13-16) (attached as Ex. C to Dennis Decl.).)  In addition,

22    historical documents refer to shipments being rejected at the LAPE for overseas

23    shipment because they were damaged.  (*See, e.g.,* Review of the Port Ordnance Office,

24    Los Angeles Sub-Port of Embarkation and its activities and Functions for the Period

25    Ending March 31, 1943, May 12, 1943, at SHR01145 ("The only item completely

26    rejected [for shipment overseas] and destroyed was approximately 100 pounds of

27    smokeless powder which was packed in 25-pound powder cans.  These cans were

28

10

Gibson, Dunn &
Crutcher LLP

1  crushed and broken open to such an extent that the powder had sifted out between the

2  stack of cans on to the floor of the car.") (attached as Exhibit L to Dennis Decl.).)

3  Finally, maps and layout plans of the RABSP refer to a sludge bed, a sewage plant, an

4  incinerator, and a burn pit in use at the RABSP.  (*See, e.g.,* Los Angeles Back-Up

5  Storage Facility Ammunition Back-Up Storage Fontana, California General Layout

6  Plan, April 1946 (attached as Exhibit M to Dennis Decl.).)

7  **B.    The Interrogatories and the United States' Responses**

8         On February 2, 2011, the United States provided verified responses and

9  objections to the Interrogatories, which had been served nearly a year earlier on April

10  1, 2010.  (Dennis Decl. ¶ 17, Ex. N.) The responses to Interrogatories 1, 2, 13, 14, 15,

11  and 16 are at issue in this motion.

12         Interrogatory 1 asked the United States to "IDENTIFY all surviving members of

13  the 622nd Ordnance Ammunition Company stationed at the RABSP from

14  approximately March 1943 to July 1943," including a long list of attached names.  (*Id.*

15  at 5.)  The United States objected that the request was "overly broad and unduly

16  burdensome" and "vague and ambiguous particularly to the extent that it relates to

17  surviving members."[3]  (*Id.*) The United States pointed to its efforts to locate

18  individuals in 2004 for the Final Report Operational History 1941-1945 Rialto

19  Ammunition Back-Up Storage Point (the "SAIC Report") produced by Science

20  Applications International Corporation ("SAIC") and identified Ralph V. Thompson

21  and Aaron P. Holt, who were interviewed for and appear extensively throughout the

22  2004 Report.[4]  The United States also stated: "The United States does not maintain

23  records that would allow it to identify surviving servicemembers based on the name of

24  
25  [3]  In each interrogatory response, the United States also incorporated its general objections.

26  [4]  The SAIC Report was partially produced in this case years ago and has been a focal

27  point of discovery for the Moving Parties.

28  

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn & Crutcher LLP

the unit individuals served in during World War II such as the 622nd Ordnance Ammunition Company." (*Id.* at 6.)

Interrogatory 2 asked the United States to "IDENTIFY all surviving U.S. Army officers stationed at the RABSP from 1941 to 1946." (*Id.* at 7.) The United States made virtually identical objections as it did to Interrogatory 1, and again stated: "The United States does not maintain records that would allow it to identify the surviving servicemembers based on the name of the duty station during World War II such as the RABSP." (*Id.*)

Interrogatory 13 asked the United States to "DESCRIBE all facts REGARDING YOUR use of TCE during World War II at the RABSP." (*Id.* at 15.) The United States objected that the request was "vague and ambiguous to the extent it relates to 'use' of TCE" and stated that the United States "is not aware of any evidence of TCE use at the RABSP during World War II." (*Id.*)

Interrogatory 14 asked the United States to "DESCRIBE all facts REGARDING YOUR waste handling and DISPOSAL practices during World War II at the RABSP." (*Id.*) The United States objected to the request as overly broad, unduly burdensome, not related to the claim or defense of any party to this litigation, and vague and ambiguous. The United States pointed to the testimony of Robert Weyand and Mr. Holt in the SAIC Report that "small quantities of damaged wood bracing, or dunnage, was burned on occasion in the area of the RABSP." (*Id.*) The United States further stated that it "is not aware of any evidence of 'waste handling or disposal' of any contaminants of concern at the RASBP during WWII." (*Id.*)

Interrogatory 15 asked the United States to "DESCRIBE all facts REGARDING YOUR handling and DISPOSAL practices for TCE during World War II at the RABSP." (*Id.* at 16.) The United States objected to the request as vague and ambiguous and stated that "it is not aware of any evidence of TCE use, handling, or disposal at the RABSP during World War II." (*Id.*)

12

Gibson, Dunn &
Crutcher LLP

Interrogatory 16 asked the United States to "DESCRIBE all facts REGARDING YOUR handling and DISPOSAL practices for ORDNANCE (whether DAMAGED or otherwise) during World War II at the RABSP." (*Id.*)  The United States objected to the request as vague and ambiguous and stated that "ammunition was to be safely handled according to the following standard operating procedure: (1) Segregate cars to conform with quantity - distance safety factors. (2) Provide security protection. (3) Open and inspect cars for condition of lading and evidence of sabotage. Recooper broken cases. Correct defective lading. (4) Notify Ordnance Officer or Chemical Warfare Officer respectively, of any overage, shortage, or damage of ammunition. (5) Close car doors, and securely affix numbered seals before release to the [LAPE] area. (6) Notify Port Transportation Division, Ammunition Inspection Section, Ordnance Office, and/or Chemical Office, as pertains, by the most expeditious means, of the car numbers, seal numbers, and expected and actual time of departure of ammunition from Rialto." (*Id.* at 16-17.)

Joshua Holmes, Assistant District Counsel of the Army Corps, signed a verification on February 2, 2011 "on behalf of the U.S. Army Corps of Engineers, that the factual assertions in the foregoing responses to Interrogatory No. 1, to the extent it relates to the Final Report Operation History, and Nos. 3-16 are true and correct to the best of [his] knowledge." (*Id.* at 18.)  Carrie Greco, Litigation Attorney of the Army Environmental Law Division, signed a verification on February 2, 2011 "on behalf of the U.S. Army, that the factual assertions in the foregoing responses to Interrogatory No. 1, except to the extent it relates to the Final Report Operational History, and No. 2 are true and correct to the best of [her] knowledge." (*Id.*)

## C.     The United States' Conduct in Responding to the Requests for the Depositions of Mr. Holmes and Ms. Greco

On February 7, 2011, Goodrich asked the United States to be prepared to discuss deposition dates for Mr. Holmes and Ms. Greco during an upcoming deposition setting

13

Gibson, Dunn & Crutcher LLP

conference call.  (Dennis Decl. ¶ 18, Ex. O.)  On February 11, 2011, the parties held a deposition setting conference call, but the United States was not prepared to discuss dates for Mr. Holmes and Ms. Greco.  (*Id.* ¶ 19.)  On February 16, 2011, Mr. Augustini sent an email to Mr. Dennis stating that he did not yet have authorization to provide dates because Mr. Holmes and Ms. Greco are attorneys.  (*Id.* ¶ 20, Ex. P.)  On February 18, 2011, Mr. Dennis responded that Goodrich was seeking dates for the depositions of Mr. Holmes and Ms. Greco based on their certifications of the interrogatory responses on behalf of the Army and the Army Corps.  (*Id.*)  On February 22, 2011, Goodrich posted a letter memorializing these emails.  (*Id.* ¶ 21, Ex. Q.)

On March 4, 2011, the United States stated its position that Goodrich had not made the required showing to take the depositions of Mr. Holmes and Ms. Greco and that it would identify alternative, non-attorney witnesses who could testify regarding the issues addressed in the interrogatory responses.  (*Id.* ¶ 22, Ex. R.)  On March 8, 2011, Goodrich responded that it was entitled to take the depositions of the verifiers of interrogatory responses to ask questions regarding their knowledge of the facts underlying the verification.  (*Id.* ¶ 23, Ex. S.)

On March 10, 2011, the parties held a meet and confer, in which the United States identified three alternative witnesses—Stanley Bauer, Dean Hiza, and Gerald Vincent—to testify regarding the interrogatory responses.  (*Id.* ¶ 24, Ex. T at 7-8.)  Goodrich reserved the right to seek the depositions of Mr. Holmes and Ms. Greco as the verifiers of the interrogatory responses but agreed to take the depositions of the three alternative witnesses first.  During the call, Goodrich asked why the United States did not have the alternative witnesses verify the interrogatory responses, to which Mr. Augustini, representing the United States, responded, "You know, I think that they probably could have verified them."  (*Id.* at 27:16-21.)

Gibson, Dunn & Crutcher LLP

**D.     Depositions of Dean Hiza, Stanley Bauer, and Gerald Vincent**

The Moving Parties deposed Mr. Bauer on April 26 and 27, 2011 in Omaha, Nebraska, Mr. Hiza on April 28, 2011 in Louisville, Kentucky, and Mr. Vincent via teleconference on May 17 and 18, 2011 because he is currently deployed in Afghanistan.  (Dennis Decl. ¶¶ 25, 26, 28.)  Based on the United States' position in the meet and confer call on March 10, 2011 that it would only make Mr. Bauer and Mr. Hiza available in Omaha and Louisville respectively, three attorneys representing the Moving Parties and three attorneys representing other defendants flew from California to participate in these depositions.  (*Id.* ¶ 27.)  One additional attorney flew from Maryland.  (*Id.*)

**1.     Testimony of Dean Hiza**

Mr. Hiza is the Senior Human Resource Specialist within the Army Human Resources Command.  (Dennis Decl. ¶ 25, Ex. U at 17:18-20.)  He testified that he believes he is the most knowledgeable person within the Army at determining the identity and locating the men and women who served during World War II.  (*Id.* at 158:12-159:13.)

At his deposition, Mr. Hiza introduced as Exhibit 197 a timeline he created of his involvement in this litigation, which he titled "Timeline of Dean Hiza's Involvement in Rialto Case."  (*Id.* ¶ 29, Ex. X.)  The timeline reflects, and Mr. Hiza testified, that March 2, 2011 (one month after the interrogatory responses and verifications were served) was the first time he ever saw or received the Interrogatories, saw any of the names listed in Interrogatory 1, or became aware of this litigation.  (*Id.* ¶ 25, Ex. U at 17:3-10; 54:1-4; 58:7-14.)  He received the Interrogatories from Ms. Greco.  (*Id.* at 54:5-13.)

With respect to individuals who served in the Army during World War II, Mr. Hiza testified that the National Personnel Records Center ("NPRC") in St. Louis, Missouri maintains an electronic registry database that specifies the locations of any

15

Gibson, Dunn &
Crutcher LLP

hard copy personnel records for an individual.  (*Id.* at 26:24-27:8.)  He said that authorized personnel can input an individual's name or serial number, determine whether any hard copy files pertaining to that individual exist, and locate those files. Then that party can order those hard copy personnel files, and they will be sent to him or her.  (*Id.* at 99:3-5.)  Mr. Hiza does not believe that this database is available for public access.  (*Id.* at 28:7-9.)

      Upon receiving the list of names in Interrogatory 1 on March 2, 2011, Mr. Hiza took two steps to attempt to locate last known addresses and Army Records.  First, on March 16, 2011, he submitted an email request to personnel with access to the Department of Defense Finance and Accounting System ("DFAS"), a database that contains contact information for soldiers who retired from the Army and are receiving retirement pay.  (*Id.* at 45:12-22; 47:3-15; 48:12-22; *id.* ¶ 30, Ex. Y.)  In his request, he asked for a search in the DFAS database to locate any soldiers listed in Interrogatory 1, which he attached to the email.  Ultimately, Mike Dobrzanski with DFAS responded with an address for Billy Neal, a name found in the DFAS database that appeared in Interrogatory 1 and had a pay entry date in 1943.  (*Id.* ¶ 30, Ex. Y.)

      Second, Mr. Hiza instructed Sergeant Brenda Ozelie, on his behalf, to submit an email request to the NPRC.  In the email, she asked for "Morning Reports" for the 622nd Ordnance Ammunition Company.  (*Id.* ¶ 31, Ex. Z; ¶ 25, Ex. U at 31:5-23.)  She submitted the request on March 25, 2011.  (*Id.* ¶ 31, Ex. Z.)  Mr. Hiza clarified in his deposition that he had intended for Sergeant Ozelie to request unit rosters rather than morning reports for the 622nd Ordnance Ammunition Company, which are lists of names and serial numbers of members of a particular unit that are located in the NPRC.5  (*Id.* ¶ 25, Ex. U at 89:23-90:8.)  Then he could use the serial numbers to

---

5  Mr. Hiza further testified that the 621st Ordnance Maintenance Company and the Ninth Service Command, both of which were identified in the SAIC Report as units
[Footnote continued on next page]

16

Gibson, Dunn &
Crutcher LLP

search for personnel records for that individual.  (*Id.* at 85:22-86:12.)  The request for morning reports was denied, and Mr. Hiza did not follow up.  (*Id.* ¶ 31, Ex. Z; *id.* ¶ 25, Ex. U at 93:25-94:6.)  Ultimately, Mr. Hiza determined that he needed cross-reference information such as an Army serial number, because searching for records with only a name could produce multiple records.  (*Id.* ¶ 25, Ex. U at 84: 21-23.)

Shortly before March 25, 2011, Sergeant Ozelie received a spreadsheet from Mr. Holmes containing the names, serial numbers, and rank of nine officers who served at the RABSP.  (*Id.* at 68:2-17; *id.* ¶ 32, Ex. AA.)  These officer names were not provided in the United States' verified response to Interrogatory 2, and Mr. Hiza had no idea how Mr. Holmes obtained the names of the nine officers.  (*Id.* ¶ 17, Ex. N at 7; *id.* ¶ 25, Ex. U at 116:1-5, 9-15.)  Mr. Hiza and Sergeant Ozelie used the serial numbers to locate and request records from the NPRC, reviewed the records, and created a spreadsheet that included a last known address for six out the nine officers.  (*Id.* ¶ 25, Ex. U at 87: 15-20; *id.* ¶ 33, Ex. BB.)

On approximately April 15, 2011, Sergeant Ozelie received a spreadsheet from Mr. Holmes containing the names, serial numbers, enlistment date, and rank of the majority, but not all, of the soldiers identified in Interrogatory 1.  (*Id.* ¶ 25, Ex. U at 97:19-25; 103: 15-23; 107: 5-10; *id.* ¶ 34, Ex. CC.)  Mr. Hiza did not know how Mr. Holmes got the serial numbers of these soldiers.  (*Id.* ¶ 25, Ex. U at 98: 1-3.)   Mr. Hiza did not know why some of the names listed in Interrogatory 1 were not listed in the spreadsheet that Mr. Holmes sent to Mr. Hiza or how Mr. Holmes decided on what names to include in the spreadsheet.  (*Id.* at 112:4-22.)  Mr. Hiza simply took the serial numbers that were sent to him, and, along with Sergeant Ozelie, used them to locate and request records from the NPRC, reviewed the records, and created a spreadsheet

---

[Footnote continued from previous page]
stationed at the RABSP, are the types of units for which the NPRC could run a search that may produce a unit roster.  (*Id.* ¶ 25, Ex. U at 138:21-139:4; 144:5-13.)

17

Gibson, Dunn & Crutcher LLP

1  that included a last known address for many of the soldiers.  (*Id.* at 98:3-7, 16-18;

2  99:3-5; 112:23-113:3; *id.* ¶ 35, Ex. DD.)

3       Sometime before April 21, 2011, Sergeant Ozelie received additional serial

4  numbers from Mr. Holmes for names on the spreadsheet for which the original serial

5  numbers sent by Mr. Holmes were incorrect.  (*Id.* ¶ 25, Ex. U at 108:14-109:15.)   Mr.

6  Hiza did not know how Mr. Holmes obtained these alternate serial numbers.  (*Id.* at

7  109: 16-17.)

8       The DoJ attorney representing Mr. Hiza at the deposition objected each time

9  Goodrich asked about communications between Ms. Greco or Mr. Holmes and Mr.

10  Hiza and instructed Mr. Hiza not to answer.[6]  (*See, e.g., id.* at 68:18-69:13.)  Thus, the

11  Moving Parties were unable to obtain information any regarding the instructions Mr.

12  Hiza was given or how he responded to them.

13       **2.       Testimony of Stanley Bauer**

14       Mr. Bauer is the Formerly Used Defense Sites ("FUDS") Potentially

15  Responsible Party ("PRP") Program Support Manager.  (Dennis Decl. ¶ 26, Ex. V at

16  148:20-23.)  He testified that he believes he is the most knowledgeable person in his

17  department regarding historical records from World War II.  (*Id.* at 235:14-19.)  He has

18  been deposed seven times, often as a Fed. R. Civ. P. 30(b)(6) witness in cases

19  involving TCE and/or perchlorate contamination at FUDS.  (*Id.* at 151:10-156:25.)

20       Mr. Bauer testified that he was consulted with regard to the responses to

21  Interrogatories 3 through 12, but not with regard to the responses to Interrogatories 1,

22  2, 13, 14, 15, or 16.  (*Id.* at 13:11-19:11; 199:17-200:2.)  Mr. Bauer did not draft the

23  language in any of the responses, and he did not review any of the responses before

24

25  [6] In fact, the DoJ attorney representing Mr. Hiza even objected and instructed Mr.
26  Hiza not to answer when Goodrich asked foundational questions, such as when Mr.
    Hiza first heard about this case and when he communicated with Ms. Greco and Mr.
27  Holmes.  (*Id.* ¶ 25, Ex. U at 55:5-56:22; 57:14-20.)

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

they were served.  (*Id.* at 167:6-168:20.)  Mr. Bauer reviewed only two documents in providing input for the interrogatory responses—the document referenced in the responses to Interrogatories 3, 5, 7, 9, and 11, and a document that Mr. Bauer believed may have been responsive to Interrogatories 4, 6, 8, 10, and 12.  (*Id.* at 15:6-19:11.)

After Mr. Bauer became aware that he was going to be deposed in this case, he looked for technical orders that he thought may be applicable to operations at the RABSP and that he would have consulted had he been asked regarding responses to Interrogatories 13 through 16.  He indicated that a few of these technical orders were produced to the parties in this action after he became aware that he was going to be deposed regarding this site.  (*Id.* at 108:10-22.)

Mr. Bauer testified that if he were trying to determine whether degreasing of small arms at the RABSP involved the use of TCE vapor degreasers, he would go back to the World War II Army technical manuals and field manuals for the weapon to see if they allowed degreasing in this manner.  Then he would try to find a list of equipment at the base and would look for vapor degreasers.  (*Id.* at 71:22-72:21.)  If he were trying to evaluate whether TCE was used in locomotive maintenance or vehicle maintenance, he would review the relevant technical manual in the 55 series and the nine series respectively.  (*Id.* at 179:10-20.)  If he were trying to determine how damaged ordnance was handled, he would consult the relevant technical manuals in the nine series.  (*Id.* at 181:6-9.)  The responses to Interrogatories 13 through 16 make no reference to any technical manuals.  (*Id.* ¶ 17, Ex. N at 15-17.)  Mr. Bauer also testified to his belief that the SAIC Report and the 1995 Archives Search Report on The Rialto Ammunition Storage Point produced by the Huntsville Division of the Army Corps did not evaluate whether TCE was used at the RABSP.  (*Id.* ¶ 26, Ex. V at 246:5-13.)

### 3.    Testimony of Gerald Vincent

Mr. Vincent is the former FUDS Section Chief for the Sacramento District of the Army Corps.  (Dennis Decl. ¶ 28, Ex. W at 15:15-18.)  He testified that he was

19

Gibson, Dunn & Crutcher LLP

consulted with respect to Interrogatory 1, but he did not attempt to locate any of the individuals identified in the Interrogatory. (*Id.* at 48:21-49:22.)  All he did was review the SAIC Report and repeat the names of the two members of the 622nd Ordnance Ammunition Company who were interviewed for the SAIC Report.[7]  (*Id.* at 48:21-49:22, 61:2-11.)  Mr. Vincent never contacted the NPRC or anyone within the United States who specializes in personnel records, such as Dean Hiza.  (*Id.*)  Likewise, with respect to Interrogatory 2, all Mr. Vincent did before concluding that the United States did not maintain such records was review the SAIC Report.  (*Id.* at 61:12-63:8.)

Meanwhile, with regard to Interrogatories 13 through 16, Mr. Vincent testified that he was consulted in helping to prepare the responses.  However, he gave contradictory testimony regarding the steps he took in assisting in the responses.  At one point, Mr. Vincent testified that he contacted Mr. Bauer to obtain general guidance with respect to which documents to review regarding TCE usage during World War II in helping to prepare responses to Interrogatories 13 and 15,[8] but did not give Mr. Bauer any indication why he needed to consult these documents nor tell Mr. Bauer that he was responding to interrogatories.  (*Id.* at 292:12-295:23.)  At another point, Mr. Vincent testified that he never asked Mr. Bauer to provide any documents, such as the relevant Common Operations Reports, in connection Mr. Vincent's work on the RABSP.  (*Id.* at 100:12-101:2.)  Mr. Vincent also testified that the statement of work governing SAIC's investigation at the RABSP would have provided for the investigation of all hazardous substances, including TCE, and SAIC's investigation of

---

[7] Since the SAIC Report was partially produced in this case years ago and has been a focal point of discovery, the Moving Parties have been aware of the identities and locations of these two men for years.

[8] Mr. Vincent did not claim to consult Mr. Bauer with regard to Interrogatories 14 and 16.

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn & Crutcher LLP

1  the operational history of the RABSP would have captured any TCE usage.[9]  (*Id.* at

2  105:1-21; 298:12-299:22.)

3       As in the depositions of Mr. Bauer and Mr. Hiza, the DoJ attorney representing

4  Mr. Vincent objected to all questions regarding communications between Ms. Greco or

5  Mr. Holmes and Mr. Vincent regarding the preparation of the interrogatory responses

6  and instructed Mr. Vincent not to answer.  (*See id.* at 288:21-23 ("I will continue to

7  assert an objection with respect to the communications between any attorney and Mr.

8  Vincent in the preparation of the interrogatories.").)

9  **E.    Depositions of Carrie Greco and Joshua Holmes**

10      After the Moving Parties took the depositions of the three alternative witnesses

11  offered by the United States, the Special Master denied the United States' motion for

12  protective order to prevent the depositions of the verifiers, Ms. Greco and Mr. Holmes,

13  from proceeding.  (*Id.* ¶ 36, Ex. EE.)  On June 22, 2011, the Special Master found that

14  the three alternative depositions "raised a significant number of questions about how

15  the original responses were formulated, as well as how the supplemental information

16  regarding Army personnel which Mr. Hiza received from Mr. Holmes was gathered."

17  (*Id.*)  The Special Master continued:

18       It is clear that only the attorneys who verified the original interrogatory
19       responses can answer questions concerning how the information stated in
         the responses, as well as how the further information subsequently
         provided to Mr. Hiza regarding Army personnel, was gathered.
20       Furthermore, ***only the attorneys can answer questions concerning why***

21  _____

22  9 To the contrary, the scope of work for SAIC's investigation of the RABSP, which
    was produced pursuant to a subpoena to SAIC after Mr. Vincent's deposition,
23  specifically limited the objective of the investigation to "focus on historic
    operations at the site which could be a source of perchlorate contamination in the
24  groundwater."  (Dennis Decl. ¶ 41, Ex. LL at SA0183.)  In addition, Tawny Tran,
    the Project Manager for the Army Corps who drafted the scope of work and
25  oversaw SAIC's limited investigation of the RABSP, confirmed that SAIC was
    only instructed to focus on perchlorate and that SAIC did not investigate potential
26  uses or releases of TCE by the Army during World War II.  (*Id.* ¶ 42, Ex. MM at
    75:23-76:6; 161:3-5; 164:4-168:8.)

27

28
                                        21

Gibson, Dunn &
Crutcher LLP

*each of the leading experts in the fields addressed by the interrogatories was not consulted prior to the submission of the interrogatory responses, but were subsequently offered to Goodrich and PSI as witnesses who could testify about the responses after the responses had been made.*

(*Id.*) (emphasis added.)

As a result of this Order, Ms. Greco was deposed on August 31, 2011, and Mr. Holmes was deposed on September 21, 2011.

### 1.    Testimony of Carrie Greco

Ms. Greco is a Litigation Attorney for the U.S. Army Legal Services Agency. (Dennis Decl. ¶ 37, Ex. FF at 13:9-15.)  She testified that she assisted in responding to Interrogatories 1 and 2.  (*Id.* at 23:16-18.)  Among the steps that Ms. Greco took was contacting the "St. Louis Personnel Records Center," which she identified at the NPRC.  (*Id.* at 34:8-9, 35:21-24.)  According to Ms. Greco, her point of contact at the NPRC, Barbara Bauman, told her that the NPRC had "service records" but that a social security number was necessary to obtain them.  Ms. Bauman also told her that the NPRC housed "unit rolls . . . that may have information."  (*Id.* at 34:8-14.)  Ms. Greco never attempted to obtain unit rolls for the 622nd Ordnance Ammunition Maintenance Company.  She communicated the information obtained from Ms. Bauman to Mr. Holmes at the Army Corps, who had primary responsibility over responding to the Interrogatories, and expected that Mr. Holmes would perform any necessary follow-up regarding the unit rolls.  (*Id.* at 34:8-18; 36:20-37:11.)

At the time Ms. Greco signed the interrogatory verifications, she had not looked at any records or unit rolls and had not heard of Mr. Hiza.  (*Id.* at 15:2-10; 43:13-14.)  Ms. Greco also testified that she has never heard of the DFAS database identified by Mr. Hiza and that she does not know how Mr. Holmes obtained the officer names and serial numbers that Mr. Holmes sent to Mr. Hiza.  (*Id.* at 49:10-12; 53:2-5, 15-23.)  In addition, Ms. Greco admitted that she does not know whether or not the statement in the interrogatory response, which she verified, is true that "[t]he *United States* does not

22

Gibson, Dunn & Crutcher LLP

1   maintain records that would allow it to identify surviving servicemembers based on the

2   name of the unit individuals served in during World War II." (*Id.* at 66:25-67:12)

3   (emphasis added.)  Finally, Ms. Greco testified that she has never provided a

4   verification to an interrogatory response other than the verification she provided to the

5   Interrogatories.  (*Id.* at 25:11-18.)

6          In direct violation of the Special Master's Order, the DoJ attorney representing

7   Ms. Greco objected to the very questions that the Special Master determined "only the

8   attorneys who verified the original interrogatory responses can answer." (*Id.* ¶ 36, Ex.

9   EE at 9.)  Namely, those were questions "concerning how . . . the further information

10  subsequently[ provided to Mr. Hiza regarding Army personnel[] was gathered . . . [and]

11  why each of the leading experts in the fields addressed by the interrogatories was not

12  consulted prior to the submission of the interrogatory responses, but were subsequently

13  offered to Goodrich and PSI as witnesses who could testify about the responses after

14  the responses had been made." (*Id.*; *see, e.g., id.* ¶ 37, Ex. FF at 22:9-22; 34:19-35:3;

15  69:17-70:10.)  For example, in direct violation of the Special Master's Order that the

16  verifiers testify regarding the information provided to Mr. Hiza after the verifications,

17  the DoJ attorney representing Ms. Greco prevented the following testimony:

18         Q. What did you send to Mr. Hiza?
           MR. AUGUSTINI: Ms. Greco, I'm going to instruct you not to answer
19         based on the attorney/client privilege and attorney work product doctrines.
           A. I'm going to assert the work product and attorney client
20         communication privilege.

21  (*Id.* at 47:21-48:2.)

22         **2.     Testimony of Joshua Holmes**

23         Mr. Holmes is Assistant District Counsel with the Sacramento District of the

24  Army Corps assigned to assist with PRP FUDS for the South Pacific Division.

25  (Dennis Decl. ¶ 40, Ex. II at 12:20-24; 19:15-17.)  He was given the assignment of

26  supporting the DoJ in the litigation involving the RABSP.  (*Id.* at 25:11-12.)  He has

27  never personally attempted to locate the names or identities of any witnesses, nor has

28

23

Gibson, Dunn &
Crutcher LLP

1    he ever attempted to reconstruct U.S. Army operations at any facility that operated

2    during World War II, and he has no expertise in locating World War II era historical

3    documents.  (*Id.* at 34:20-35:12; 43:13-19.)

4    In responding to Interrogatory 1, Mr. Holmes looked at the SAIC Report to

5    identify what steps SAIC had taken to locate personnel who worked at the RABSP.

6    However, he did not look at the scope of work for SAIC's investigation of the RABSP,

7    he did not call anyone at SAIC to determine what work had been performed, he did not

8    attempt to search for any Army records or determine what Army records SAIC had

9    located, and he did not solicit help from anyone within the United States who has

10   expertise in locating people who served in the Army during World War II.  (*Id.* at

11   50:8-12; 52:22-54:8; 58:6-9.)  Mr. Holmes indicated that he would be surprised to find

12   out that SAIC was limited to identifying a particular number of surviving

13   servicemembers because such a limitation "wouldn't make any sense."[10]  (*Id.* at 61:18-

14   62:25.)  Mr. Holmes had not heard of the NPRC before verifying the responses to the

15   Interrogatories, and he did not remember receiving information from Ms. Greco

16   regarding the information maintained at the NPRC, including information regarding

17   unit rolls.  (*Id.* at 56:19-25.)

18   In addition, Mr. Holmes testified that the two spreadsheets he provided to Mr.

19   Hiza after he verified and responded to the interrogatories—one of which contained

20   the names, serial numbers, and rank of nine officers who served at the RABSP and the

21   other of which contained the names, serial numbers, enlistment date, and rank of the

22   majority, but not all, of the soldiers identified in Interrogatory 1—was provided to him

23   by Leslie Hill, counsel for the DoJ.  (*Id.* at 68:18-69:5; 78:10-79:5.)  The alternate

24   serial numbers that he passed along to Mr. Hiza were also provided to him by DOJ

25   _____

26   [10]  In fact, the United States specifically limited SAIC's scope of work to interviewing
      only five people "who may provide information related to site operations during

27   DOD ownership."  (Dennis Decl. ¶ 38, Ex. GG at SA0184.)

28   
                                              24
─────────────────────────────────────────────
JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

attorneys.  (*Id.* at 82:9-22.)   He testified that he did not know how the DoJ attorneys obtained the information in the officer spreadsheet but that he did know how the DoJ attorneys obtained the information in the enlisted men spreadsheet.  (*Id.* at 69:6-70:2; 73:11-16; 80:19-21.)  However, in direct violation of the Special Master's Order regarding the scope of the deposition, the DoJ attorney representing Mr. Holmes objected to questions regarding "how the further information subsequently provided to Mr. Hiza regarding Army personnel[] was gathered," (*id.* ¶ 36, Ex. EE at 9), and Mr. Holmes refused to disclose how the DoJ obtained this information that he passed along to Mr. Hiza based on privilege objections and instruction from counsel:

> Q: Do you know how the Department of Justice obtained this information [in the spreadsheet sent to Mr. Hiza]?
> MS. RUSSELL: I'm going to instruct Mr. Holmes not to answer to the extent that it would reveal confidential attorney-client communications and work product.
> THE WITNESS: I can't answer because it would reveal attorney work product and attorney-client communication.

(*Id.* ¶ 40, Ex. II at 80:19-81:4.)  The Moving Parties still do not know how the DoJ attorneys obtained the information back in April regarding the identities of officers who served at the RABSP, nor how they obtained the Army serial numbers, enlistment dates, and ranks of the enlisted men in the 622nd Ordnance Ammunition Company.[11]  (*Id.* ¶ 41.)

Mr. Holmes also testified that he prepared the responses to Interrogatories 13, 14, 15, and 16.  In preparing responses to these Interrogatories, Mr. Holmes consulted with Mr. Vincent, as well as documents including the SAIC Report, the United States' Army Corps Archives Search Report on the RABSP, and certain historical documents cited in the SAIC Report.  Mr. Holmes was unable to identify any other documents he

---

[11] Also in direct violation of the Special Master's Order, Mr. Holmes would not answer questions regarding his discussions with Mr. Hiza after the Interrogatories were verified based on privilege objections and instruction from counsel.  (Dennis Decl. ¶ 40, Ex. II at 65:4-13.)

Gibson, Dunn & Crutcher LLP

consulted in responding to the Interrogatories, although he indicated that it was "possible" that he consulted other documents.  (*Id.* ¶ 40, Ex. II at 94:20-95:1.)  Before developing and verifying responses to Interrogatories 13 and 15 regarding TCE usage at the RABSP, Mr. Holmes did not know or make any effort to determine whether SAIC investigated TCE usage at the RABSP, he did not consult with Mr. Bauer, he did not know about the existence of the Army Corps' Common Operations Reports, and he did not conduct an investigation regarding whether vehicle maintenance, locomotive maintenance, or degreasing small arms at the RABSP may have used TCE.  (*Id.* at 91:11-93:1; 95:21-96:14; 99:4-12; 102:14-20.)  Based upon counsel's privilege objection and instruction, Mr. Holmes would not answer questions regarding the instructions he gave to Mr. Vincent when he asked Mr. Vincent to assist him in the preparation of the responses to Interrogatories 13-16.  (*Id.* at 105:14-23.)

**F.    The United States' Conduct in Refusing to Supplement its Interrogatory Responses**

On May 27, 2011, after completing the depositions of the three alternative witnesses, Goodrich asked the United States to supplemental its responses to Interrogatories 1, 2, 13, 14,15 and 16, because the witnesses' testimony made clear that the responses were incomplete, inaccurate, and improperly verified.  (Dennis Decl. ¶ 42, Ex. JJ.)  Goodrich highlighted for the United States which aspects of Mr. Bauer, Mr. Hiza, and Mr. Vincent's testimony were inconsistent with the interrogatory responses and which aspects directly contradicted the responses.  Goodrich also indicated that if the United States did not agree to supplement its responses and have them verified by appropriate individuals, the Moving Parties would be forced to bring a motion to compel pursuant to Federal Rule of Civil Procedure 37(a)(3)(B)(iii) and seek to recover reasonable fees and costs incurred in bringing the motion and in preparing for and taking the depositions of the three alternative witnesses.  (*Id.*)  The

26

Gibson, Dunn &
Crutcher LLP

1  United States did not respond to Goodrich's request but agreed to meet and confer on

2  the issue.

3       On June 7, 2011, the parties met and conferred, during which the Moving Parties

4  again laid out the inadequacies of the interrogatory investigation and responses that the

5  depositions revealed and made clear that the responses must be amended.  (*Id.* ¶ 43,

6  Ex. KK.)  Goodrich also offered a compromise proposal, indicating that it was

7  "certainly willing to try to work with [the United States] on the fees and expenses . . .

8  incurred to take [the] depositions [of the three alternate witnesses]."  (*Id.* at 18:5-8.)

9  The United States rejected the compromise, instead maintaining the position that the

10  witnesses provided no testimony that was inconsistent with the responses and that any

11  additional information provided to the Moving Parties during the depositions obviated

12  the need to supplement the responses because the Moving Parties now had that

13  information.  For example, according to the United States, "our view is that [Mr. Hiza]

14  did not identify anything incorrect in the interrogatory responses.  He used additional

15  information to perform some searches." (*Id.* at 19:9-22.)  The United States also took

16  the position that, "[w]e just disagree on the facts, and that's what the trial is for." (*Id.*

17  at 23:15-16.)  Further, counsel for the United States represented that the responses to

18  Interrogatories 13 and 15 were proper, citing Mr. Vincent's testimony that the

19  investigation in support of the SAIC Report would have uncovered potential uses and

20  releases of TCE.  (*Id.* at 24:8-10; 27:14-22.)

21       In light of the position taken by the United States and the Special Master's

22  denial of the United States' motion for protective order, the Moving Parties proceeded

23  with the depositions of Ms. Greco and Mr. Holmes.  Shortly after completing the

24  deposition of Mr. Holmes, the final deposition related to the Interrogatories, Goodrich

25  wrote the United States another letter laying out the further inadequacies that were

26  highlighted by the depositions of Ms. Greco and Mr. Holmes and again asking the

27  United States to supplement the responses.  (*Id.* ¶ 44, Ex. LL.)  Again, the United

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

1  States did not respond but agreed to meet and confer on the issue.  During the meet and

2  confer on October 4, 2011, the United States again refused to supplement its responses.

3  The only "compromise" that the United States offered was that it might be willing to

4  supplement the responses to Interrogatories 1 and 2 after discovery is completed, based

5  on what surfaces as a result of the personnel records that the Court has ordered the

6  United States to produce in response to a motion to compel brought by the Moving

7  Parties.  (*Id.*  ¶ 45, Ex. MM.)

8  **G.     The Production of Unit Rosters, Morning Reports, and Personnel Files**

9        On August 26, 2011, the Special Master granted the Moving Parties' motion to

10  compel the production of documents responsive to certain document requests

11  identifying men and women who served at the RABSP, including unit rosters, morning

12  reports, and personnel files of individuals identified in the unit rosters and morning

13  reports.  (*Id.*  ¶ 46, Ex. NN at 5-6.)  The United States is in the middle of a rolling

14  production of unit rosters, morning reports, and personnel files for the 662nd Ordnance

15  Ammunition Company, the 261st Ordnance Maintenance Company, and the 3183rd

16  Quartermaster Service Corps, all of which have been identified as serving at the

17  RABSP in 1943.  (*Id.* ¶ 47.)  These records, maintained by the United States at the

18  NPRC and which the United States vigorously opposed producing to the Moving

19  Parties, have allowed the Moving Parties to identify hundreds of previously unknown

20  individuals who served at the RABSP during World War II, and ongoing investigation

21  efforts have already led to the location of surviving Army personnel who served at the

22  RABSP.  (*Id.*)

23                                              **IV.**

24                        **THE MOVING PARTIES' ARGUMENT**

25  **A.     Legal Standard**

26        Upon a showing of good cause, parties may obtain discovery regarding any

27  matter that is not privileged and is relevant to the claim or defense of any party.  Fed.

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

R. Civ. P. 26(b)(1).  "Under the liberal discovery principles of the Federal Rules, defendants [are] required to carry a heavy burden of showing why discovery was denied."  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).  The district court has broad discretion to order parties to comply with their discovery obligations, including ordering parties to respond to interrogatories and imposing sanctions on parties who fail to do so.  *See Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1059 (9th Cir.1998) (noting the district court's broad authority under Federal Rule of Civil Procedure 37(b)(2) to "make such orders in regard to [a discovery] failure as are just," including dismissal).

Under Federal Rule of Civil Procedure 33(b)(1)(B), an officer or agent of a party must furnish the information available to the party in response to interrogatories propounded under Rule 33(a). While officers or agents who verify interrogatories need not have firsthand knowledge of the information they gather, they should investigate or consult books, records, other officers or employees, former employees, counsel, and any other reasonable source.  *See, e.g., General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210 (8th Cir. 1973) (holding that the agent designated to respond to interrogatories was obligated "to furnish all information available" to the defendant, including all information within the personal knowledge of current employees, former employees, and corporate counsel); *Hickman v. Wal-Mart Stores, Inc.*, 152 F.R.D. 216, 223 (M.D. Fla. 1993), aff'd, 58 F.3d 640 (11th Cir. 1995) ("[The defendant] has a duty to make a reasonable search of its business records and make a reasonable inquiry of its employees and agents in order to obtain the information asked in [the p]laintiff's interrogatories."); *Casson Const. Co., Inc. v. Armco Steel Corp.*, 91 F.R.D. 376, 382 (D. Kan. 1980) ("The rules require that [the defendant] select an officer or employee to gather and obtain from books, records, other officers or employees, or other sources, the information necessary to answer the interrogatories and sign them on behalf of the [defendant] not himself."); *International Ass'n of Machinists, Dist. 169 v. Amana*

29

Gibson, Dunn &
Crutcher LLP

1    *Refrigeration, Inc.*, 90 F.R.D. 1, 2 (E.D. Tenn. 1978) ("the answering agent must

2    consult with other members of the organization who are in possession of the

3    information sought to be discovered" and provide all information held by "sources

4    under its control"); *EEOC v. Hickey-Mitchell Co.*, 372 F. Supp. 1117, 1122 (E.D. Mo.

5    1973) ("[The d]efendant should seek the required answers by whatever reasonable

6    means are available, e.g. personal observation and recollection, if corporate records are

7    inadequate.").

8         Government agencies answering interrogatories under Rule 33(b)(1)(B) are

9    subject to the same requirements as corporations.  Like a corporate agent, a

10    government agent who verifies interrogatories must conduct a reasonable investigation

11    and furnish all information available to the agency.  *See, e.g., United States v. 58.16*

12    *Acres of Land, more or less in Clinton County, State of Ill.*, 66 F.R.D. 570 (E.D. Ill.

13    1975) (holding that, like a private party, an agent answering interrogatories on behalf

14    of a government agency must consult with other relevant sources so that the answer to

15    the interrogatory contains "such information as is available to the party").

16         Under Federal Rule of Civil Procedure 37(a)(3)(B)(iii), a party may move for an

17    Order compelling a discovery response if "a party fails to answer an interrogatory

18    submitted under Rule 33."  Rule 37(a)(4) makes clear that "an evasive or incomplete

19    disclosure, answer, or response must be treated as a failure to disclose, answer, or

20    respond."  Thus, a party is entitled to an Order compelling supplemental interrogatory

21    responses if the original responses are inadequate.  *See, e.g., Tatum v. Schwartz*, No.

22    CIV S-0601440, 2007 WL 2220977, at *1-*3 (E.D. Cal. Aug. 2. 2007) (compelling a

23    party to provide supplemental responses within ten days to interrogatory responses that

24    were inadequate and evasive).

25

26

27

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

**B.** **The Depositions of the Alternative Witnesses and the Verifiers Made Clear that the Interrogatory Responses Are Incomplete and Inaccurate.**

Rather than comply with its obligations under the Federal Rules of Civil Procedure to respond fully and accurately to discovery requests, the United States yet again forced the parties seeking discovery to prove that the responses were incomplete and inaccurate by deposing the employees of the United States Army whom the United States should have consulted in responding to the Interrogatories.  Even worse than forcing the Moving Parties to do the work that the United States should have done itself, the United States put the Moving Parties through the expense and charade of deposing two alternative witnesses, Mr. Hiza and Mr. Bauer, whom the United States knew had nothing to do with formulating the actual responses to the six key Interrogatories and could provide no insight into the factual bases of the responses. The third, Mr. Vincent, revealed just how woefully inadequate an investigation the verifiers performed.

At the time the United States offered these alternative witnesses, Goodrich asked why the United States did not have the alternative witnesses verify the interrogatory responses, and the United States responded, "You know, I think that they probably could have verified them."  (Dennis Decl. ¶ 24, Ex. T at 27:16-21.)  However, contrary to the United States' representations, these witnesses largely disclaimed any knowledge regarding the bases for the verifications of these key Interrogatories, and in some cases confirmed that the responses were inadequate, or worse, inaccurate.  This approach was unwarranted, inefficient, and expensive, and all it did was confirm the Moving Parties' suspicion that that the United States was not being forthcoming.

Even worse than the charade with respect to the alternative witnesses, the United States continues to directly violate the Special Master's June 22, 2011 Order by hiding behind improper claims of privilege to prevent the Moving Parties from discovering key factual information regarding how to locate firsthand witnesses, despite the fact

31

Gibson, Dunn &
Crutcher LLP

that this information is directly responsive to the Interrogatories and the DoJ attorneys have known about it since at least April.

### 1. Contrary to the Inaccurate Responses to Interrogatories 1 and 2, Mr. Hiza Testified that the United States Maintains Records that Would Allow It to Identity Servicemembers Based on Unit.

Mr. Hiza testified that he was never consulted regarding the responses to Interrogatories 1 and 2, which involved identifying surviving soldiers and officers who served at the RABSP, despite being the most knowledgeable person within the Army at determining the identity and locating the men and women who served during World War II.  In fact, Mr. Hiza never even saw the Interrogatories until March 2, 2011, one month *after* the United States responded to the Interrogatories and more than three weeks after the Opposing Parties asked the United States to provide dates for the depositions of Mr. Holmes and Ms. Greco.  In other words, not until a month after responding to the Interrogatories did the United States ask Mr. Hiza to take the steps that would be necessary to properly respond to Interrogatories 1 and 2.

In direct contradiction to the response to Interrogatory 2 that "[t]he United States does not maintain records that would allow it to identify the surviving servicemembers based on the name of the duty station during World War II such as the RABSP," Mr. Hiza produced a spreadsheet that he received from Mr. Holmes shortly before March 25, 2011, containing the names, serial numbers, and rank of nine officers who served at the RABSP.  Similarly, in direct contradiction to the response to Interrogatory 1 that "[t]he United States does not maintain records that would allow it to identify surviving servicemembers based on the name of the unit individuals served in during World War II such as the 622nd Ordnance Ammunition Company,"  Mr. Hiza produced a spreadsheet that he received from Mr. Holmes containing the names, serial numbers, enlistment date, and rank of the majority, but not all, soldiers identified in Interrogatory 1.

32

Gibson, Dunn &
Crutcher LLP

And the inconsistencies between the United States' response that it does not maintain such records and Mr. Hiza's testimony do not stop there.  Mr. Hiza also testified that, upon receiving the Interrogatories, he submitted requests for searches to be performed in two databases: (1) the DFAS database that contains contact information for retired soldiers receiving retirement pay and (2) the registry database that specifies the locations of any hard copy personnel records for an individual.  He also submitted a request to the NPRC to pull unit rosters and morning reports for the 622nd Ordnance Ammunition Company to try to find serial numbers for the individuals in the unit, which could lead to their personnel records.  The fact that Mr. Hiza readily identified three search requests targeted at locating surviving individuals who served at the RABSP upon receiving the Interrogatories is simply more evidence that the United States' responses are incomplete and inaccurate.  In addition, the unit rosters, morning reports, and personnel files that the Special Master ordered the United States to produce confirm Mr. Hiza's testimony.  As a result of obtaining those documents, the Moving Parties have been able to identify hundreds of previously unknown individuals who served at the RABSP during World War II, and ongoing investigation efforts have already led to the location of surviving Army servicemembers who served at the RABSP.  (Dennis Decl. ¶ 47.)

It is perplexing and disturbing that the Department of Justice has continued to present Dean Hiza's testimony, without a verification, as a further response to Interrogatories 1 and 2.  Mr. Hiza made clear that before responding to the Interrogatories, the United States should have known how to locate identifying information for the 622nd Ordnance Ammunition Maintenance Company and officers stationed at the RABSP, including their serial numbers, rank, enlistment dates, last known addresses, current addresses if they are listed in the DFAS database, and personnel files.  Ms. Greco's and Mr. Holmes' testimony confirmed that the United States failed to conduct a reasonable investigation at the time of verification or provide

33

Gibson, Dunn & Crutcher LLP

complete responses.  The verifiers had information in their possession regarding unit rolls at NPRC that could identify men and women who served at the RABSP and failed to follow up on that information.

Despite knowing ways to identify the surviving members of the 622nd Ordnance Ammunition Maintenance Company and officers who served at the RABSP, the United States simply repeated information from the SAIC Report or stated that it could not locate information responsive to the Interrogatories.  Mr. Hiza's testimony that he was given the assignment of further responding to the Interrogatories in March makes clear that the United States knew at that time that it had not adequately responded to the Interrogatories.  However, instead of acting responsibly and supplementing its responses with complete answers, the United States attempted to use Mr. Hiza's deposition to remedy its inadequate response.  Somehow, by April, with Mr. Hiza's deposition impending, the DoJ was able to provide the serial numbers, rank, and enlistment dates to Mr. Hiza via Mr. Holmes, but the Department is still concealing how it located such information under an inappropriate claim of privilege, even though the Special Master specifically identified the discovery of this information as one of the key reasons the Moving Parties needed to depose the verifiers.  It is now clear that early in this more than seven-month charade, the DoJ lawyers knew how to answer Interrogatories 1 and 2, but have consistently engaged in conduct intended to deny, obfuscate, hide, and delay information that is critical to locating these aging and dying witnesses.  The Moving Parties have no alternative but to assume it is being done inappropriately to prevent discovery into finding percipient witnesses to the RABSP's operations who are still alive and can give testimony.

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn & Crutcher LLP

## 2.    Mr. Bauer and Mr. Vincent Made Clear That The United States Conducted an Inadequate Investigation in Responding to Interrogatories 13 through 16.

Mr. Bauer testified that he was not consulted regarding Interrogatories 13 through 16, which relate to the Army's use of TCE, its waste handling, and its disposal practices for TCE and ordnance during World War II.  The United States' failure to consult Mr. Bauer on critical issues in this case is inexplicable given the fact that Mr. Bauer has been put forward as a witness seven times in cases generally involving recreating the potential use and disposal of TCE and perchlorate by the Armed Forces during World War II and appears to have the most complete collection in the Army Corps of manuals and guides from the war that specifically address the Army's use of TCE, among other things.  Had the responding agents consulted with Mr. Bauer, he could have pointed them to the proper process of evaluating potential TCE usage at the RABSP and ensured that the verifiers consulted the proper manuals, historical documents, and Common Operations Reports.

Meanwhile, not only was Mr. Bauer not consulted regarding Interrogatories 13 through 16, but also his testimony regarding how he would make these determinations completely undermines the process that Mr. Holmes and Mr. Vincent undertook in preparing the responses.  On TCE use, Mr. Bauer indicated that he would first consult the applicable technical manuals on small arms degreasing, locomotive maintenance, and vehicle maintenance to determine whether the use of TCE was authorized for each activity, and then he would consult site specific historical documents.  Regarding ordnance handling, Mr. Bauer indicated that he would consult the relevant technical manuals in the nine series.  Yet Interrogatories 13 through 16 make no reference to any technical manuals nor any of the information contained in them.

Mr. Holmes, who has no expertise or experience of any kind on the questions raised in Interrogatories 13 through 16, confirmed in his deposition that he had no

35

Gibson, Dunn & Crutcher LLP

basis to verify Interrogatories 13 through 16 and relied exclusively on Mr. Vincent and the investigation conducted by SAIC.  In turn, Mr. Vincent also relied almost exclusively on the SAIC Report, which he testified would have captured any TCE usage.  However, Mr. Holmes had no idea whether SAIC had investigated the questions identified in these Interrogatories, and he made no effort to inform himself before relying on SAIC's investigation in responding to the Interrogatories.  Both Mr. Vincent and Mr. Holmes simply regurgitated the information in the SAIC Report, despite the fact that the investigation described in the SAIC Report was limited at the direction of the United States to only investigating possible perchlorate contamination at the RABSP.  Ms. Tran and SAIC's scope of work make clear that SAIC was not instructed to and did not investigate TCE at all.  In addition, Mr. Holmes' refusal to reveal the instructions he gave to Mr. Vincent conceals any rationale for why Mr. Vincent did not verify the Interrogatories or why the United States' answered these Interrogatories inaccurately.

## C.    Goodrich is Entitled to Its Reasonable Costs Associated with Proving that the Responses Were Inadequate and Inaccurate.

Goodrich is entitled to its reasonable expenses, including attorney's fees, incurred in making this motion to compel discovery.  Fed. R. Civ. P. 37(a)(5).  In the present case, the United States has consistently failed to comply with its discovery obligations.  This long list now includes its failure to supplement inadequate and inaccurate interrogatory responses and its failure to conduct a reasonable investigation in responding to the Interrogatories.  In refusing to comply with the Federal Rules, the United States has submitted Goodrich, and other parties, to the needless expense of having to prove that these discovery responses were false.  Goodrich thus requests $100,000 for the reasonable costs and expenses incurred in taking the depositions of Mr. Hiza, Mr. Bauer, Mr. Vincent, Ms. Greco, and Ms. Holmes; opposing the United States' Motion for Protective Order to prevent the depositions of Ms. Greco and Mr.

36

Gibson, Dunn & Crutcher LLP

1   Holmes, which was denied; bringing the Motion to Compel the production of unit

2   rosters and morning reports, which was granted; and making this Motion to Compel,

3   including the preparation and filing of the instant joint stipulation.  This figure

4   represents only a small portion of the time and expense the United States has required

5   Goodrich to needlessly expend.  (Dennis Decl. ¶¶ 48-53.)  These expenses are

6   reasonable and appropriate.  (*Id.* ¶¶ 54-56, Exs. OO-PP.)  They are also necessary to

7   curtail the government's obvious strategy of obfuscating defendants' discovery.

8                                     **V.**

9                        **THE UNITED STATES' ARGUMENT**

10  **A.    DoD'S ANSWERS TO INTERROGATORIES 1 AND 2 COMPLIED**

11         **WITH RULE 33 AND WERE ACCURATE AT THE TIME OF**

12         **RESPONSE IN FEBRUARY 2011, BUT WILL BE TIMELY**

13         **SUPPLEMENTED PER RULE 26(e) TO REFLECT  SUBSEQUENT**

14         **INFORMATION OBTAINED BY DoD.**

15         Interrogatory 1 requested information regarding the "surviving" members of the

16  622nd Ordnance Ammunition Company stationed at the RABSP from approximately

17  March to July 1943.  DoD's response to Interrogatory 1 was accurate and entirely

18  appropriate at the time the response was served in February 2011.

19         As Goodrich notes, DoD's Interrogatory responses provided an accurate

20  description and referenced the extensive efforts that the Army Corps already had made

21  to find surviving members of the 622nd Army Ordnance Company in 2004, which was

22  a significant component of the investigation and historical research conducted for the

23  Final Operational History Report relating to the Rialto Ammunition Backup Storage

24  Point.  See Gentry Decl., ¶ 9, Ex. I at 5, Joint Stipulation.  Mr. Holmes unequivocally

25  confirmed that he verified this portion of DoD's response to Interrogatory 1, and that

26  he had a reasonable basis to do so.  First, Mr. Holmes confirmed that he was familiar

27  with and had reviewed the Final Operational History Report before verifying the

                                      37

28

Gibson, Dunn &
Crutcher LLP

response.  See Gentry Decl.,¶ 7, Ex. G at 50:2-12.  Second, Mr. Holmes consulted with Gerald Vincent, Chief of the Base Closure and Realignment ("BRAC")/FUDS Section, USACE, Sacramento District, the person responsible for overseeing the preparation of the Final Operational History Report, including the substantial efforts to locate Army veterans who may have served in Rialto for a brief time during World War II.  Mr. Vincent also possesses extensive experience conducting CERCLA-type investigations.  See Gentry Decl.,¶ 7, Ex. G at 51:20-22.  At his depositions on May 17 and May 18, 2011, Mr. Vincent confirmed that he had direct responsibility for overseeing the investigation into and report on the Army's former operations at the RABSP.  See Gentry Decl.,¶ 14, Ex. N at 115:11-18.  There can be no credible contention that Mr. Vincent was not sufficiently knowledgeable to consult with and to address the issues raised by the Interrogatories.  See Declaration of Stanley Bauer, dated October 31, 2011, ¶¶ 5, 8 (confirming Mr. Vincent's responsibility for "overall project management" for issues relating to the Final Operational History Report, his knowledge, experience, and capability to conduct site investigations, and that Mr. Vincent was a "logical choice" to consult regarding the Interrogatories).

Moreover, Mr. Vincent testified that he personally reviewed the subject Interrogatories and assisted in formulating the substantive responses to Interrogatories 1, 2, and 13-16.  See Gentry Decl. ¶ 14, Ex. N at 45:8-46:9 (Mr. Vincent discussing unsuccessful attempts to identify "surviving" personnel from World War II) and Id. at 43:1-17 (Mr. Vincent testifying that he provided information for the interrogatory responses addressing the RABSP operations and explaining the basis for the responses).  Thus, as Mr. Holmes confirmed, he reasonably believed that the Army Corps and its contractor "did their due diligence and tried to find as many people as they could possibly find, and that's who they were able to find."  See Gentry Decl., ¶ 7, Ex. G at 62:13-15.  Mr. Holmes reasonably believed that the portion of Interrogatory 1 relating to the Final Operational History Report was truthful and accurate to the best

38

Gibson, Dunn & Crutcher LLP

of his knowledge and belief, and that remains the case today. See Gentry Decl., ¶ 7, Ex. G at 145:14-147:20.

The remaining portion of Interrogatory 1 and all of Interrogatory 2, which requested information regarding *unnamed* "surviving" Army officers stationed in Rialto between 1941 and 1946, were appropriately verified on behalf of the Army by Ms. Greco. Ms. Greco's testimony confirmed that she understood her obligations under Rule 33, and that she signed the verification because the statements in the Interrogatory response were true and correct to the best of her knowledge and belief at the time. See Gentry Decl., ¶ 6, Ex. F at 42:22-43:1, 62:6-14.

When asked by Goodrich's counsel, Ms. Greco explained that she had a reasonable belief that the United States did not maintain records of "surviving" members of Army's 622nd Ordnance Ammunition Company or Army officers that may have been stationed in Rialto more than sixty years ago, as stated in the February 2011 response to Interrogatories 1 and 2:

> Q. Is that a correct statement ma'am, to the best of your knowledge?
>
> A. Yes.
>
> Q. And what do you base that on?
>
> A. I base that on my professional experience of handling CERCLA cases over the past 15 plus years of trying to locate individuals in various cases that the Army does not maintain any records that you can locate that are based on the surviving members of the 622nd Ordnance Ammunition Company stationed at the RABSP. . . .
>
> Q. So prior to February 2 of 2011, when you had on other matters tried to find men and women who served during World War II, you have not been able to identify any resource within the Army that would allow you to do that. Is that fair to say?
>
> A. Yes. I used all available resources and they didn't yield, based on what I can recollect as I'm sitting here, they didn't reveal any names or identification w[h]ere they were.

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn & Crutcher LLP

<u>See</u> Gentry Decl., ¶ 6, Ex. F at 30:11-21 and 32:6-14.  Ms. Greco further explained the steps she took to confirm her understanding, based on 15 years of experience working on similar CERCLA cases, that the Army did not have in its possession any means to identify surviving Army members from World War II who served in Rialto.  <u>Id</u>. at 32:4-5 ("The Army had no records that would allow me to find them.") and <u>id</u>. at 40:10-12 (confirming the same conclusion based on her research).  <u>See</u> <u>generally</u> <u>Ameripride</u>, 2011 WL 1321873, at *2 ("reasonable inquiry" is limited to persons and documents within the responding party's control).

In addition, contrary to Goodrich's assertions, Ms. Greco had no reasonable expectation or belief at the time DoD served the Interrogatory responses that the National Personnel Records Center ("NPRC") would be able to provide useful information from its publicly available holdings:

> Q.  Have you used the [N]PRC before to identify the names and men and women who served at any other Army facilities during World War II?
>
> A.  Yes.
>
> Q.  And were you successful in getting names from them?
>
> A.  No.  Getting names from them.  I provide the name to them.  I'm trying to find out if we can locate them.  And they were unable to provide me any information. . . .
>
> Q.  And my question, when you certified this answer in response to interrogatory, did you know for a fact that the [N]PRC could not really help in that regard?
>
> A.  I certified based on the best of my knowledge.  My knowledge at the time.  My knowledge was that the Army does not maintain records that allow it to identify surviving service members based on the name of the unit served. . . .
>
> Q.  My question for you is, is the following an accurate statement based on your knowledge today.  Quote, the United States does not maintain records that would allow it to identify surviving service members based on the name of the unit individuals served in during World War II, such as the 622nd Ordnance Ammunition Company, close quote.
>
> A.  Based on my knowledge, I would say, yes.

40

Gibson, Dunn & Crutcher LLP

1    See Gentry Decl., ¶ 6, Ex. F at 36:2-11, 40:20-41:3, 65:3-11.  As demonstrated by the

2    testimony of Ms. Greco and Mr. Vincent recited above, DoD's responses to

3    Interrogatories 1 and 2 properly reflected the information, knowledge, and experience

4    available at the time.

5           Goodrich's assertion that Mr. Hiza contradicted the facts set forth in DoD's

6    responses to Interrogatories 1 and 2 is equally without merit.  Regardless of whether he

7    was consulted in advance, Mr. Hiza confirmed that he reviewed the responses and that

8    the substance was accurate.  See Gentry Decl., ¶ 13, Ex. M at 26:18-23. Contrary to

9    Goodrich's assertion, DoD counsel never stated that Mr. Hiza was consulted before the

10   Interrogatory responses were served.  Mr. Hiza was offered as an alternative witness

11   on the general subject matter addressed in Interrogatories 1 and 2.  For example, Mr.

12   Hiza explained that as many as 80% of the Army's records relating to WW II service

13   were destroyed in a fire in 1973, and that the Army maintains no databases that would

14   allow it to identify members of a particular Army company, let alone individuals who

15   may have passed through a particular installation, such as the RABSP.  Id. at 34:2-11.

16   Interrogatory 2 supplied no information that the Army could use to conduct a

17   meaningful search, and Interrogatory 1, which supplied merely a first and last name of

18   individuals, was not sufficient for the Army to determine who is a "surviving" member

19   of the 622nd Ordnance Company today.  Mr. Hiza was unable to obtain personnel

20   information from within the Army or from the publicly available holdings of the

21   National Personnel Records Center based on the minimal information provided in the

22   Interrogatory itself (i.e., a name or the duty location).[12]  And Mr. Hiza further

23

24   [12] Goodrich repeats the baseless allegation that it does not know where Mr. Hiza
     obtained the list of nine officer names and serial numbers produced at his
25   deposition.  See Gentry Decl., ¶ 9, Ex. I at 26, Joint Stipulation.  DoD already has
     explained that this list of officers was compiled from documents produced to all of
26   the parties in the case more than five years ago.  See Declaration of Michael C.
     Augustini, dated May 31, 2011 (Dkt 737-1), ¶6.  The parties also discussed this
27                                                      [Footnote continued on next page]

28   41

Gibson, Dunn &
Crutcher LLP

confirmed  that he was advised that Word War II personnel files are no longer in the possession, custody, and control of the Army.  <u>See</u> Dennis Decl., Ex. Z (Hiza Depo Ex. 201: April 1, 2001 email from N. Zussblatt to Army).

Goodrich seemingly contends that it learned of the existence of unit rosters and morning reports for the first time on April 28, 2011, during the deposition of Mr. Hiza. That is false.  Pyro's counsel made a series of Freedom of Information Act ("FOIA") requests to the National Archives and Records Administration ("NARA"), and received a response dated October 22, 2009, explaining: "Copies of <u>most</u> of the monthly rosters from 1912-43 and 1947-61 for Army units (including Army Air Corps) are available by writing to Military Personnel Records, National Personnel Records Center, 9700 Page Avenue, St. Louis, MO 63132-5100."  Gentry Decl. ¶ 12, Ex. L (NARA letter to Solinger).  The letter explained to counsel precisely what form to use to make the request (the "GSA Standard Form 180").  <u>Id</u>.  Thus, Pyro (and presumably Goodrich) knew precisely what steps to take to acquire publicly available unit rosters and morning reports long ago, but they chose not to do so.

To the extent that Goodrich is contending that DoD had a duty to undertake broad searches in publicly available resources, such as the NPRC facility in St. Louis or other public libraries, Rule 33 imposes no such requirement.  A party need not conduct "extensive independent research" to answer an interrogatory, or to collect and provide information that is equally available to the opposing party in a response.  <u>See</u> <u>La Chemise Lacoste v. The Alligator Co.</u>, 60 F.R.D. 164, 171 (D. Del. 1973);  <u>see</u> <u>also</u> <u>Onofrio</u>, 11 F.R.D. at 184 ("A party interrogated may only answer matters of fact within his knowledge, and is not required to express opinions or to make research and compilation of data and information not readily known to him.").

---

[Footnote continued from previous page]
very issue with the Special Master at the hearing on DoD's motion for protective order in June 2011.

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn & Crutcher LLP

Notwithstanding DoD's firm belief that the responses to Interrogatories 1 and 2 were complete and correct based on the information available at the time of the response in February 2011, DoD has acknowledged that additional information, including personnel files or final pay vouchers for identified members of the Army's 622nd Ordnance Ammunition Company, has become available during the course of discovery, and DoD has agreed to supplement its responses to Interrogatories 1 and 2 to reflect that information in accordance with Rule 26(e), even though Goodrich will have already received such information.  Indeed, as noted above, DoD committed to supplementing the response to Astro's Interrogatories 1 and 2 during the parties' meet and confer session on October 4, 2011, stating that DoD would provide the supplemental responses in due course upon completion of the ongoing production in November 2011.  Goodrich nevertheless filed this motion, asserting that DoD "refused" to supplement.  The Special Master should deny Goodrich's motion based on DoD's agreement to provide timely supplemental responses.  See Baxter Healthcare Corp. Fresenius Medical Care Holding, Inc., 2009 WL 904152, at *3 (N.D. Cal. Apr. 2, 2009) (finding that a party timely supplemented its interrogatory responses after a "flurry of activity" before final discovery deadline).

**B.    DoD'S RESPONSES TO INTERROGATORIES 13 THROUGH 16 WERE ACCURATE WHEN SERVED AND REMAIN ACCURATE, THUS REQUIRING NO SUPPLEMENTATION AT THIS TIME.**

**1.    <u>The Verification Process Employed By DoD To Respond To Interrogatories 13 through 16 Does Not Render The Responses Either Incomplete Or Incorrect.</u>**

Rule 26(e)(1)(A) states that a party must supplement an Interrogatory Response after "the party learns that in some material respect the ... response is incomplete or incorrect."  But there is no requirement within either Rule 26 or Rule 33 that any

43

Gibson, Dunn & Crutcher LLP

1  particular person verify a response, and the party serving the Interrogatory cannot

2  dictate whom the responding party consults in developing an appropriate Interrogatory

3  response.  See Kaufman v. American Family Mutual Ins. Co., 2007 WL 1430105, at

4  *1-2 (D. Colo. May 11, 2007) (stating that "a party cannot ordinarily be forced to

5  prepare its opponent's case"); accord Riss & Co. v. Association of American

6  Railroads, 23 F.R.D. 211, 212 (D.D.C. 1959) ("A litigant may not compel his

7  adversary to go to work for him.") (internal citation and quotation omitted).  By

8  throwing around the phrase "go to guy" and consistently misstatting to this Court that

9  Mr. Stanley Bauer was not consulted by DoD in the process of responding to

10  Interrogatories 13 through 16, Goodrich apparently hopes that the Special Master will

11  require DoD to do additional work that Goodrich should do as part of developing its

12  case or to write an opinion that somehow lends credence to its meritless theories of

13  CERCLA liability relating to the RABSP, which DoD strongly disputes.

14      Goodrich's arguments ultimately must fail because they rest on false premises.

15  Mr. Jerry Vincent did consult Mr. Bauer during his preparation of DoD's responses to

16  Interrogatories 13 through 16.  For example, Goodrich states that, "not only was Mr.

17  Bauer not consulted regarding Interrogatories 13 through 16, but also his testimony

18  regarding how he would make these determinations completely undermines the process

19  that Mr. Holmes and Mr. Vincent undertook in preparing the responses."  Gentry Decl.

20  ¶ 9, Ex. I at 29, Joint Stipulation.  Goodrich's own examination of Mr. Vincent made

21  clear that he consulted Mr. Bauer in order to provide input on DoD's responses.

22  Gentry Decl. ¶ 14, Ex. N at 291:18, 292:6, 292:18-297:7, 297:11-299:16.

23      Mr. Bauer also confirms that Mr. Vincent "was the logical choice [in

24  determining whom to consult on site-specific issues] given the role of the Sacramento

25  District in the preparation of the Operational History Report."  Bauer Decl., ¶ 8.

26  Therefore, Goodrich's claim that DoD's process for providing complete and accurate

27  responses was deficient is without merit.  Goodrich claims that "Mr. Bauer indicated

28

44

Gibson, Dunn &
Crutcher LLP

that he would first consult the applicable technical manuals on small arms degreasing, locomotive maintenance, and vehicle maintenance to determine whether the use of TCE was authorized for each activity, and then he would consult site specific historical documents." Gentry Decl. ¶ 9, Ex. I at 29, Joint Stipulation. This is precisely what Mr. Vincent did to confirm the facts set forth in DoD's responses to Interrogatories 13 through 16.

Mr. Vincent explained that he learned from his extensive experience working with FUDS from the World War II era that small arms were cleaned with either gasoline or diesel due to the limited availability of solvents. Gentry Decl. ¶ 14, Ex. N at 85:25-92:11; 97:14-21. Mr. Vincent also explained that from his work on the Camp Beale FUDS he learned that the technical manuals on the cleaning of small arms do not provide the type of information Goodrich suggests. Id. at 97:22-98:12. Finally, the "evidence" which Goodrich cites for the proposition that TCE was used "to clean rifles, which were shipped from the manufacturers to places like the RABSP for distribution and came packed in heavy grease," is a document that references the use of "Vapor degreasers." Gentry Decl. ¶ 9, Ex. I at 2, Joint Stipulation. There is no evidence that the Army owned or operated a vapor degreaser at the RABSP. Therefore, Goodrich's speculative assertions regarding the degreasing of small arms do not warrant supplementing any of DoD's responses.

Mr. Vincent also explained that, with the assistance of Mr. Bauer, he reviewed technical manuals, technical bulletins, and common operations reports specifically on locomotive and vehicle maintenance. He testified as follows:

Q. I'm looking at a set of titles of common op reports that Mr. Bauer produced. . . .

A. What I did look at was vehicle maintenance, train maintenance. And, again, you -- as you go through there, you'll see it, almost all of them start off talking about what level echelon maintenance activities you're performing. And then it narrows down what the types of materials were available for usage.

45

Gibson, Dunn & Crutcher LLP

1  Q.  Got it.  So when you said you saw TMs and TBs, essentially you were
2  looking at whatever was excerpted into the common op reports that Mr.
   Bauer had helped you figure out which ones to look at?

3  A.  Correct.

4  Q.  You weren't yourself thumbing through the entire TM or TB; right?

5  A.  I did go through a few of them, but that -- I thought maybe [they'd]
6  have some more additional information.  But from years of working with
   Stan [Bauer], I know how thorough [he] is, and [he] would have pulled
7  out all the relevant [parts] and inserted those into his common ops
   [reports].

8  Gentry Decl. ¶ 14, Ex. N at 295:18-296:17.  Thus, again, Mr. Vincent testified that he

9  was familiar with the relevant technical manuals, technical bulletins, and common

10  operations reports that Goodrich claims were ignored, and he in fact had consulted

11  with Mr. Bauer to confirm his understanding.  Mr. Bauer also confirms that the

12  technical manuals, bulletins, and common operations reports he reviewed do not

13  substantiate allegations of TCE use, handling, or disposal at the RABSP during World

14  War II.  See Bauer Decl., ¶¶ 9-10.

15        Finally, Goodrich incorrectly asserts that the Final Operations Report did not

16  address in any waywhether TCE was used at the RABSP.  Gentry Decl. ¶ 9, Ex. I at

17  29, Joint Stipulation.  In fact, Mr. Vincent corrected Goodrich's counsel on this very

18  issue, when he was asked: "And am I correct, sir, that in all of your work on the

19  RABSP, you never went through the effort to try to determine if TCE had been used at

20  the RABSP during World War II?  A: That's not correct."  Gentry Decl. ¶ 14, Ex. N at

21  102:10-14.  The 2004 SAIC Report represents a concerted effort to identify the

22  historical documents relating to the RABSP, irrespective of the contaminants those

23  documents might address.  Mr. Vincent explained this at his deposition in response to

24  questions from Goodrich's counsel:

25  Q.  There was some testimony yesterday in which you said you believed
    that SAIC, back in their evaluation in 2003, had looked at TMs and TBs,
26  those kinds of reference documents, in connection with evaluating
    whether or not solvents were used at the RABSP.  Do you remember that?

27

28
                                   46

Gibson, Dunn &
Crutcher LLP

1    A.  Yes, I did.

2    Q.  And that's still your recollection, that that evaluation was done back in
      2003 by SAIC?

3

4    A.  The -- My recollection, based on the discussions of how we put the
      focus of that work effort together, the primary focus was on perchlorates
      because that is what started the -- the massive interest in Rialto.

5

6    However, in the statement of work, like all statements of work, it's broad
      in its basics so that you do not walk past a pit full of methyl ethyl death

7    because it's not on your list.  You look at all the activities, and then you
      draw your assumptions on what could [have] been a contaminant of

8    concern.  And that's how we do all of our preliminary assessments.  And
      this was just a very in-depth and very well-put-together preliminary

9    assessment, which is the site history and activities.  And so it would have
      been standard operating procedures, regardless of -- I told that to Joyce

10   [Clarke], it would have been their normal mode of doing their record
      search.  They uncover anything and everything that's of relevance.  And I

11   can't say that I specifically said, "Joyce, look for TCE."  But I would have
      said, "Joyce, while you're doing records search, look for any contaminants

12   that could possibly have been associated with the work and activities that
      would have made up the DOD activities on the entire Rialto site."

      Does that make sense?

13
      Q.  It certainly does, and I think you've been consistent over the past
14    couple days on that.

15   Id. at 298:5-299:18.

16         Thus, Goodrich's transparent attempt to explain away the lack of evidence of

17   TCE use by the Army at the RABSP during World War II falls short.  DoD's position

18   that there is no credible proof of TCE use is supported by a thorough search of

19   historical documents and that investigation encompassed documents relating to the two

20   contaminants of concern, perchlorate and TCE.  Neither was identified.  Neither has

21   been identified since.

22         **2.    DoD's Responses to Interrogatories 13 through 16 are not**

23              **"incomplete or incorrect" in "some material respect."**

24         Goodrich fails to demonstrate how any of the evidence or deposition testimony

25   discovered since DoD served its responses to Interrogatories 13 through 16 render the

26   responses either "incomplete or incorrect."  As laid out in the Joint Stipulation at 5-7,

27   (Gentry Decl., ¶ 9, Ex. I), Interrogatories 13 through 16 seek discovery related to,

28

                                              47

Gibson, Dunn &
Crutcher LLP

1   generally, DoD's alleged "use of TCE," "waste handling and DISPOSAL practices,"

2   "handling and DISPOSAL practices for TCE," and "handling and DISPOSAL

3   practices for ORDNANCE." Gentry Decl. ¶ 1, Ex. A. Goodrich cites to certain

4   documents in its "Statement of Facts" that discuss TCE as the basis to compel DoD to

5   supplement its responses to Astro's Interrogatories. Gentry Decl., ¶ 9, Ex. I at 2-5,

6   Joint Stipulation. None of the documents cited, however, refer to the RABSP.

7   Furthermore, none of the documents cited point to activities that establish the Army's

8   alleged use, handling, or disposal of TCE at the RABSP. In order to compel the

9   supplementation of DoD's responses to Astro's Interrogatories 13 through 16, the

10   Special Master would have to reach conclusions about evidence that fall singularly

11   within the purview of the trier of fact. Stated differently, the issue of whether the

12   United States used, handled, or disposed of TCE at the RABSP is the question Judge

13   Gutierrez must answer on summary judgment or at trial. Thus, it is not appropriate for

14   Goodrich to invite the Special Master to "weigh the evidence" based on the confusing

15   hodgepodge of exhibits it has placed in the motion record. DoD cannot be compelled

16   to endorse Goodrich's flawed theories, and they in no way warrant supplementation of

17   the Interrogatory responses.

18        At the time DoD responded to Astro's Interrogatories 13 through 15, DoD was

19   not aware of any evidence of TCE use, handling, or disposal at the RABSP during

20   World War II. Thus, DoD completely and correctly responded to Interrogatories 13

21   through 15. None of the documents identified during discovery, nor any of the

22   documents referenced by Goodrich in its Motion, change DoD's position that there is

23   no evidence that the United States used, handled, or disposed of TCE at the RABSP

24   during World War II. In addition, Interrogatory 14 requests "waste handling and

25   DISPOSAL practices during World War II at the RABSP," which necessarily covers

26   more than just TCE handling and disposal. Nonetheless, DoD's response to Astro's

27

28

Gibson, Dunn &
Crutcher LLP

1  Interrogatory 14 was complete and correct when verified in February 2011 and DoD is

2  not aware of any evidence that warrants changing this response in any way.

3        With respect to the DoD's response to Interrogatory 16, which asked for

4  "handling and DISPOSAL practices for ORDNANCE," DoD provided a complete and

5  correct response, including citations to documents within the DoD's production.

6  Despite an allegation that DoD's response to Interrogatory 16 is "evasive,"

7  "inadequate," or "incomplete," Goodrich fails to advance even a single sentence in its

8  31-page motion as to why it believes this to be the case.   The logical conclusion is that

9  DoD's response to Astro's Interrogatory 16 was complete and correct.

10  **C.    GOODRICH'S POSITION IS INCONSISTENT WITH ITS OWN**

11         **APPROACH TO ANSWERING INTERROGATORIES.**

12        Goodrich's repeated contention that DoD did not make reasonable inquiries

13  before responding to Interrogatories cannot be reconciled with positions Goodrich has

14  taken with respect to its own corporate officer who certified Goodrich's interrogatory

15  response in the Rialto-Colton litigation.

16        Specifically, on November 12, 2007, Goodrich responded to a comprehensive

17  set of interrogatories served by the City of Rialto.  See Gentry Decl., ¶ 15, Ex. O.  The

18  43-page interrogatory response was verified as "true" by Bruce Amig, Goodrich's

19  Director of Global Remediation Services, as an authorized representative of the

20  corporation.  Id.  A few weeks later, Rialto commenced a deposition of Mr. Amig.

21  During the examination by Rialto's counsel, Mr. Amig repeatedly testified that his

22  knowledge about Goodrich's operations in Rialto was "primarily" or "purely" derived

23  from outside counsel, presumably Gibson Dunn.  See, e.g., Gentry Decl., ¶ 16, Ex. P at

24  65-66 (investigating Goodrich's historic operations in Rialto), at 90-91 (discussing

25  Goodrich's standard operating procedures in Rialto), and at 131 (Goodrich's loading of

26  rockets in Rialto)).  Mr. Amig also stated that Goodrich's interrogatory response was

27  drafted by outside counsel, and further confirmed that, other than reviewing the draft

28

49

Gibson, Dunn &
Crutcher LLP

1    response, he had done nothing to independently verify the factual assertions Goodrich

2    made in its interrogatory response.  Id. at 134.  It is ironic that Goodrich complains that

3    all of DoD's efforts to respond to Astro's Interrogatories were insufficient when

4    Goodrich's corporate representative admitted that he did absolutely nothing to confirm

5    that accuracy of the responses crafted by Goodrich's litigation counsel.

6         To make matters worse, Goodrich's counsel cautioned and instructed Mr. Amig

7    not to reveal the content or facts received through those communications during the

8    course of the deposition.  See, e.g., id. at 60-61, 65-66, and 90-92.  Given that

9    Goodrich repeatedly asserted attorney-client privilege and work product objections

10   during the deposition of its corporate representative regarding the facts addressed in

11   Goodrich's interrogatory response, Goodrich cannot credibly contend that DoD is

12   somehow "hiding behind" claims of privilege.  Unlike Mr. Amig, Ms. Greco and Mr.

13   Holmes are litigation attorneys actively involved in the United States' defense of this

14   action, and they nevertheless were deposed and answered Goodrich's questions

15   regarding the verification of DoD's Interrogatory responses.

16   **D.    DoD COMPLIED WITH THE SPECIAL MASTER'S ORDER**

17   **        REGARDING THE GRECO AND HOLMES DEPOSITIONS, AND**

18   **        GOODRICH HAS NOT ATTEMPTED TO MEET AND CONFER ON**

19   **        ANY PRIVILEGE ISSUES ARISING FROM THOSE DEPOSITIONS.**

20        Goodrich's false assertions that DoD "directly violated" the Special Master's

21   June 22 order should be rejected.  See Gentry Decl., ¶ 9, Ex. I at 25, lines 17-22, Joint

22   Stipulation.  As a threshold matter, Goodrich has not even attempted to meet and

23   confer with DoD regarding any assertions of privilege made during the depositions of

24   Ms. Greco and Mr. Holmes.  For Goodrich to raise these issues for the first time in its

25   portion of the Joint Stipulation is a blatant violation of Local Rule 37, which the

26   Special Master should not tolerate.

27

28

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

Moreover, at the hearing on DoD's motion for protective order, Goodrich's counsel acknowledged that DoD clearly was entitled to maintain its privilege claims during the depositions of Ms. Greco and Mr. Holmes and stated that Goodrich had no basis to assert waiver at that time. <u>See</u> Gentry Decl., ¶ 8, Ex. H at 26 ("There's been no waiver of these privileges, per se, simply because these answers have been verified by attorneys."), at 27 ("We're not arguing waiver today. There's no – I don't have a foundation to argue waiver today."), and at 28 ("[A]s of right now, it's a wide open opportunity for the United States to assert privilege where they believe, in good faith, they can do so."). The Special Master's ensuing order stated that DoD was entitled not to answer questions that sought attorney-client communications or attorney work product material. <u>See</u> June 27 Order (Dkt. 806) at 11 ("The United States and the attorneys who are to be deposed are entitled to assert the attorney client and work product privileges at the deposition, in accordance with applicable law."). Thus, DoD's conduct during those depositions fully complied with the Special Master's order.

Finally, Goodrich is simply wrong in asserting that Mr. Hiza's testimony contradicted the statements in DoD's responses to Interrogatories 1 and 2. <u>See</u> <u>supra</u> U.S. Argument, Section II.A. Contrary to Goodrich's insinuations, Ms. Greco and Mr. Holmes explained why they did not contact Mr. Hiza before verifying the responses to Interrogatories 1 and 2. Both Ms. Greco and Mr. Holmes testified that they had no prior dealings with his office and did not know Mr. Hiza existed before the Interrogatory responses were served. <u>See</u> Gentry Decl., ¶ 6, Ex. F at 15:11-14 (explaining how she located Mr. Hiza in March 2011 and testifying that she "did not understand" what Mr. Hiza did in the Army's Human Resources Command prior to that time); <u>id.</u> at 57:8-11 ("That's correct, I did not know Mr. Hiza at that time."). In short, DoD did not prohibit Goodrich from making relevant inquiries into how Mr. Hiza was identified as a person capable of addressing Army personnel issues and

51

Gibson, Dunn & Crutcher LLP

Goodrich was allowed to explore the basis for DoD's Interrogatory responses, which were served before Mr. Hiza was identified as an alternative witness.

E.      **THE SPECIAL MASTER SHOULD SUMMARILY REJECT GOODRICH'S EXCESSIVE DEMAND FOR MORE THAN $100,000 IN ATTORNEYS' FEES AND COSTS.**

Citing Fed. R. Civ. P. 37(a)(5), Goodrich requests $100,000 for the "reasonable" costs and expenses incurred in taking the depositions of Mr. Hiza, Mr. Bauer, Mr. Vincent, Ms. Greco, and Mr. Holmes; opposing the United States' Motion for Protective Order regarding the depositions of Ms. Greco and Mr. Holmes; bringing the Motion to Compel the production of unit rosters and morning reports, which was granted; and preparing the instant joint stipulation. Gentry Decl. ¶ 9, Ex. I at 30, Joint Stipulation. Approximately $80,000 of the $100,000 Goodrich seeks appears to be either the same "reasonable expenses" Goodrich sought or relate to issues presented in prior motions. See Joint Stipulation Re United States Motion for Protective Order (Dkt. 707-1); Goodrich Motion to Compel Documents (Dkt. 832). Goodrich's prior attempts to recover these costs were denied. For example, the May 2011 Joint Stipulation made the same arguments almost verbatim with respect to Ms. Greco and Mr. Holmes. It is simply an abuse of the discovery process and a waste of the Special Master's time for Goodrich to regurgitate settled issues to trump up its fees and expenses in the instant Joint Stipulation.[13] See June 27 Order (Dkt. 806); August 3

_____

[13] The Special Master limited the scope of Goodrich's depositions of Ms. Greco and Mr. Holmes to only 6 of the 16 Interrogatory responses and granted DoD's request to require Goodrich to conclude the depositions in less than one day, instead of the three days permitted by the Case Management Order. See Order (Dkt 806) at 11 ("The deposition of each attorney shall be limited to one day unless good cause is presented to the Special master for additional time prior to the conclusion of the deposition."). The Special Master further confirmed that DoD had the right to make appropriate instructions to protect attorney-client privilege.

Gibson, Dunn & Crutcher LLP

1   Report and Order (Dkt. 877); August 26 Report of Special Master (Dkt. 949);

2   September 26 Report of Special Master (Gentry Decl., ¶ 10, Ex. J).

3   For the reasons stated above, the Special Master should deny in full Goodrich's

4   Motion to Compel Supplemental Responses to Interrogatories.  If Goodrich's motion

5   to compel is denied, as it should be, then it is not entitled to recover any costs or

6   expenses.[14]  Even if Goodrich's motion is granted, in whole or in part, its request for

7   expenses under Rule 37(a)(5) is nonetheless inappropriate.  First, such expenses can be

8   awarded only after the non-moving party has had "an opportunity to be heard."  More

9   importantly, Rule 37(a)(5) provides that a court "must not" order the payment of

10  expenses if:

11      (i)    The movant filed the motion before attempting in good faith to obtain the

12          disclosure or discovery without court action;

13      (ii)    The opposing party's nondisclosure, response, or objection was

14          substantially justified; or

15      (iii)    Other circumstances make an award of expenses unjust.

16  See also Reygo Pacific Corp. v. Johnston Pump Co., 680 F.2d 647, 649 (9th Cir. 1982)

17  (overruled on other grounds) (holding that a request for discovery is substantially

18

19  _____

20  [14]  Indeed, in that case there would be a presumption that DoD should be awarded its
       expenses in defending the motion to compel.  Under Rule 37(a)(5)(B):

21      If the motion is denied, the court ... must, after giving an opportunity to be
22      heard, require the movant, the attorney filing the motion, or both to pay
        the party ... who opposed the motion its reasonable expenses incurred in
23      opposing the motion, including attorney's fees.  But the court must not
        order this payment if the motion was substantially justified or other
24      circumstances make an award of expenses unjust.

25  DoD has been forced to spend substantial time briefing Goodrich's motion to compel
    despite making every effort to resolve this matter fairly and equitably.  Goodrich
26  refused to discuss the issues in a constructive manner, and then misrepresented DoD's
27  offer to supplement the responses to Interrogatories Nos. 1 and 2 in its brief.

28

Gibson, Dunn &
Crutcher LLP

1  justified "if reasonable people could differ as to whether the party requested must

2  comply.")).  All three limitations on the award of expenses apply here.

3       First, as discussed above, Goodrich not only frequently distorts the record and

4  testimony of witnesses in its Joint Stipulation, Goodrich also misrepresents DoD's

5  position with respect to supplementing its Interrogatory Responses.  Goodrich states,

6  "[t]he only 'compromise' that the United States offered was that it might be willing to

7  supplement the responses to Interrogatories 1 and 2 after *discovery* is completed."

8  Gentry Decl. ¶ 9, Ex. I at 21, Joint Stipulation (emphasis added).  In fact, DoD made

9  clear during the Meet and Confer on October 4, 2011, that it will supplement

10  Interrogatory Responses 1 and 2 "once [the process of searching for and producing

11  personnel files] is complete."  Gentry Decl., ¶ 11, Ex. K at 7:22-8:5.  During the Meet

12  and Confer, DoD never refused to supplement Interrogatory Responses 1 and 2, nor

13  did counsel suggest that such supplementation would have to wait until "discovery is

14  completed" in February 2012.  Gentry Decl., ¶ 9, Ex. I at 21, Joint Stipulation.  Rather,

15  counsel for the United States stated: "Now, as I said, obviously, we have more

16  information now than we did in February.  And that's why ... what I've proposed is to

17  supplement 1 and 2, you know, in due course after the production is complete, which is

18  going to be under the special master's order ... basically, the first week in November."

19  Gentry Decl., ¶ 11, Ex. K at 12:13-18.

20       The hearing for this Joint Stipulation is set for November 22, 2011.  By that

21  time, DoD will have already supplemented its responses to Interrogatories 1 and 2, just

22  as DoD made clear it would do upon the completion of the production of the personnel

23  files in November.  Despite the reasonableness of this offer during the Meet and

24  Confer on October 4, 2011, Goodrich nonetheless elected to bring this matter before

25  the Special Master for resolution.  Its misrepresentation of DoD's position and

26  insistence on involving the Special Master on this matter despite the offer of a

27  reasonable resolution demonstrates a lack of "good faith" and disqualifies Goodrich

28

54

Gibson, Dunn &
Crutcher LLP

1   from recovering its fees and expenses.  It is clear that DoD has already proposed to

2   supplement its responses to Interrogatories 1 and 2 within a reasonable time after

3   completion of the production of personnel records, and will have supplemented those

4   responses by the time this matter is heard by the Special Master.  Goodrich's decision

5   to race to put this matter in a motion to compel demonstrates its disregard for the

6   discovery process and the resources necessary to litigate frivolous issues.  The bottom

7   line is that the vast majority of Goodrich's 31-page motion to compel involves

8   Interrogatories 1 and 2, which DoD stated on October 4, 2011, it would supplement

9   upon completion of the production of the personnel records.

10          Second, DoD continues to be justified in its responses to Interrogatories 13

11  through 16.  As explained above, no supplementation is necessary for Interrogatories

12  13 through 16.  Goodrich's characterization of the facts is misleading.  In fact,

13  Goodrich's arguments are not based on facts at all, but mere supposition and baseless

14  inference.  The record contains no substantiation of any use of, handling, or disposal of

15  TCE or munitions during World War II at the RABSP.  For instance, Goodrich's

16  citation to "recoopered or destroyed" material at the RABSP simply refers to repairing

17  the crates in which munitions were shipped.  <u>See</u> Gentry Decl., ¶ 9, Ex. I at 4, Joint

18  Stipulation.  Similarly, Goodrich cites to documents that discuss using "solvents" in

19  vehicle or locomotive maintenance or small arms degreasing, but not specifically to

20  TCE, which is merely one of numerous solvents, and none of the documents indicate

21  the activity took place at the RABSP.  <u>See id</u>. at 2-3.  In the case of degreasing small

22  arms, TCE is specifically called for, but only in conjunction with a vapor degreaser.

23  <u>See id</u>. at 2.  Goodrich fails to mention that it has no evidence that the Army ever

24  owned or used a vapor degreaser at the RABSP, or that small arms were ever

25  degreased with TCE at the RABSP.  The mere supposition Goodrich continues to cite

26  to is not "evidence" and certainly does not require supplementation of DoD's

27  responses to Astro's Interrogatories 13 through 16.

28

55

Gibson, Dunn &
Crutcher LLP

Third, the circumstances of this complex case  extremely broad Interrogatories require the denial of any award of expenses.  Goodrich cites no authority that grants them standing to recover costs for the supplementation of the United States' Responses to Astro's Interrogatories, even if they succeed on some portion of its scattershot motion to compel.  Indeed, Astro is not even a moving party in the motion to compel the United States to supplement Astro's Interrogatories.  Morover, DoD is substantially justified in its position that its responses to Astro's Interrogatories 13 through 16 are sufficient, without further supplementation, because they were, and continue to be, complete and correct.  See Fraser v. Nationwide Mut. Ins. Co., 334 F. Supp. 2d 755 (E.D. Pa. 2004).  As the Supreme Court has stated:

> [T]he test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was "substantially justified." Fed.Rules Civ.Proc. 37(a)(4) and (b)(2)(E). To our knowledge, that has never been described as meaning "justified to a high degree," but rather has been said to be satisfied if there is "genuine dispute," ... or "if reasonable people could differ as to [the appropriateness of the contested action]."

Pierce v. Underwood, 487 U.S. 552, 565 (1988), citing Reygo Pacific Corp., 680 F.2d 647, 649, and 8 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2288, p. 790 (1970).  DoD will have already supplemented its responses to Interrogatories 1 and 2 by the time this matter is presented to the Special Master on November 22, and DoD fundamentally disagrees with Goodrich's characterization of the impact of the documents they cite.  Alternatively, Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure does not require the United States to supplement an Interrogatory Response when the "additional or corrective information ... [was] made known to the other parties during the discovery process or in writing."  Here, Goodrich has already received from DoD Technical Manuals, Bulletins, and Common Operations Reports.  Goodrich's use of the information in this motion to compel, by definition, means that no supplementation is necessary.

56

Gibson, Dunn &
Crutcher LLP

# VI.

## THE MOVING PARTIES' REQUEST FOR RELIEF

In light of the foregoing, the Moving Parties request that the Court grant this Motion to Compel supplemental responses to Interrogatories 1, 2, 13, 14, 15, and 16 and Goodrich's request for reimbursement of its reasonable fees and expenses in developing the facts that demonstrate that (1) the responses were inadequate and inaccurate when made, and (2) the United States and DoJ lawyers knew that when the responses were first given.

# VII.

## THE UNITED STATES' CONCLUSION

The Special Master should deny Goodrich's motion to compel supplemental interrogatory responses and Goodrich's demand for attorneys' fees and costs. All of DoD's responses were appropriate and accurate based on the available information at the time DoD served responses in February 2011. In light of the additional information emerging on Army personnel files, DoD agreed to provide a supplemental response to Astro's Interrogatories 1 and 2, and will do so in a timely manner. There is no merit to the allegation that DoD's responses to Astro's Interrogatories 13 through 16 were incomplete or incorrect.

The Special Master also must reject Goodrich's demand for attorneys' fees and costs. Goodrich failed to note that the Special Master already has rejected in connection with prior motions Goodrich's claims for some of the same fees and costs Goodrich seeks here. Goodrich simply rehashes the same arguments that the Court has found insufficient to shift its litigation costs to the United States.

In sum, the Special Master should reject Goodrich's motion in its entirety.

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION
AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP

Dated:  November 1, 2011          Respectfully submitted,

                                  GIBSON, DUNN & CRUTCHER LLP


                                  By: _____/s/_____
                                          Patrick W. Dennis

                                  Attorneys for Defendant
                                  GOODRICH CORPORATION

Dated:  November 1, 2011          HUNSUCKER GOODSTEIN & NELSON PC


                                  By: _____/s/_____
                                          David C. Solinger

                                  Attorneys for Defendant
                                  PYRO SPECTACULARS, INC.

Dated:  November 1, 2011          Respectfully Submitted,

                                  IGNACIA S. MORENO
                                  Assistant Attorney General
                                  Environment and Natural Resources Division
                                  United States Department of Justice

                                           /s/
                                  _____
                                  MICHAEL C. AUGUSTINI
                                  JAMES G. GENTRY
                                  Attorneys for Defendant United States
                                  Department of Defense

JOINT STIPULATION RE: GOODRICH CORPORATION'S AND PYRO SPECTACULARS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORIES

Gibson, Dunn &
Crutcher LLP