EXHIBIT A

*Syper by TM 9-850, 5 June 1949.*

# TB 9-850-18

## WAR DEPARTMENT TECHNICAL BULLETIN

## DEGREASING OF SMALL ARMS

Ref: TM 9-850, Cleaning, Preserving, Sealing, Lubricating
and Related Materials Issued for Ordnance
Materiel, 24 August 1944.

War Department, Washington 25, D. C.    31 May 1945

1. **GENERAL.**
   a. The metal surfaces on most small arms have a phos-
phate finish, such as Parco-lubrite or Parkerizing, to pro-
vide resistance to corrosion. These finishes are readily
recognized by their dull-gray or black color.
   b. Phosphate finishes deteriorate rapidly when degreased
with strong alkaline solutions. It is most important, there-
fore, that the instructions in this bulletin be adhered to
when degreasing small arms.

2. **PRECAUTIONS.** Refer to TM 9-226 and TM 9-226 for
precautions when degreasing machine guns.

3. **DRY-CLEANING SOLVENT.** Dry-cleaning solvent is
first preference for degreasing small arms, as it does not
harm phosphate finishes, dries rapidly, is noncorrosive,
and has a fast degreasing action.

4. **VAPOR DEGREASERS.** Vapor degreasers using trichlor-
ethylene are suitable for cleaning all types of small arms.
Weapons cleaned in vapor degreasers must be immediately
dipped in preservative lubricating oil (special) after the
degreasing process. The natural dark color of phosphate
finishes will be restored when oiled.

\* Supersedes TB 9-850-17, dated 16 March 1945.

**RESTRICTED** DISSEMINATION OF RESTRICTED MATTER—No person is entitled
solely by virtue of his grade or position to knowledge or possession of classified mat-
ter. Such matter is entrusted only to those individuals whose official duties require
such knowledge or possession. (See also paragraph 23b, AR 380-5, 15 March 1944.)

CEHCX031109

US047738

EXHIBIT B

EXHIBIT B

FILED UNDER SEAL

CONFIDENTIAL DOCUMENT SUBJECT TO PROTECTIVE ORDER

EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CA - WESTERN DIVISION

| | |
|---|---|
| CITY OF COLTON, a California municipal corporation, | ) ) )CASE NO. ED CV09-01864(SSx) ) |
| Plaintiff, | )[Consolidated with Case |
| v. | ) Nos. CV 09-06630 PSG(SSx) |
| | )     CV 09-06632 PSG(SSx) |
| AMERICAN PROMOTIONAL | )     CV 09-07501 PSG(SSx) |
| EVENTS, INC.; et al. | ) and  CV 09-07508 PSG(SSx) |
| | ) |
| Defendants. | )CASE NO.CV 10-00824PSG(SSx) |
| ----------------------- | ) |
| AND CONSOLIDATED ACTIONS | ) ) |
| ----------------------- | ) |
| UNITED STATES OF AMERICA, | ) ) |
| Plaintiff, | ) |
| v. | ) |
| GOODRICH CORPORATION, et al. | ) ) |
| | ) |
| Defendants. | ) |

VIDEOTAPE
DEPOSITION TESTIMONY OF
JAMES BOND
VOLUME I

Taken on behalf of the Defendants
pursuant to Notice of Deposition
on the 27th day of May, 2010
beginning at the hour of 10:00 a.m.
The Elderidge Hotel
701 Massachusetts St.
Lawrence, Kansas 66044

Page 2

```
 1              A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4         Ms. Carissa Beecham
           BEST BEST & KRIEGER, LLP
 5         400 Capitol Mall, Suite 1650
           Sacramento, California 95814
 6          Appeared Telephonically for the
           City of Colton
 7
 8    ON BEHALF OF THE WITNESS:
 9         Mr. Alexander G. Calfo
           YUKEVICH CALFO & CAVANAUGH
10         601 S. Figueroa Street
           38th Floor
11         Los Angeles, California 90017
           213-362-7777/Fax: 213-362-7788
12         ACALFO@Yukelaw.com
           Appeared in person for Witness,
13          James Bond
14
15    ON BEHALF OF THE DEFENDANTS:
16         Mr. Pat Dennis
           and
17         Ms. Deirdre P. Lanning
           GIBSON, DUNN & CRUTCHER, LLP
18         333 South Grand Avenue
           Los Angeles, California 90017-3197
19         213-229-7000/Fax: 213-229-7520
           dlanning@gibsondunn.com
20         Appeared in person on Behalf of
            Goodrich Corporation
21         Mr. Christopher T. Johnson
           DONGELL LAWRENCE FINNEY, LLP
22         Forty Fifth Floor
           707 Wilshire Boulevard
23          Los Angeles, California 90017
           213-943-6100/Fax: 213-943-6101
24         Appeared in person on Behalf of
            WHITTAKER
25
```

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800-697-3210

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    May 27, 2010                    JAMES BOND, VOLUME I

Page 3

1           A P P E A R A N C E S (Cont.)
2

3
4        Mr. Daniel Kippen
         VOSS, COOK & THEL, LLP
5        Suite 450
         895 Dove Street
6        Newport Beach, California 92660-2998
         Appeared in person on Behalf of
7        The 1996 Thomas O. Peters and
         Kathleen S. Peters Revocable Trust,
8        Thomas O. Peters and Stonehurst Site, LLC
9
         Ms. Amanda A. Neidert
10       MILES & STOCKBRIDGE, P.C.
         10 Light Street
11       Baltimore, Maryland 21202-1487
         410-727-6464/Fax: 410-385-3700
12       aneidert@milesstockbridge.com
         Appeared in person on Behalf of Black &
13          Decker, Inc., Emhart Industries, Inc.,
            Kwikset Corporation and Kwikset Locks,
14          Inc.
15       Ms. Jill H. Van Noord
         GALLAGHER & GALLAGHER
16       Park Place
         3100 Araphoe Avenue, Suite 403
17       Boulder, Colorado 80303
         303-800-6904/Fax: 303-800-6910
18       jvannoord@thegallaghergroup.com
         Appeared in person on Behalf of
19          County of San Bernardino and Robertson's
            Ready Mix, Inc.
20
         Mr. David Solinger
21       HUNSUCKER GOODSTEIN & NELSON, PC
         21800 Oxnard Street, Suite 780
22       Woodland Hills, California 91367
         818-598-8340/Fax: 818-598-8350
23       dsolinger@hgnlaw.com
         Apperaed in person on Behalf of Pyro
24          Spectaculars, Inc., and Astro
            Pyrotechnics.
25

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800-697-3210

ON BEHALF OF THE DEFENDANTS:

Page 4

1    A P P E A R A N C E S  (Cont.)
2
ON BEHALF OF THE DEFENDANTS:
3
        Mr. Michael C. Augustini
4    UNITED STATES DEPARTMENT OF JUSTICE
     601 D. Street, N.W. Room 9408
5    U.S. Department of Justice
     Washington, D.C. 20004
6    P.O. Box 23986
     Washington, D.C. 20044-7611
7    202-616-6519/Fax: 202-514-8865
     michael.augustini@usdoj.gov
8    Appeared in person on Behalf of United
      States Department of Justice
9
10       Ms. Christine Renshaw
     RENSHAW & ASSOCIATES
11   107 Figueroa Street, Suite 600
     Ventura, California 93006
12   805-643-1529/Fax: 805-643-1520
     crenshaw@renshawlegal.com
13   Appeared Telephonically on Behalf of
      Trojan Fireworks Co.
14
        Ms. Rochelle L. Russell
15   U.S. DEPARTMENT OF JUSTICE
     Enviornmental Defense Section
16   301 Howard Street, Suite 1050
     San Francisco, California  94105
17   415-744-6566
     Rochelle, Russell@usdoj.gov
18    Appeared Telephonically on Behalf of
      Enivironmental Defense, U.S. Department
19    of Justice
20
21   THE COURT REPORTER:
22       Ms. Dana Burkdoll
         MIDWEST REPORTERS, INC.
23       800-528-3194
         www.midwestreporters.net
24       dana@midwestreporters.net
25

Page 5

1                   A P P E A R A N C E S  (Cont.)

2

3      THE VIDEOGRAPHER:

4

            Mr. David Clark

5      MIDWEST REPORTERS, INC.

      800-528-3194

6        www.midwestreporters.net

        dana@midwestreporters.net

7

8      ALSO PRESENT:

9        Mrs. Bonnie Bond

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1          I'm on the third paragraph down there on

2     Line 11.

3          It says, "I saw broken ammunition arrive

4     at the facility in railcars.  Some of the

5     ammunition arrived in a broken condition, and I

6     assisted in the removal of the broken ammunition

7     from the railcars.  I moved the broken ammunition

8     to either the ground or to the -- or to igloos?"

9          All right.  And you recall that, right,

10    sir?

11        A.   Yes.

12        Q.   Can you recall the igloos today?

13        A.   Well, they was just a big cement hut

14    thing.

15        Q.   Like a cave?

16        A.   Well, it was above the ground.  You seen

17    it, didn't you?

18          MR. CALFO:  I can't testify.

19          THE WITNESS:  Oh, okay.  All right.

20          MR. DENNIS:  It's your turn.

21    BY MR. DENNIS:

22        Q.   Were they circular or semicircular?

23        A.   Circular, semi -- semicircular.

24        Q.   Okay.  And built above ground, right?

25        A.   Yeah.

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    May 27, 2010                    JAMES BOND, VOLUME I

Page 28

1      Q.    And you entered through a door inside?

2      A.    Yes.

3      Q.    Did you -- do you recall storing any

4    ammunition inside of those igloos?

5      A.    Well, yeah.  We stored some ammunition in

6    them.

7      Q.    I'm going to -- I'm going to read on on

8    this -- Exhibit 49 on Paragraph 4, which is Line

9    15.

10         MR. DENNIS:  Just make sure he's with us

11   please, Counsel.  Thank you.

12   BY MR. DENNIS:

13     Q.    It says, "Once in awhile I saw ammunition

14   and powder spill on the bare ground."

15         Is that accurate, Mr. Bond?

16     A.    Yes, I did.

17     Q.    Next paragraph, No. 5:  "I participated in

18   unloading the railcars at the Rialto Fontana

19   Backup Ammunition Storage Point on a regular

20   basis.  A large number of railcars were unloaded

21   regularly."

22     A.    Right.

23     Q.    Is that still -- that's accurate, right?

24     A.    Yes.

25     Q.    Thank you.

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    May 27, 2010                    JAMES BOND, VOLUME I

Page 29

1          I'm down on Paragraph 6, Line 19:

2      "Sometimes I'd place the ammunition I unloaded

3      from the trains on the bare ground.  I saw the

4      chemicals inside broken ammunition that had been

5      in railcars swept onto the ground and not picked

6      up."

7          Is that accurate, Mr. Bond?

8      A.    That's right.

9      Q.    Thank you.

10         Paragraph 7:  "During my time at

11     Rialto/Fontana Backup Ammunition Storage Point, I

12     saw various types of munitions unloaded from the

13     trains at the ammunition depot, including 90-,

14     50-, and 30-caliber weapons."

15     A.    Yeah.

16     Q.    That's accurate?

17     A.    Uh-huh.

18     Q.    The 90, 50, and 30 are -- are they

19     different bullet sizes?

20     A.    Yeah.

21     Q.    And do you know what kind of arms those

22     bullets were used in?

23     A.    Well, they used the 90 for -- on the Japs

24     and on the frontline.

25     Q.    All right.

Page 30

```
 1        A.    That's what they used on that.

 2        Q.    Did -- did you have an opportunity to

 3   handle a weapon at Fontana?

 4        A.    Yeah.

 5        Q.    Okay.  I think -- I'll get there.  I think

 6   it's in the declaration.

 7        A.    Uh-huh.

 8        Q.    Let me go on on Paragraph 8.  Are you --

 9   are you with me?

10        "Broken white powder bags were removed

11   from railcars at Rialto/Fontana Backup Ammunition

12   Storage Point and some powder went on ground.  We

13   stored the bags in igloos."

14        Is that accurate?

15        A.    That's right.

16        Q.    Okay.  I'm on the second page of the

17   declaration, Exhibit 49.

18        This is Paragraph 9:  "Rifles covered with

19   a greasy compound called Cosmoline were issued to

20   me at Rialto."

21        Is -- is that correct, Mr. Bond?

22        A.    That's right.

23        Q.    Okay.  "The Cosmoline was removed by using

24   a solvent."

25        Do you recall that?
```

Page 31

1    A.   Yes.

2    Q.   Paragraph 10:  "I was one of over 600 men

3  stationed at Rialto/Fontana Backup Ammunition

4  Storage Point.  We slept and ate in tents."

5         Is that accurate, to the best of your

6  memory?

7    A.   Yes.  Right.

8    Q.   Okay.  I've got to ask you one slightly

9  personal question, Mr. Bond, one -- one slightly

10  personal question.

11         Were the tents comfortable?

12    A.   Well, they had Army cots in there.

13    Q.   I guess -- I guess that's better than

14  sleeping on the bare ground?

15    A.   Yeah.

16    Q.   All right.  I'm sorry.  I didn't mean to

17  digress.  I just wanted to ask you that one

18  question.

19         Okay.  Paragraph 11.

20         Are you okay?

21    A.   Okay.

22    Q.   "While I was there, I regularly engaged in

23  maneuvers.  During maneuvers, bullets were shot

24  over our heads."

25    A.   Right.  I remember that.

Page 32

1      Q.    I would remember that, too.

2            Paragraph 12:  "There was a target/pistol

3      range, and it was used regularly.  Dud bombs were

4      picked up from the ground.  I have marked on a map

5      as 'A' the location of the target/pistol range."

6            Do you remember the target range?

7      A.    I -- I can't remember that; I really

8      don't.

9      Q.    Okay.  When -- when you went over this

10     with Mr. Solinger, at the time you recalled it;

11     but now, today, you don't remember it?

12     A.    Well, I remember going over it with him.

13     Q.    Is -- with -- if you look at the map --

14     can you look at -- at the map with me?

15           The -- the handwriting on there, the

16     "JWB," is -- are those your initials?

17     A.    Right.

18     Q.    And is that your handwriting?

19     A.    Right.

20     Q.    And in that paragraph we were reading a

21     moment ago, it was talking about a -- a

22     target/pistol range, and it said it was near where

23     this "A" is on the map.

24     A.    Yeah.  Well, it -- well, what it was, they

25     had a trench dug out across there and pulled proof

Page 61

C E R T I F I C A T E

     I, Dana L. Burkdoll, a Shorthand Reporter,
hereby certify that the within-named
witness was first duly sworn to testify the
truth, and that the deposition by said witness
was given in response to the questions
propounded as herein set forth, was first taken
in machine shorthand by me, and afterwards
reduced to writing within my direction and
supervision, and is a true and correct record of
the testimony given by the witness.

     I further certify that I am not a relative
or employee or attorney or counsel of any of the
parties, or financially interested in the
action.

     WITNESS my hand this 27th day of May,
2010.


_____

Dana L. Burkdoll
Shorthand Reporter
Notary Public
Exp: 5/27/2011

EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CA - WESTERN DIVISION

---

CITY OF COLTON, a California municipal )
corporation,                          )
            Plaintiff,                )CASE NO.
        v.                            )ED CV 09-01864 PSG
AMERICAN PROMOTIONAL EVENTS, INC.; et )(SSx)
al.,                                  )
            Defendants.               )[Consolidated with
_____)Case Nos. CV
AND CONSOLIDATED ACTIONS              )09-06630 PSG (SSx),
_____)CV 09-06632 PSG
UNITED STATES OF AMERICA,             )(SSx), CV 09-07501
            Plaintiff,                )PSG (SSx) and CV
        v.                            )09-07508 PSG (SSx)]
GOODRICH CORPORATION, et al.,         )
            Defendants.               )CV 10-00824 PSG
                                      )(SSx)

---

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

ORVAL POTTER

---

Taken at 6 West Rose
Walla Walla, Washington

DATE TAKEN:  June 2, 2010
REPORTED BY:  KATHLEEN HAMILTON, CRR, RPR, CCR 1917

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800-697-3210

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    June 2, 2010                          ORVAL POTTER

Page 2

1                         A P P E A R A N C E S
2    FOR THE WITNESS:
3                         ALEXANDER G. CALFO
                          Yukevich Calfo & Cavanaugh
4                         601 S. Figueroa Street
                          38th Floor
5                         Los Angeles, California 90017
                          213.362.7777
6                         acalfo@yukelaw.com
7    FOR DEFENDANT GOODRICH CORPORATION:
8                         PATRICK W. DENNIS
                          DEIRDRE P. LANNING
9                         Gibson Dunn & Crutcher, LLP
                          333 South Grand Avenue
10                        Los Angeles, California 90071
                          213.229.7567
11                        pdennis@gibsondunn.com
                          dlanning@gibsondunn.com
12
     FOR DEFENDANTS BLACK & DECKER, EMHART INDUSTRIES, KWIKSET
13   CORPORATION AND KWIKSET LOCKS:
14                        ANTON L. HASENKAMPF
                          Allen Matkins Leck Gamble Mallory &
15                        Natsis, LLP
                          Three Embarcadero Center
16                        12th Floor
                          San Francisco, California 94111
17                        415.273.7464
                          ahasenkampf@allenmatkins.com
18
     FOR DEFENDANTS PYRO SPECTACULARS AND ASTRO PYROTECHNICS:
19
                          DAVID C. SOLINGER
20                        Hunsucker Goodstein & Nelson, PC
                          21800 Oxnard Street
21                        Suite 780
                          Woodland Hills, California 91367
22                        818.598.8340
                          dsolinger@hgnlaw.com
23
24
25

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800-697-3210

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    June 2, 2010                    ORVAL POTTER

Page 3

1    FOR DEFENDANTS COUNTY OF SAN BERNARDINO AND ROBERTSON READY
     MIX:
2
                              MARTIN N. REFKIN
3                             Gallagher & Gallagher
                              1925 Century Park East
4                             Suite 950
                              Los Angeles, California 90067
5                             310.203.2600
                              refkin@thegallaghergroup.com
6
     FOR PLAINTIFF THE UNITED STATES OF AMERICA:
7
                              ROCHELLE L. RUSSELL
8                             U.S. Department of Justice
                              301 Howard Street
9                             Suite 1050
                              San Francisco, California 94105
10                            415.744.6566
                              rochelle.russell@usdoj.gov
11
                              LESLIE HILL (by phone)
12                            U.S. Department of Justice
                              P.O. Box 23986
13                            Washington D.C. 20026
                              202.616.6519
14                            leslie.hill@usdoj.gov
15                            JOSHUA R. HOLMES
                              US Army Corps of Engineers
16                            1325 J Street
                              Sacramento, California 95814
17                            916.557.5293
                              joshua.r.holmes@usace.army.mil
18
     FOR DEFENDANTS KEN THOMPSON, INC. AND RIALTO CONCRETE
19   PRODUCTS:
20                            NATHAN A. PEREA (by phone)
                              Varner & Brandt, LLP
21                            3750 University Avenue
                              Suite 610
22                            Riverside, California 92501
                              951.274.7777
23                            nap@varnerbrandt.com
24
25

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800-697-3210

Page 4

1   FOR DEFENDANT HARRY HESCOX:
2                               REGINALD R. SCHUBERT (by phone)
                                Isola Law Group, LLP
3                               405 West Pine Street
                                Lodi, California 95240
4                               209.367.7055
                                rschubert@isolalaw.com
5
    FOR DEFENDANT TROJAN FIREWORKS:
6
                                CHRISTINE RENSHAW (by phone)
7                               Renshaw & Associates
                                107 Figueroa Street
8                               Suite 600
                                Ventura, California 93006
9                               805.643.1529
                                carenshaw@renshawlegal.com
10
    FOR DEFENDANT WHITTAKER:
11
                                CAROLINE SIEFERT (by phone)
12                              Dongell Lawrence Finney
                                707 Wilshire Boulevard
13                              45th Floor
                                Los Angeles, California 90017
14                              213.943.6100
                                csiefert@dlflawyers.com
15
    FOR PLAINTIFF CITY OF COLTON:
16
                                CARISSA BEECHAM (by phone)
17                              Best Best & Krieger, LLP
                                2001 North Main Street
18                              Suite 390
                                Walnut Creek, California 94596
19                              925.977.3300
                                carissa.beecham@bbklaw.com
20
    THE VIDEOGRAPHER:
21
                                GREGORY GLOVER
22                              Buell Realtime Reporting, LLC
                                1411 Fourth Avenue
23                              Suite 820
                                Seattle, Washington 98101
24                              206.287.9066
25   ALSO PRESENT:              CHARLIE POTTER

Page 51

1     maybe it jogs your memory later.

2              At some point ammunition that you had helped stack

3     in the igloos, did you put it back on a train or a truck so

4     that it could be taken out of Fontana?

5          A.    Yes, it was some of it was shipped out.

6          Q.    All right.  Did you actually perform that job as

7     well, picking it up and getting it back onto some vehicle,

8     if you can recall?

9          A.    I can't recall, no.

10         Q.    Do you remember -- let me back up.  I asked you

11    earlier if you remembered how the ammunition came, and I

12    think you said by railcar; right?

13         A.    Yes.

14         Q.    Okay.  Do you remember receiving any ammunition

15    that you unloaded that came by truck?

16         A.    Not as I can recall.

17         Q.    Do you recall seeing any trucks leaving Fontana

18    with ammunition stacked in them?

19         A.    No.

20         Q.    Do you remember seeing the railcars that you

21    described earlier being moved around the Fontana facility by

22    a locomotive?

23         A.    No.

24         Q.    Okay.  Do you ever remember seeing a locomotive at

25    Fontana, the engine?  You understand what I'm talking about?

Page 52

1    A.    Yeah.  See, most of that -- most of that was done

2    at night.  We unloaded in the daytime.

3    Q.    Got you.

4    A.    The cars.

5    Q.    Got you.

6    A.    So I'd say no.

7    Q.    Okay.  The -- the railroad cars, were they totally

8    enclosed, the ones you can recall?

9    A.    Yes.

10    Q.    You remember seeing any that were the sort of half

11    size with boxes stacked up, not --

12    A.    No.

13    Q.    -- not enclosed?

14    A.    No.

15    Q.    Take a look at this paragraph 23, if you will, on

16    page 3 of your declaration.  It says, "Rifles covered with a

17    greasy compound called Cosmoline were issued to me at

18    Rialto.  The Cosmoline was removed by using a solvent."

19        Is that -- that's accurate, sir?

20    A.    Yes.

21    Q.    Okay.  For example, that rifle we saw you holding

22    in the photograph, when that got issued, is that the kind of

23    rifle that had Cosmoline on it?

24    A.    Well, fact that all new ones come in was covered

25    with Cosmoline.

Page 53

1      Q.   And would those come by rail as well, to the best

2  of your memory?

3      A.   Well, I don't know.  I can't remember that.

4      Q.   Okay.

5      A.   We just -- they issued them, and that's it.

6      Q.   Do you -- do you remember yourself actually

7  cleaning that material off of a rifle?

8      A.   No.

9      Q.   All right.

10      A.   I can't remember, but I knew that they was

11  cleaned.

12      Q.   Yeah.  It says here, "using a solvent."  Do you

13  remember anything about the type of solvent used to clean

14  Cosmoline off rifles at Fontana?

15      A.   No.

16      Q.   All right.  For example, if I ask you this, could

17  that solvent have been TCE, the solvent we discussed

18  earlier, would you know?

19      A.   I wouldn't know.

20      Q.   Okay.  I've got a few more documents I'd like to

21  show you.  I'm happy to take a break or continue on if

22  everyone's okay.

23      A.   Go ahead.

24          MR. CALFO:  Keep going, if everyone's okay.

25          MR. DENNIS:  Why don't we take these.

CITY OF COLTON vs. AMERICAN PROMOTIONAL EVENTS, INC.    June 2, 2010          ORVAL POTTER

Page 145

1                    C E R T I F I C A T I O N

2

3    STATE OF WASHINGTON

4    COUNTY OF KING

5

6          I, Kathleen Hamilton, a Certified Shorthand

7    Reporter and Notary Public in and for the State of

8    Washington, do hereby certify that the foregoing transcript

9    of the deposition of ORVAL POTTER, having been duly sworn,

10   on JUNE 4, 2010, is true and accurate to the best of my

11   knowledge, skill and ability.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 14th day of June, 2010.

14

15

16

17                        _____

18                        KATHLEEN HAMILTON, RPR, CRR, CCR

19

20   My commission expires:

21   APRIL 2014

22

23

24

25

EXHIBIT E



DECLASSIFIED
Authority N.N.N. 730022

RESTRICTED

PREPARED FOR CHEMICALS DIVISION REQUIREMENTS COMMITTEE

MEETING OF JANUARY 3, 1944

CLASSIFICATION CANCELLED
BY _____ DATE _____

TRICHLORETHYLENE AND PERCHLORETHYLENE

Tentative Supply-Requirements Program for 1944

War Production Board
Chemicals Division
Requirements Committee

Document No. 68
December 29, 1943

Copy No. 32

RESTRICTED

DOES NOT CONTAIN
CONFIDENTIAL COMPANY DATA
OUTSIDE PRODUCTION AREAS
BY _____

APPROVED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority NND 750522
By LE NARA Date 1/24/09



RESTRICTED

### TRICHLORETHYLENE AND PERCHLORETHYLENE

Refined tetrachlorethane, trichlorethylene, and perchlorethylene are colorless liquids produced from crude tetrachlorethane, which results from the chlorination of acetylene. They can be produced simultaneously and complete flexibility exists as to the relative amounts of each obtainable from a single plant.

Refined tetrachlorethane is manufactured solely on order of the Chemical Warfare Service for a secret and urgent use and none is released for any other purpose. Perchlorethylene is used in the manufacture of hexachlorethane, also for Chemical Warfare Service use, and both it and trichlorethylene are important as degreasing agents for metals. Prewar use included substantial amounts for dry cleaning purposes and it is hoped that placing the materials under allocation will release some for this purpose under the small order exemption clause. Under the present priorities system, high priority orders have backlogged to a point where some control has obviously become necessary. It is accordingly proposed to place both tri and perchlorethylenes under allocation. The following summary of supply and requirements indicates the approximate distribution to be anticipated under the order.

RESTRICTED

- 2 -

REPRODUCED AT THE NATIONAL ARCHIVES



DECLASSIFIED
Authority N.N.D. 750032
By LF NARA Date 12/12/09

RESTRICTED

## TRICHLORETHYLENE AND PERCHLORETHYLENE

### Summary of Supply & Requirements
### Calendar year 1944
(Unit: 1,000 pounds of designated chemical)

#### TRICHLORETHYLENE

| | 1 Q | 2 Q | 3 Q | 4 Q | Total |
|---|---|---|---|---|---|
| PRODUCTION 1/ | 54,000 | 54,000 | 56,000 | 56,000 | 220,000 |
| **REQUIREMENTS** | | | | | |
| Direct Military | | | | | |
| Army 2/ | - | - | - | - | - |
| Navy 2/ | - | - | - | - | - |
| Aircraft 3/ | 1,190 | 1,190 | 970 | 970 | 4,320 |
| Foreign | 857 | 612 | 618 | 611 | 2,728 |
| Land-Lease 5/ | 857 | 612 | 618 | 611 | 2,728 |
| OEW 5/ | | | | | |
| Canada 5/ | | | | | |
| Indirect Military & Civilian | 51,923 | 52,198 | 54,412 | 54,419 | 212,952 |
| Metals degreasing | 49,598 | 49,873 | 52,087 | 52,094 | 203,652 |
| Fire extinguishers 6/ | 675 | 675 | 675 | 675 | 2,700 |
| Caffeine extraction 8/ | 150 | 150 | 150 | 150 | 600 |
| Miscellaneous 7/ | 1,500 | 1,500 | 1,500 | 1,500 | 6,000 |
| TOTAL REQUIREMENTS | 54,000 | 54,000 | 56,000 | 56,000 | 220,000 |
| Indicated surplus, or deficit (-) | - | - | - | - | - |

#### PERCHLORETHYLENE 10/

| | 1 Q | 2 Q | 3 Q | 4 Q | Total |
|---|---|---|---|---|---|
| PRODUCTION | 10,260 | 10,260 | 8,460 | 8,460 | 37,440 |
| **REQUIREMENTS** | | | | | |
| Direct Military | | | | | |
| Army 2/ | - | - | - | - | - |
| Navy | 19 | 19 | 19 | 20 | 77 |
| Aircraft 2/ | - | - | - | - | - |
| Foreign 5/ | - | - | - | - | - |
| Land-Lease | - | - | - | - | - |
| OEW | - | - | - | - | - |
| Canada | - | - | - | - | - |
| Indirect Military & Civilian | 10,241 | 10,241 | 8,441 | 8,440 | 37,363 |
| Hexachlorethane 8/ | 7,260 | 7,260 | 5,460 | 5,460 | 25,440 |
| Metals degreasing, miscellaneous 9/ | 2,981 | 2,981 | 2,981 | 2,980 | 11,923 |
| TOTAL REQUIREMENTS | 10,260 | 10,260 | 8,460 | 8,460 | 37,440 |
| Indicated surplus, or deficit (-) | - | - | - | - | - |

For footnotes see following page.                — 3 —



DECLASSIFIED
Authority NND 750122
By LE NARA Date 1/24/08

RESTRICTED

Trichlorethylene & perchlorethylene footnotes

1/ Increased efficiency of operation anticipated during second half of 1944
resulting from installation of agitators in chlorination chambers of major
producing plant.
2/ Small amounts only are required for direct purchase; these are included
under categories "metals degreasing" and "miscellaneous". CWS perchlorethy-
lene requirements for hexachlorethane are included under that category.
3/ 3,500 gallons a month for Army Air Force, 29,000 gallons per month in
first half and 25,000 gallons per month in second half of 1944 for Bureau of
Aeronautics; 12.2 pounds per gallon.
4/ Essential ingredient of carbon tetrachloride type of fire extinguisher
(freezing point depressant).
5/ Requirements are relatively negligible in amount.
6/ Estimate of Drugs and Cosmetics Section, WPB, December 29, 1943.
7/ Miscellaneous solvent uses.
8/ Current rate of consumption for hexachlorethane in both private and
government plants.
9/ Includes small but essential requirement for medicinals for sheep and
other animals.
10 Does not include perchlorethylene produced as part of hexachlorethane
process.

RECOMMENDATION

It is recommended that trichlorethylene and perchlorethylene be placed
under allocation control.

RESTRICTED



EXHIBIT F

VICINITY MAP

SCALE OF MILES

Pacific Ocean

MILITARY CONSTRUCTION
AMMUNITION BACKUP STORAGE DEPOT
FONTANA, CALIFORNIA.
AUGUST    1942
SCALE AS SHOWN.
U.S.ENGINEER OFFICE    LOS ANGELES, CALIF.
PREPARED UNDER THE DIRECTION OF
COLONEL, RUFUS W. PUTNAM
DISTRICT ENGINEER

GENERAL    PLOT    PLAN

SCALE   IN   FEET

SHR00771

EXHIBIT G



**DEPARTMENT OF THE ARMY**
LOS ANGELES DISTRICT, CORPS OF ENGINEERS
P O BOX 2711
LOS ANGELES CALIFORNIA 90053-2325

REPLY TO
ATTENTION OF

CESPL-ED-HI (1110-525a)                                    20 July 1993

MEMORANDUM FOR Commander, South Pacific Division, CESPL-ED-G
              ATTN: Vince Del Greco

SUBJECT: DERP-FUDS Inventory Project Report (INPR) for Site No.
J09CA223100

1.  Enclosed is the INPR for:

        - J09CA058400 SAN BERNARDINO ENGINEERING DEPOT

2.  We determined that ordnance waste and potentially hazardous
waste eligible under DERP-FUDS may exist at this site.

3.  I recommend the following:

        a.  Findings and Determination of Eligibility be approved and
signed.

        b.  Forward a copy of this report to Commander,
Huntsville Division to determine if further action is appropriate
for the ordnance contamination.

        c.  Sacramento District pursue further investigation at this
HTRW site.

Encl                                            R. G. VANANTWERP
                                                COL, EN
                                                COMMANDING

DEFENSE ENVIRONMENTAL RESTORATION PROGRAM
FORMERLY USED DEFENSE SITE
FINDINGS AND DETERMINATION OF ELIGIBILITY
SAN BERNARDINO ENGINEERING DEPOT
SAN BERNARDINO CALIFORNIA
SITE NO. J09CA058400

FINDINGS OF FACT

1.  The San Bernardino Engineering Depot including Camp Ono consisted of a total of
1662.62 acres and was leased by the U.S. Army on 1 July 1940 from the four owners listed
below:
   a.  Muscoy Water Company, 1390.72 acres through Lease number W868-eng-1503.
   b.  Farm Homes Corporation, 270.6 acres through Lease number W3480-eng-3842.
   c.  Atchison Topeka and Santa Fe Railway Company, 1.32 acres through Lease number
       W04-193-eng-2135.
   d.  Edward S. Meyer, 0.16 acres through Lease number W04-139-eng-5861.

2.  The San Bernardino Engineering Depot was used as military storage and repair depot,
dry cleaning facility, tent manufacturing facility, locomotive vehicle maintenance ammunition
storage and filler mission for Los Angeles Port of Embarkation.  Camp Ono, part of the
Engineering Depot was used as a prisoner of war camp.  Site improvements included
approximately 23 buildings including army barracks, mess halls, motor pool, vehicle repair
buildings, tent repair and dyeing building, storage buildings, ammunition storage bunkers, dry
cleaning building and 61,577 linear feet of rail road track.

3.  The U.S Army terminated the leases on the site in various parcels and at different times as
follows:
   a.  Lease for Muscoy Water Company were terminated between 14 April 1945 and 15
       January 1946.
   b.  Lease for Farm Homes Corporation was terminated on 11 April 1946.
   c.  Lease for Atchison Topeka Santa Fe Railway Company was terminated on 20
       December 1946.
   d.  Lease for Edward S. Meyer was terminated on 9 September 1946.

The above listed properties were returned to the original owners on the dates indicated
above.  The present owners include industrial commercial and residential developers and
private land owners.  There are industrial buildings shopping centers, multi-family apartment
buildings, and single family residences currently occupying the site.

DETERMINATION

Based on the foregoing Findings of Fact the site has been determined to be formerly used
by the  Department of Defense.  It is therefore eligible for the Defense Environmental
Restoration Program - Formerly Used Defense Sites, established under 10 USC 2701, et seq.

DATE  9 Nov 93

MILTON HUNTER
Brigadier General, U.S. Army
Commanding

### SITE SURVEY SUMMARY SHEET
### FOR
### DERP-FUDS SITE NO. J09CA058400
### SAN BERNARDINO ENGINEERING DEPOT
### SAN BERNARDINO, CALIFORNIA
### 12 JULY 1993

**SITE NAME:** SAN BERNARDINO ENGINEERING DEPOT, also known as Camp Ono

**LOCATION:** The former San Bernardino Engineering Depot consisted of 1662.82 acres and is located 4 miles northwest of San Bernardino bounded by Kendall Drive, Cajon Boulevard, and Little League Avenue with the Interstate Freeway running through the center of the property parallel with Cajon Boulevard. A second separate parcel of land is bound by 3rd Avenue on the north, First Avenue on the south, Gary Street on the west, and Nolan Street on the east. A third separate parcel of land is located between the Southern Pacific Railway on the east, Cajon Boulevard on the west, Institution Road on the north, and running approximately one mile to the southern boundary. A fourth parcel of land occupies an area a quarter of a mile north of Little League Drive and up to Yucca Avenue between the Union Pacific Railroad and Cajon Boulevard. A fifth parcel lies a quarter of a mile north of the fourth parcel and is bounded by Cajon Boulevard on the east, the Union Pacific Railroad on the south where the railroad and road cross each other. Camp Ono occupied approximately 300 acres within the Depot. The POW Camp Ono site was located between Cajon Boulevard and Kendall Drive and was considered part of the San Bernardino Engineering Depot. See site map attached.

**SITE HISTORY:** The San Bernardino Engineering Depot was used by the U.S. Army as a vehicle and ammunition supply and storage depot, dry cleaning facility, sewage spreading area, tent manufacturing and dyeing facility, locomotive maintenance facility, railcar and war tank degreasing facility, motor vehicle pool, prisoner of war camp, bomb manufacturing, and water softening facility. The site was also a part of the Advance Communications Zone Depot in the Southern California defense system. The U.S. Army used solvents in the railcar and tank degreasing operation. The grease and solvents were dumped into open pits thereby contaminating the soil and possibly the groundwater. The Cajon Landfill was not located within the former site boundary. There is no information available that would indicate that the DOD dumped waste in the landfill. The Culligan Corporation a water purification company occupied a portion of the site during the war, and maintains a water warehousing facility only at the present time. A prisoner of war camp known as Camp Ono occupied 300 acres of the site. On 28 January a total of 499 Italian prisoners of war were incarcerated in Camp Ono. The prisoners were used to maintain army vehicles, degrease army tanks, and operated a tent repair and tent dyeing facility. The activities performed by the depot was responsible for the contamination not necessarily Camp Ono. A soil gas survey was conducted in 1989 by WM Dennis Mecklin who was the water resource control engineer of the ground water investigation section of the California Regional Water Quality Control Board Santa Ana Region. Trichloroethene (TCE) and tetrachloroethene (PCE) were detected from trace to quantifiable concentrations in eight public water supply wells in the Delman Heights area of San Bernardino in 1980. The Muscoy (San Bernardino Engineering Depot) area is located up-gradient of these wells; therefore, it is considered a potential source of the contamination found in these wells. Under the authority of the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), and the Superfund Amendments and Reauthorization Act of 1986 (SARA), the U.S. Environmental Protection Agency (EPA), tasked

J09CA058400

Ecology and Environment, Inc.'s Field Investigation Team (FIT) to conduct a Screening Site Inspection of the San Bernardino Engineering Depot. FIT did not confirm the presence of PCE in soil on the site; therefore, it is inconclusive whether the San Bernardino Engineering Depot (Camp Ono) contributed to the regional groundwater contamination. The current owners include industrial commercial and residential developers and private land owners. There are industrial buildings shopping centers, multi-family apartment buildings, and single family residences, occupying the site including some open land.

SITE VISIT: A site visit was conducted on 25 February 1992 by Mr. Viroj Isaradharm, P.E. and Mr. Dennis L. Stouse, P.E. of MESA Engineering, Inc., Monterey Park, California. A map of the site was obtained from the Corps of Engineers Real Estate Division.

CATEGORY OF HAZARD: PRP/HTRW and OEW

PROJECT DESCRIPTION:

a. PRP/HTRW: Recommend CESPK pursue further investigation at this site to determine the appropriate level of PRP involvement.

b. OEW: Recommend the MCX for OEW at Huntsville Division make a determination regarding further investigation at this site.

AVAILABLE STUDIES AND REPORTS: Information used to write this report were obtained from the following sources:

a. A real estate file at the U.S. Army Corps of Engineers, Los Angeles District, Real Estate Division. Contact Christine Candian at (213) 894-2695.

b. Historical collection of newspaper items and reports from the San Bernardino County Library, California Room.

c. The CERCLA Screening Site Inspection Report prepared by Ecology and Environment, Inc.

d. Soil Gas Survey Report prepared by the Regional Water Quality Control Board.

DISTRICT POC: Jatin Desai, Los Angeles District, (213) 894-6256

PROJECT SUMMARY SHEET
FOR
DERP-FUDS OEW PROJECT NO. J09CA058402
SAN BERNARDINO ENGINEERING DEPOT
SITE NO. J09CA058400
12 JULY 1993

**PROJECT DESCRIPTION:** Documented historical data from old and recent newspaper reports indicates that ordnance was stored on the site during World War II.

**PROJECT ELIGIBILITY:** The site was formerly owned (used) by DOD (Army). Any ordnance found would clearly be the result of past DOD activity.

**POLICY CONSIDERATIONS:** None

**PROPOSED PROJECT:** Recommend the Corps' Mandatory Center of Expertise (MCX) for OEW at the Huntsville Division make a determination if further action is appropriate.

**RAC FORM:** Attached.

**DISTRICT POC:** Request CEHND inform Mr. Jatin Desai at (213) 894 6268 when a determination is made regarding project status.

EXHIBIT H

EXHIBIT H

FILED UNDER SEAL

CONFIDENTIAL DOCUMENT SUBJECT TO
PROTECTIVE ORDER

EXHIBIT I

# EXHIBIT I

## FILED UNDER SEAL

## CONFIDENTIAL DOCUMENT SUBJECT TO PROTECTIVE ORDER

EXHIBIT J

EXHIBIT J

FILED UNDER SEAL

CONFIDENTIAL DOCUMENT SUBJECT TO
PROTECTIVE ORDER

EXHIBIT K

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)



SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND931517

REPORT ON
EXPLOSIVES LOADING AND STORAGE FACILITIES
LOS ANGELES PORT OF EMBARKATION

1.  **INTRODUCTION**

    a.  This report has been prepared to give a comprehensive view of
the explosives loading and storage facilities which are available at the
Los Angeles Port of Embarkation, and the safety of these facilities from
the standpoint of exposure to centers of population and vital installa-
tions, considering the concentration of explosives which might be subject
to mass detonation.

    b.  The information in this report has been obtained from personnel
of the Los Angeles Port of Embarkation, the Rialto Ammunition Back-Up
Storage Point, the United States Engineer Office, the Coast Guard, and the
Weather Bureau, supplemented by personal observations of the writers.

    c.  All drawings and aerial photographs are basically the work of
the United States Engineer Office with additions or changes where neces-
sary for the purposes of this report.

2.  **LOCATION**

    The ammunition and explosives loading aboard ships is done at Victory
Pier (Berths 8 and 9 of Pier A), Long Beach, California, approximately 15
miles south of the Los Angeles business district and located on San Pedro
Bay.

3.  **PERSONNEL**

    a.  The principal officers of the Port and the personnel assigned
to explosives handling are as follows:

              Port Commander.........................Colonel J. K. Herbert
              Executive Officer......................Lt. Col. J. H. Warren
              Director, Intelligence and Security....Major M. A. Brandt
              Port Transportation Officer............Major H. B. Brand
              Ordnance Officer.......................Lt. Col. S. Glazier

SECRET

2652                              - 1 -          NND931517          COE044891

SBC 0927

RLA 0184
US038871

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517                    SECRET

b.   The Headquarters of the Los Angeles Port of Embarkation is located at the foot of Fries Street, Wilmington, California.

c.   The U. S. Coast Guard Headquarters are in the building formerly occupied by the California Yacht Club at Wilmington.

                    Captain of the Port......Captain G. B. Gelly
                    Explosives Detail........Lieut. J. H. Cumalot

d.   Ship loading is done by contracting with stevedoring companies, with the majority of stevedoring done by the Marine Terminal Company.  Loading is done by W.S.A. on contract and the government pays the terminal operator $2.62 per measured long ton.  The explosive loading scale for longshoremen is $2.475 per hour for straight time and $3.71 per hour for overtime.

e.   The Los Angeles Port of Embarkation is a facility of the Transportation Corps situated in the area of the Ninth Service Command.

f.   The U. S. District Engineer office is located at 751 South Figueroa Street, Los Angeles, California.  Colonel Rufus Putnam is the Commanding Officer and Lt. Colonel H.W. Thompson is the Executive Officer.

4.   DESCRIPTION

a.   Area and Boundary

        Victory Pier, which is used for explosives loading, is to the seaward of Pier A, Long Beach to which it is connected by means of a causeway.  Victory Pier is owned by the government and built on land leased from the City of Long Beach.  The city has the option of purchasing the pier after the war.  A breakwater which formerly protected the Outer Harbor, by means of the adding of rock and fill, composes the land on which the pier is built.  Pier is located at the mouth of the Los Angeles River on the west bank.  Fill has been added to the east side of

2652

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517                    SECRET

COE044892

SBC 0928

RLA 0185
US038872

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937617

SECRET

the pier approach thus diverting the river to the east from the pier.

The pier is located at the foot of Pico Avenue in the City of Long Beach,

California, and has an area of 29 acres.

    b.   Capacity

        At the present time, berths A8 and A9 of Victory Pier are used

for the loading of explosives and each of these berths will accommodate

a ship of the Victory class.

    c.   Expansion

        There is no available space for expansion at this location

unless further fill is added.  At the present time, a project has been

approved for the construction of four more berths at Victory Pier.  It

is proposed to put these four new berths between berth A8 and Pier A.

(See Appendix A-II)  These new berths as well as a new breakwater just

outside the pier will be completed about the middle of 1945.  As the area

within the immediate vicinity of the pier is heavily populated and con-

tains several installations of vital importance, it does not seem advis-

able to increase the present explosives loading facilities.

    d.   General Topography

        The entire area is on made land, being a compacted fill

hydraulically dumped.  The land is level in all directions.

    e.   Present Use of Land

        Two small office buildings and two small buildings housing

trailer pumps are the only buildings on the pier.  Occupation of the land

is as follows:

| | |
|---|---|
| Buildings | 1% |
| Service Tracks | 4% |
| Wharf | 25% |
| Open Storage Space | 70% |

DECLASSIFIED
E.O. 12356
NND937617

SECRET

2652

SBC 0929

COE044893

RLA 0186
US038873

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET 

DECLASSIFIED
E.O. 12356, SEC 3.2
NND937517

A triangular plot on the eastern side of the pier contains a number of oil wells with more to be drilled in the immediate future.

f.   Soil and Foundation Conditions

Borings show fine sand at 20 feet; sand, clay, and shell at 30 feet; sand, clay, shell, and some hard strata of clay and sand at 40 feet; and sand at 50 feet.

Ground on which pier is built is solid fill inside concrete bulkheads.  The end of the pier is armoured with Class B rock on top of wood buttresses.  Paving on pier consists of a 4 inch bituminous binder.

g.   Hydrological Features

The pier deck is +14.0; lowest tide recorded is -2.56; mean low water 0.0; mean high water +5.5; and high high water is +7.54.  In the winter months, there is a four foot maximum surge which hampers loading.  A new breakwater which is to be constructed will reduce this.

5.   CLIMATOLOGICAL AND METEOROLOGICAL CONDITIONS

a.   Temperatures

| | | |
|---|---|---|
| Mean Maximum | 69.0° | 12 year record |
| Mean Minimum | 53.5° | 12 year record |
| Maximum Recorded | 97.0° | 11 year record |
| Minimum Recorded | 34.0° | 11 year record |

b.   Precipitation

| | | |
|---|---|---|
| Average Annual | 10.66" | 53 year record |
| *Greatest in 24 hours | 5.12" | 23 Feb 1913 |
| Average Annual Snowfall | none | |
| *Average Daily | | |
| Relative Humidity | 63% | 43 year record |

c.   Air Movement

SBC 0930

| | | |
|---|---|---|
| *General Direction | West | 53 year record |
| *Average Velocity | 5 m.p.h. | 53 year record |
| *Highest Velocity | 48 m.p.h. | 53 year record |
| *Average number of | | |
| days of dense fog | 25 days | 66 year record |

2652                                    - 4 -

SECRET  DECLASSIFIED
E.O. 12356, SEC 3.2
NND937517

COE044894

RLA 0187
US038874

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

d.  Lightning                          

> *Average number of thunderstorms   5   60 year record

Note:  Information regarding San Pedro relative to climatological and
meteorological conditions was incomplete.  For the purpose of this report
some figures shown are those for Los Angeles and are so distinguished
by an asterisk.

e.  Days for Loading

A total of about 240 hours per year, or an average of about ten
days would be unfavorable for loading, taking into consideration fog and
rain.  The channel and harbor are open the year round.  The surrounding
land does not offer any protection for the pier in bad weather.

6.  TRANSPORTATION

a.  Supplying Facilities

Based on the number of cars of explosives received at the Port
in recent months, the following facilities are supplying the bulk of
explosive materiel to the Port:

| | | |
|---|---|---|
| Wingate Ordnance Depot | Wingate, N.M. | 24.9% |
| Sierra Ordnance Depot | Furlong, Cal. | 20.3% |
| Texarkana Ordnance Center | Texarkana, Tex. | 12.2% |
| Tooele Ordnance Depot | Tooele, Utah | 9.8% |
| Umatilla Ordnance Depot | Hermiston, Ore. | 6.0% |
| Cornhusker Ordnance Plant | Grand Island, Neb. | 3.2% |
| Hawthorne Navy Ammunition Depot | Hawthorne, Nev. | 5.6% |
| | Total | 77.0% |

The remaining 23% comes from various installations situated at
points all over the country with no facility supplying over 3% of the
total.

b.  Pier Intransit Storage

There are two tracks on the east side of the pier which are
used for intransit storage.  Both of these are dead-end tracks, but are
equipped with crossovers.  A limit of 50 cars of explosives has been set

2652
                          - 5 -                COE044895

RLA 0188
US038875

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.2
NND937517

for the pier.  This includes those on the intransit storage tracks as well as those on the unloading tracks.

   c.  <u>Public Carriers</u>

       Wilmington, California, is served by the Atchinson Topeka and Santa Fe R.R., the Union Pacific Railroad, Southern Pacific Railroad, and the Pacific Electric Railway, which is a subsidiary of the Southern Pacific and the only line having access to the piers.  Army locomotives can also operate on the Pier since it is government owned.  The only public carrier yard in Wilmington in which explosives cars for the Pier are handled is the Meade Street Yard of the Pacific Electric Railway.  Except in extremely rare cases, cars of explosives destined to the Pier are set off at Rialto Ammunition Back-Up Storage Area.  They are then ordered in by the Port Transportation Office as required.  There are no regular freight trains from Rialto to the Pier and each train of explo-sives is given special movement by the railroads.  <u>Trains consist of a minimum of ten cars.</u>  Since a special movement is made, cars do not lie in freight classification yards for any long periods of time.

       From Rialto cars move over the A.T.&S.F. to San Bernardino at which point they are turned over to the U.P.R.R. which delivers them to the P.E. Ry. at Meade Street Yard, Long Beach.  They are then delivered to the pier by the P.E. Ry. using a Diesel locomotive for this service.  Two regular switches per day are made by the P.E. Ry., usually at 6:00 a.m. and 6:00 p.m.  Meade Yard is considered unsafe for the storage of explosives due to its proximity to public highways, factories, etc.

       From Rialto to the Pier, cars of explosives pass through the following cities:  San Bernardino, Colton, Riverside, Ontario, Pomona, East Los Angeles, Southgate, Lynwood, Wilmington, and Long Beach.

2652

- 6 -

DECLASSIFIED
E.O. 12356, SEC 3.2
NND937517
SECRET

COE044896

SBC 0932

RLA 0189
US038876

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

~~SECRET~~ 

d.   Port Track Layout

There are six tracks on the Pier.  Two running along the face
of the Pier on 13 foot centers with the centerline of the nearest track
9 feet from the face of the pier.  There are three crossovers between
these tracks.  At a distance of 165 feet from the face of the pier are
two depressed tracks on 13 foot centers.  These tracks, which are used
for unloading, have three crossovers.  Two tracks, used for intransit
storage, are located 400 feet from the face of the Pier, on 13 foot
centers and having three crossovers.

These six tracks extend the entire length of the Pier.

Eighty-five pound rail is used on the two tracks on the face
of the Pier.  Eighty pound rail is used on the depressed and storage
tracks and 85 pound rail is used on the approach tracks.

From the approach tracks to the tracks on the face of the Pier
there is a grade of 1.33%.  All curves on the Pier have a radius of
383 feet or more.

Two access tracks serve Pier A and extend beyond to make a
connection at the approach to Victory Pier.

All six tracks on the Pier terminate in dead-ends.

e.   Public Highways

U. S. Highway #6 runs into Wilmington and State Highway #15
runs into Long Beach.  U. S. #6 connects with Transcontinental Highway
#66 at Los Angeles and #15 connects with it at Pasadena.  Access to the
Pier is over Pico Avenue, a paved street.

f.   Port Roads

SBC 0933

There are no designated port roads.  With the exception of the

2652                          - 7 -                    COE044897

RLA 0190

US038877

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET  DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

depressed tracks and areas occupied by buildings, the entire pier

surface is paved and easily accessible by automobile.

g.  Locomotives

There is one 45 ton Diesel locomotive at the Pier and an 80

ton Diesel locomotive has been ordered.  When the 80 ton locomotive

arrives, the 45 ton Diesel will be sent to Rialto Ammunition Back-Up

Storage Area.

h.  Inspection of Cars

Cars arriving at Victory Pier are given an inspection by the

M.P.s.  Seals are checked by the ammunition inspectors against a list

forwarded by the Commanding Officer at Rialto.  If any car is suspected,

it is set out on a siding for closer inspection.  A set-off track for

suspect cars is now under construction.  This new track will have con-

crete barricades.

i.  Motor Vehicles

Tractors and fork lifts now in use on the pier are gasoline

powered.  Some electrically driven equipment is on order and it is

planned to place overhead exhaust pipes on the gasoline powered equipment.

j.  Ship Channels

The ship channel from Victory Pier to opening in breakwater

has a depth of 40 feet.

It is the intention to endeavor to take a burning ship outside

the breakwater before sinking it.  Depths outside the breakwater range

from 50 to 75 feet.

k.  Barges and Lighters

Barges and lighters are not used at this port for the loading

of explosives.

2652                          - 8 -

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

COE044898

SECRET

SBC 0934

RLA 0191
US038878

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET

DECLASSIFIED
E.O. 11055, SEC 3.3
NND937517

1. __Control of Explosives into Port__

Except in extremely rare cases, cars of explosives for the Port of Los Angeles are set off and held at Rialto Ammunition Back-Up Storage Area. From that point they are ordered into the pier by the Port transportation Officer. Since a limit of 50 cars of explosives on the pier at one time has been set, this is taken into consideration when scheduling cars from the Back-Up.

7. __CONTRUCTION__

   a. __Piers__

Victory Pier, which is an extension of Pier A, was formerly a breakwater which protected the Outer Harbor. Fill and rock was added to the breakwater and forms the Pier which is 591 feet wide with berths for two ships. It is surrounded by concrete bulkheads. Fill is being added to the west side of the approach thus allowing four additional berths to be located between Victory Pier and Pier A. When the addition is completed, 32 feet 5 inches will extend over the water. Pier apron will consist of 4 inch asphalt composition on 6 inches of gravel on 27 inches rolled sand on 15 inches reinforced concrete bearing piles. Earth will be held by a bulkhead of 60 foot steel sheet plates. Floor will be supported by two rows of 66 foot reinforced concrete piles, then two rows of 75 foot reinforced concrete piles, then timber fender piles 55 feet long with 10 foot penetration and strapped to 8 inch by 18 inch chock timbers bolted to wharf. This apron will be +16 above the water and will have two tracks on 13 foot centers, the centerline of the nearest track being 8.5 inches to 11.08 inches from face of pier. Fill behind pier apron will be +12, leaving a difference of 4 feet which will

SBC 0935

2652

- 9 -

DECLASSIFIED
E.O. 11055, SEC 3.3
NND937517

COE044899

RLA 0192
US038879

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND931517    SECRET

be used to accommodate depressed tracks for the placing of box cars for
unloading.

Victory Pier is 591.5 feet in width, 1300 feet in length on
the west side, and 2824.59 feet in length on the east side.  This length
includes the west side of the approach.  (See Appendix A-II for plan of
Pier and proposed additions.)  Pier apron is 165 feet wide and +16 the
balance of the Pier is +12, a difference of 4 feet.  A ramp leads to the
apron from the Pier at the north end.

The approach from Pier A is 82 feet wide and extends 1600 feet
south of Pier A, then 800 feet southwest to Victory Pier.  The approach
has two railroad tracks and a two lane macadam road.

Since the Pier and approach are on filled ground, fire stops
are not required.

Information is not available on load bearing capacity of this
Pier.

Two tracks are on the Pier approach.  Where the approach and
the Pier meet, they branch out.  The track to the west serves the two
tracks on the Pier apron as well as the two depressed unloading tracks.
The track to the east serves the two Pier intransit storage tracks.

   b.  Pier Sheds

The office building and the smoking building as well as the
small buildings housing the trailer pumps are of frame construction.

   c.  Warehouses

SBC 0936

Warehouses on Piers A and B are of steel frame with galvanized
steel covering.  Roof is of 3 inch tongue and grooved lumber on 3 inch
by 8 inch purlins on steel trusses.  Floors are of concrete.

DECLASSIFIED
E.O. 12356, SEC 3.3
NND931517

2652          - 10 -          SECRET

COE044900

RLA 0193
US038880

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

8. EXPLOSIVE SAFETY                                    ~~SECRET~~

    a. Quantities

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

A limit of 50 cars of explosives has been established for the Pier. This includes cars on the intransit storage track as well as those on the unloading tracks. This is just slightly above the amount required to load two ships simultaneously. During the past few months, one ship per month has been full loaded and the remainder were part loaded. Full loads run about 7500 tons and part loads average 2000 tons.

Quantities of explosives loaded and the number of ships are:

| Month | Ships | Tonnage (Long Tons) |
|-------|-------|---------------------|
| March 1944 | 8 | 18,800 |
| April 1944 | 5 | 12,087 |
| May 1944 | 4 | 5,601 |
| June 1944 | 3 | 8,480 |
| July 1944 | 5 | 13,789 |
| August 1944 | 5 | 10,336 |

It is estimated that at any one time there may be approximately 3,400 tons (7,622,000 pounds) net of high explosives subject to a mass detonation. This is based on a total of 50 cars on the pier, averaging 27,000 pounds net of high explosives each, plus two ships which might contain a total of 8500 tons gross or 2800 tons net. This quantity would probably cause structural damage at distances up to 4 miles from the Pier. (See Exposures, page 17)

Part loaded ships pull away from Victory Pier and proceed to Piers A and B to complete loading. It is estimated that not more than two partly loaded ships would be at these piers at one time and subject to mass detonation. Two ships might contain a total of 6,000 tons gross or 2000 net of high explosives. This quantity would probably cause structural damage at distances up to 3 miles from the piers.

COE044901

2652                        - 11 -        ~~SECRET~~

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

SBC 0937

RLA 0194
US038881

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517         SECRET

b.    Loading Operations

Explosives are unloaded from box cars on the depressed tracks
and then taken by lift truck or placed on a trailer pulled by a tractor
and transported 165 feet across the Pier.  Such a method of loading tends
to create a traffic hazard with lift trucks and tractors plying back and
forth from box car to ship.

The railroad tracks on the Pier apron are too  close to the
bull rail to put in platforms and load directly from box car to ship.
Distance from rail to centerline of nearest track is nine feet.  If the
face of the dock was widened about ten feet for its entire length, it
would be possible to construct a platform along the edge of the Pier and
load directly from car to ship.  This would increase the safety and
possibly the efficiency of loading operations.

It is noted from the plans of the new pier to be located
between Victory Pier and Pier A that the tracks along the pier apron will
be between 8.5 feet and 11.08 feet from the bull rail to the center of
the nearest track.

Twenty man crews are used for each hatch and the load an
average of 11.2 tons per hour around the clock.  Five hatches are worked
on full loaded ships and two to three hatches on part loaded ships.
Loading crews work two eleven-hour shifts, 7:00 a.m. to 6:00 p.m. and
7:00 p.m. to 6:00 a.m.

Steel cable slings are used in the loading of bombs.  Two 250
pound bombs are slung together and four at a time are lifted.  Slings or
nets are not used around boxed material.  Pallets with end rails are used
on certain types of material, such as bulk explosives.  Mattresses are not
always used.

2652                                    - 12 -        SECRET        DECLASSIFIED
                                                                    E.O. 12356, SEC 3.3
                                                                    NND937517

RLA 0195
US038882

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

SECRET

The Coast Guard is responsible for ammunition and explosives

from the point of rest in the railroad car to the point of rest in the

ship.

c.  Ammunition Inspectors

The Port has 14 ammunition inspectors, exclusive of those

stationed at Rialto Ammunition Back-Up Storage Area.

The Coast Guard has 250 men in the explosive detail.  Ten men

are stationed aboard ship and ten men are on the pier under a supervisory

officer for one or two ships.  The roving guard is supposed to make a

continuous fire inspection of the ship and check all fire equipment,

steam pressures, etc.

d.  Returned Ammunition

Returned ammunition has been brought into this Port, but a

recent order prohibits it, unless approved by the Office of the Chief of

Transportation.  This ammunition was inspected by a squad of six men of

the Bomb Disposal Unit which is also used to check the considerable amount

of scrap material that is being brought into Piers A and B.

e.  Damaged Material

Damaged material is sent to Rialto Ammunition Back-Up Storage

Area where it is recoopered or destroyed.

f.  Lightning Protection

There is no lightning protection on the buildings on Victory

Pier or those buildings on Piers A and B.  There is a low frequency of

thunderstorms in this area.

SBC 0939

g.  Explosive Anchorages

Explosive anchorages 1, 2, and 3 just off Victory Pier are

used.  No limit as to quantity of explosives has been established and no

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

COE044903

RLA 0196
US038883

*Reproduced from the holdings of the*
**National Archives and Records Administration**
*Pacific Region (Laguna Niguel)*



SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND93751?

particular distance between ships has been set. Ships are separated
according to the amount of explosives they contain. No limit has been
established as to the number of ships allowed in the anchorage at one
time. This anchorage has been established by the Captain of the Port
under his emergency powers.

The old explosive anchorage at the main entrance is no longer
used due to its vulnerability to torpedo attack; however, anchorages
A1, A2, and A3 on the other side of the main entrance have been used on
occasion. The explosive anchorage formerly had a limit of 500 tons and
ships carrying in excess of this quantity had to lie one mile off the
breakwater to the seaward.

    h.  <u>Standby Tugs</u>

Two standby tugs are available, each 400 H.P. and equipped with
radio. One is located at Victory Pier and the other can reach there in
ten minutes. There are twenty additional tugs in the harbor all of them
equipped with radio.

    i.  <u>Communications</u>

In a small office on the Pier there is a telephone as well as
a radio telephone fixed station which is a member of the Port radio net.
Each of the Coast Guard trailer pumps on the Pier have a radio which is
part of the Coast Guard net.

Twelve mobile F.M. sets are now at the Port and stations are
being set up. These will operate on a frequency of 34.100 K.C.

9.  <u>FIRE PROTECTION</u>                           SBC 0940

    a.  <u>Water Supply</u>

Water is obtained from the City of Long Beach through a 12 inch
line with 12 inch gate valves located 350 feet north of the end of Pier A

2652             - 14 -  SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND93751?

COE044904

RLA 0197
US038884

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)



SECRET

and three more on the pier approach. Pipe on the approach and pier is 12 inch transite which terminates in a dead-end. Two four inch lines are taken off the 12 inch main and form a loop to the face of the pier, where it extends in both directions and terminates in dead-ends. Four hydrants are on the 12 inch main and ten 2½ inch gate valves are located on the four inch line to supply ships water and also to be used in fire fighting. Hydrants are 6 inch Locke double 4.

Water pressure averages 75 pounds and goes up to 85 pounds at times. A flow test made on the pier 10 August 1944 showed static pressure at 77 pounds, residual 65 pounds, and a flow of 1350 g.p.m. Reduced to zero residual pressure, this would give a flow of 3420 g.p.m.

b.  Public Protection

The City of Long Beach Fire Department will respond to an alarm from Victory Pier or Piers A, B, and C. Equipment is fully manned and the pieces available are, one 1000 g.p.m. pumper, two 750 g.p.m. pumpers, one squad car, and one ladder company. In an emergency, fire equipment from the City of Los Angeles would also be available.

c.  Private Protection

Two civilian firemen and two trained, limited service, enlisted men are present at the Pier during loading operations. These men are also trained in the operation of the Army Diesel engine.

During loading operations, the Coast Guard provides a 500 g.p.m. trailer pumper and crew at shipside for each vessel. In addition to the trailer pumper alongside each ship, there are two 500 g.p.m. trailer pumpers at permanent locations on the pier. Several 50 pound carbon dioxide and 5 gallon water portable extinguishers are available as well as a foam generator and 5400 pounds of foam powder.

SBC 0941

2652                    - 15 -

COE044905

RLA 0198
US038885

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

~~SECRET~~ 

Radio or telephone is the only means of giving a fire alarm.
However, at the time of inspection an A.D.T. fire alarm system with
6 stations on the pier, connected with the Long Beach Fire Department
was being installed.

Fire inspections of buildings are conducted by civilian and
enlisted men of the fire department.  Aboard ship the inspection is
handled by the Coast Guard.

d.  <u>Sprinkler Systems</u>

The Pier warehouses are equipped with automatic sprinklers with
electric water flow alarm.  This is an A.D.T. supervised service.  The
small frame office and smokehouse are not so equipped.

e.  <u>Fire Boats</u>

A Coast Guard patrol and fire boat is on duty during loading
operations.  The Army tug that stands by to move the ship in case of
emergency is also to be equipped as an auxiliary fire boat.  The Coast
Guard has 8 fire boats in the vicinity of the Pier; two 850 g.p.m. and
six 2000 g.p.m.  Los Angeles has four; one 12,000 g.p.m., two 2500 g.p.m.,
and one 1000 g.p.m.  Long Beach has one 1000 g.p.m.

f.  <u>Housekeeping</u>

Housekeeping on the Pier is very good.

g.  <u>Heating Facilities</u>

Climatic conditions are such that heating devices are not
required.

h.  <u>Dunnage Yards</u>

Dunnage is kept at a minimum and is not allowed to accumulate.

10.  <u>ELECTRIC POWER</u>

SBC 0942

Electricity is supplied by Consolidated Edison.  Current comes in

2652

- 16 -

~~SECRET~~

COE044906

RLA 0199

US038886

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.C. 12356, SEC 3.3
NND937517

SECRET

at 4160 V. and is reduced to 120/240 by transformer on Pier. If this plant goes out, load can be shifted to Boulder Dam. Weatherproof electric outlets are located along the depressed track at intervals of 120 feet.

11. EXPOSURES

a. From the Facility

It is estimated that at any one time, there may be approximately 7,622,000 pounds net of high explosives subject to mass detonation. (See page 11) This would probably cause severe structural damage for distances up to four miles. For the maximum distance at which various quantities may be expected to cause severe damage, see the chart on the following page.

(1) Civilian Population

The civilian population within four miles of the pier is estimated at approximately 71,500 people. This figure can be increased approximately 100,000 for the people working in various industries and military reservations within a radius of four miles from the Pier.

One Mile Radius

| Part of Long Beach | Estimated | 200 |
|---|---|---|

Two Mile Radius

| Part of Long Beach | Estimated | 5,400 |
|---|---|---|
|  | Estimated Subtotal | 5,600 |

Three Mile Radius

| Part of Long Beach | Estimated | 13,600 |
|---|---|---|
| Part of Wilmington | " | 1,700 |
|  |  | 15,300 |
|  | Estimated Subtotal | 20,900 |

SBC 0943

- 17 -

DECLASSIFIED
E.C. 12356, SEC 3.3
NND937517

SECRET

COE044907

RLA 0200
US038887

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)



SBC 0944

COE044908

RLA 0201
US038888

*Reproduced from the holdings of the*
**National Archives and Records Administration**
**Pacific Region (Laguna Niguel)**

SECRET

#### Four Mile Radius

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

| | | |
|---|---|---|
| Part of Long Beach | Estimated | 35,000 |
| Part of Wilmington | " | 15,000 |
| Part of Signal Hill | " | 600 |
| | | 50,600 |

Estimated Grand Total  71,500

### (2) Industrial Installations

To the following may be added a number of small sized plants uniformly distributed throughout the area. There is 6,000,000 barrels of oil storage in the harbor area. Richfield and Pacific States Oil Refineries produce 25,000 barrels of high test gasoline and this area has the largest concentrations of high octane gasoline production in the country. There are several large shipbuilding yards in the vicinity as well as a large number of oil wells. Most of these are pumped, but there are a considerable number with pressures up to 400 pounds at the head.

#### One Mile Radius

Approximately 50 oil wells (some high pressure)
E. K. Wood Lumber Company
Great Lakes Carbon Corporation

#### Two Mile Radius

Approximately 300 oil wells (some high pressure)
Wilmington Gas Works
Fellows and Stewart Boat Works
Spencer-Kellog and Sons
Ford Motor Company (large plant)
Southern California Edison Co. (large generating station)
City of Long Beach Gas Works
United Concrete Pipe Company
J. H. Baxter and Company
Val Vita Corporation
Proctor and Gamble Manufacturing Company
Graham Brothers, Incorporated
Sully Miller Construction Company
Consolidated Steel Corporation
Dry Dock
Hodgson-Greene Haldeman Company
Number of piers, wharves, and docks
Rio Grande Oil Company (tank farm)

SBC 0945

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517



COE044909

RLA 0202
US038889

*Reproduced from the holdings of the*
**National Archives and Records Administration**
**Pacific Region (Laguna Niguel)**



SECRET
DECLASSIFIED
E.O. 12356, SEC 3 3
NND 937517

### Three Mile Radius

Approximately 200 oil wells (some high pressure
Garbutt and Walsh Boat Works
Union Pacific Freight Yard
Hancock Oil Company (tank farm)
Texas Company (tank farm)
California Shipbuilding Company
Vegetable Oil Products Company
Wilmington Boat Works
Patten Blinn Lumber Company
American Lumber and Treating Company
Harbor Belt Line Freight Yard
Charles R. McCormick Company
Consolidated Lumber Company
Olympic Refining Oil Company
Texas Company Refinery
Southern Pacific Depot
Number of piers, wharves, and docks

### Four Mile Radius

Approximately 75 oil wells
Bethlehem Shipbuilding Corporation
General Petroleum Company (tank farm)
E. K. Wood Lumber Company
Passenger and Automobile ferry
Several Fish Canneries
Kerchhoff Cuzner Lumber Company
Crescent Wharf and Warehouse
Municipal Lumber Company
Standard Oil Company (tank farm)
Los Angeles Shipbuilding and Dry Dock Company
Texas Company (tank farm)
Shell Oil Company (tank farm)
Associated Oil Company (tank farm)
Union Oil Company (tank farm)
San Pedro Lumber Company
P. C. Borax Company
Sunset Oil Company (tank farm)
Harbor Department Yards
Cas Oil and Gasoline Terminal
Consolidated Shipbuilding Corporation
Western Pipe and Steel Shipbuilding Company
Warren So. West, Incorporated
Number of piers, wharves and docks.

2652                           - 19 -          DECLASSIFIED
E.O. 12356, SEC 3.3
SECRET                    NND 937517

**SBC 0946**

COE044910

RLA 0203
US038890

*Reproduced from the holdings of the*
*National Archives and Records Administration*
*Pacific Region (Laguna Niguel)*

SECRET

(3) <u>Military Installations</u>

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

<u>One Mile Radius</u>

| | | |
|---|---|---|
| Victory Pier—approximately 100 men per ship exclusive of ships crew can be added | Estimated | 200 |
| Piers A, B, C, D | " | 400 |
| Portion of Navy Base including 1100 foot drydock—the only one on the west coast outside of Bremerton that can handle a 45,000 ton battleship | " | 4,000 |
| Navy Landing | " | 50 |

<u>Two Mile Radius</u>

| | | |
|---|---|---|
| Portion of Navy Base | Estimated | 10,000 |

<u>Three Mile Radius</u>

| | | |
|---|---|---|
| Naval Air Station | Estimated | 500 |
| Coast Guard Headquarters | " | 500 |

<u>Four Mile Radius</u>

| | | |
|---|---|---|
| Naval Receiving Station | Estimated | 10,000 |
| Navy Degaussing Station | " | 25 |
| Headquarters, Port of Embarkation | " | 500 |

b.   <u>To the Facility</u>

One of the runways at the Naval Air Station points directly

at the Pier.  Information received is to the effect that there has been

little difficulty with low flying planes.

There are several oil wells in the vicinity, some under high

pressure with the well being whipstocked out under the bay.  There is

a considerable traffic hazard from the harbor congested with Navy ships.

There is also a large concentration of tankers and bunkering piers.

Bunkering is allowed at the explosives loading pier, but

ammunition loading is stopped during bunkering.  The Army is now bunker-

ing most ships before they proceed to the Pier for loading.

SBC 0947

2652

SECRET



DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

- 20 -

COE044911

RLA 0204
US038891

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

12.  BACK-UP STORAGE AREA

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND931517

   a.  Location

       Rialto Ammunition Back-Up Storage Area is located at Rialto,
California, in San Bernardino County, approximately 53 airline miles from
Victory Pier at Long Beach, 67 miles via road and 70 miles via railroad.
Personnel is now 135 and all civilian labor on ammunition handling is
under Civil Service.

   b.  Area and Boundaries

       Rialto has a total area of 2823 acres and is bounded on the
south by Highland Avenue, on the west by Sierra Avenue, on the east by
Linden Avenue, and on the north by Riverside Avenue and an unimproved
road.  Site now occupied by the Back-Up Storage Area was formerly the
location of the Fontana Airport.  Elevation runs from +1560 to +1630.

   c.  Capacity

       There are twenty standard igloos on the reservation and present
capacity of freight cars is 200.

   d.  Expansion Possibilities

       Original plan was to add twenty more igloos and loop tracks
back to the Classification Yard.  There is still room for this addition,
should it be required.  Surrounding areas are mostly brush and area of
reservation could be expanded.  The cost price of Rialto Ammunition
Back-Up Storage Point land was about $49 per acre, plus 7.6 acres ease-
ment from the Southern Pacific Railroad for access tracks.  There are a
few other easements outstanding for water lines, etc.

   e.  Present Use of Land

| | |
|---|---|
| Barricaded Storage Yard | 21% |
| Igloo Area | 4% |
| Classification Yard and running tracks | 1% |

SBC 0948

2652

– 21 –

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND931517

COE044912

RLA 0205
US038892

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET

Remaining 74% is occupied by the Administration Area and the

remainder is unsettled prairie.

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

f.  Soil and Foundation Conditions

Land is mostly sand and gravel which will hold considerable

water.  This is debris cone and washing from the hills.  About 25% will

pass through a one inch screen, rest is larger.  There is little possi-

bility of flood.

g.  Climatological Conditions

(1)  Temperatures

| | | |
|---|---|---|
| Mean Maximum | 76.2° | 16 year record |
| Mean Minimum | 47.4° | "    "    " |
| Maximum Recorded | 114.0° | "    "    " |
| Minimum Recorded | 25.0° | "    "    " |

(2)  Precipitation

| | | |
|---|---|---|
| Average Annual | 18.23" | 15 year record |
| *Greatest in 24 hours | 5.12" | 23 Feb 1913 |
| Average Annual Snowfall | none | |
| *Average Daily Relative Humidity | 63% | 43 year record |

(3)  Air Movement

| | | |
|---|---|---|
| General Direction | S.W. | 39 year record |
| *Average Velocity | 5 m.p.h. | 53 "    " |
| *Highest Velocity | 48 m.p.h. | 53 "    " |
| *Average number of days of dense fog | 25 days | 66 "    " |

(4)  Lightning

*Average number of thunderstorms  5   60 year record

Those figures followed by an asterisk are those for Los Angeles

since figures for Rialto were not available.

h.  Track Layout

Track layout is good in the new storage yard, but in both the

Igloo Area and the Classification Yard the tracks terminate in dead-ends.

COE044913

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

SECRET

SBC 0949

RLA 0206

US038893

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

Access track from Santa Fe to reservation is on a fifty foot wide right-of-way. Eighty-five pound rail is used throughout reservation. Barricades in the storage yard are of sand, gravel, etc., built on a two to one slope.

i.  Routes and Schedules to Port

Most cars arriving at Rialto are routed through Barstow, Calif. Both the Santa Fe and the Union Pacific use the same tracks from Barstow. Cajon Pass lies between Barstow and Rialto and everything for the Coast must go through the Pass. There is a steep grade at this point and a bottleneck is formed. It now takes 16 hours from Barstow where formerly three hours were required. As an alternate route, cars can come in on the Southern Pacific, interchange to the Union Pacific at Colton, and then interchange to the Santa Fe at San Bernardino. There is one local freight per day from San Bernardino to Rialto, but there are a number of freights daily into San Bernardino. There are no regular freights to the Port and a special movement is made when cars are ordered in. There are usually at least ten cars in a train and they are routed via the Santa Fe to San Bernardino, Union Pacific to Meade Yard in Long Beach, and Pacific Electric to Victory Pier.

Rialto receives ten days free demurrage from the railroad and it is deemed economical to store in cars, since it would cost no days demurrage to unload a car. However, cars are arriving too early and as a result cars are held from seven to eight days. Cars arriving at Rialto are opened and contents inspected.

j.  Roads

Roads to Rialto are first class highways with a two lane macadam access road from main highway to reservation. All igloos are

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

SBC 0950

COE044914

RLA 0207
US038894

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

SECRET    DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

served by both roads and rail and access roads will be built to barri-

caded spurs in the storage yard. The patrol road will be blacktopped.

A concrete drainage ditch runs along north side of restricted area.

Ditches are used for storm drainage.

k. Locomotives

At present, there is an 80 ton Diesel locomotive on the reser-

vation. Due to lack of grades, this locomotive can handle 18 or more

cars. A 45 ton Diesel locomotive is to be furnished from Victory Pier

when another is received to replace it.

l. Igloos

Igloos are of standard design on concrete footings and spaced

in accordance with quantity-distance tables. Igloos are not used to a

great extent.

m. Administration Area

The Administration Area is at the southeast corner of the

reservation. All buildings are of frame construction and of one story

in height with the exception of the Administration Building which is

two stories high.

n. Explosive Safety

The greatest number of cars of explosives held at Rialto at

one time was 461. However, the average is about 400 cars per month.

There are three ammunition inspectors at present, which leaves

them one short of a full complement.

Recoopering is done between or around the igloos, one box at a

time. Damaged material is destroyed out in the area. There is no desig-

nated burning ground. Small quantities have been burned in a pit. How-

ever, this is now a target range.

2652

- 24 -

SECRET

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

COE044915

SBC 0951

RLA 0208
US038895

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517          SECRET

Telephones are the only means of communication with the exception of a radio on one of the fire trucks which is tied into the State Forestry network. One of the new F.M. stations is to be put in here.

There is no lightning protection on any buildings on the reservation.

o.  <u>Fire Protection</u>

Water is down about 700 feet. A Layne deep well pump, electrically and gasoline driven on automatic control, pumps into a 6000 gallon pressure tank, pressure of which is maintained at about 60 pounds. This water is piped through a 6 inch line to the Administration Area only.

A civilian fire department is on duty at all times. Their equipment consists of a 300 g.p.m. pumper with front mounted pump and a 300 gallon booster tank of water. The State Forestry Department has loaned the Back-Up Point one of their 500 gallon pumpers equipped with a 250 gallon water tank and another will be loaned if needed in the future. Both pieces of apparatus are fully equipped for fighting brush fires. A railway flat car is now being equipped for fire fighting with a 500 g.p.m. dismounted trailer pump and three 3000 gallon redwood tanks. This car will be behind the engine at all times and will also serve as a reacher or spacer between engine and explosive cars.

In case of an emergency, assistance might be obtained from Rialto, one pumper and Fontana, two pumpers, but both would probably be under-manned. The state Foresty Service can also furnish pumpers and men.

There are no fire alarms and fire inspections are made by fire department personnel.

2652                    - 25 -          DECLASSIFIED
                    SECRET          E.O. 12356, SEC 3.3
                                     NND937517

SBC 0952

COE044916

RLA 0209
US038896

Reproduced from the holdings of the
National Archives and Records Administration
Pacific Region (Laguna Niguel)

DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517                 

Housekeeping is good except that the brush presents a constant fire hazard and must constantly be given attention, either by burning off or grubbing out.

p.  Power Supply

Southern California Edison Company supplies 2300 Volts which is reduced to 110 Volts for use in the area.

q.  Exposures from the Facility

Within a two mile radius there are only scattered dwellings. Within a five mile radius is a greater portion of the towns of Fontana with a population of 4,000 and Rialto with a population of 1800. There are no industrial or military installations in the vicinity.

r.  Exposures to the Facility

The only exposure to the facility is a brush fire hazard. Considerable work has been done to eliminate this possibility and plans have been made to continue the program until the hazard is reduced to a minimum or entirely eliminated.

s.  Internal Exposures

Since both pieces of fire apparatus are contained in one frame building, it is felt that a fire might put both of them out of service.

13. EMERGENCY LOCATIONS FOR LOADING OR BACKUP

Should it be necessary to load at some point other than Victory Pier, there are three alternatives. Loading could be done at other piers in the harbor, but the hazard would be tremendous. Or, loading might be done in open water. There is no alternate location in the immediate vicinity for emergency back-up storage, unless the Navy could

SBC 0953



DECLASSIFIED
E.O. 12356, SEC 3.3
NND937517

COE044917

RLA 0210
US038897

# The Project Gutenberg

EXHIBIT L

Reproduced at the National Archives

# LOS ANGELES PORT OF EMBARKATION
### OFFICE OF THE PORT ORDNANCE OFFICER
#### WILMINGTON, CALIFORNIA

May 12, 1943

SPTAP
3.14. 7/3.

Subject: Review of the Port Ordnance Office, Los Angeles
Sub-Port of Embarkation and its activities and
Functions for the Period Ending March 31, 1943.

To:     Office of the Chief of Ordnance
        Pentagon Building
        Washington, D. C.

        ATTN: Historical Section

        In compliance with Ordnance Department Order No.
337, the following pertains to the establishment and activ-
ities of the Port Ordnance Office, Los Angeles Sub-Port of
Embarkation (Now the Los Angeles Port of Embarkation).

## ADMINISTRATIVE BRANCH

        On January 2, 1943, Capt. Maynard was transferred
to Camp Anza as Ordnance Officer, to activate the Ordnance
Office at that station. The official order was issued on
January 15, 1943. He remained at Camp Anza until March 22,
1943, when he was returned to LASPE to assume the duties of
Armament Maintenance Officer.

        On January 13, 1943 Major Ralph Anspach, the Port
Ordnance Officer, left for Detroit to attend a Conference of
representatives of Port Ordnance Offices at Tank-Automotive
Center, Detroit, returning on January 22nd.

        Mr. E. V. Normoyle reported to Richmond Tank Depot
on January 13, 1943, to study the latest methods of prepar-
ing Ordnance vehicles for shipment. On January 20th, he was
commissioned a Captain in AUS and returned to LASPE on Jan-
uary 23, 1943. From this date he has served as Motor Main-
tenance Officer under Capt. G. B. Chapman, Motor Transport
Officer.

        January 15, 1943. On this date 1st Lt. Alva D.
Newburn was assigned to Ordnance Office, Camp Anza, as Motor
Maintenance Officer.

        Major David F. Blankenhorn transferred from Tank
Automotive Center, Detroit, to LASPE December 29, 1942, re-
ported at this station January 18, 1943 and was assigned as
Ordnance Executive Officer.

        On February 3, 1943, 1st Lt. Wayne A. Fox was trans-

-1-

ARCHIVES II
REGISTER AGENCY

ORD.
ENTRY 664 H -
EXEC. DIV. - HISTORIES
OF ORD. ACTIVITIES
@ POEs, 1919-1945
BOX 1 - BALT PORT
AGENCY TO NEW
ORLEANS POE
F: LA POE (ORIG) V.1
HISTORY THRU 4/30/43

SHR01136

ferred from Fort Mason to Ordnance Section, LASPE, and on March 22, 1943, he was transferred to Camp Anza and assigned Camp Ordnance Officer relieving Capt. Maynard.

On February 20th, 1943 Major Anspach was detailed the Law Member of the General Court-Martial appointed to meet at this Port.

Major Anspach during the period of this Historical Report continues as President of the Cargo Priority Board for this Port.

Major Blankenhorn, on February 19, 1943, visited Stockton Ordnance Depot and on February 23, 1943 went to Lathrop H. & R. P. thence to Benicia Arsenal, thence to Port Ordnance Officer, Oakland, in connection with coordination of shipments thru LASPE.

On March 22, 1943, Major Blankenhorn was appointed member of an Army Specialized Training Board for the purpose of Selecting enlisted men to participate in the Army Specialized Training Program.

March 1, 1943, Capt. Chapman, Motor Transport Officer, was ordered to Rock Island Arsenal, Rock Island, Illinois and reported there on March 9, 1943, for the purpose of receiving three weeks instruction in Supervisory Leader Training Program; after which he returned to LASPE as Motor Transport Officer.

March 3, 1943. 1st Lt. Frank N. Davis and Gerald R. Storch (civilian), Jr. Auto Advisor, proceeded to Fort Mason for 14 days instruction at the Controlled Materials Plan Institute.

March 22, 1943 1st Lt. Hosier transferred from LASPE Ordnance Shipping Officer to Commanding Officer at Fontana Ammunition Storage Point relieving Major Nelson who was assigned Ordnance Shipping Officer at this Port.

On March 3, 1943, 2nd Lt. Robert A. Glick was transferred from SFPE to LASPE and on March 22, 1943, was sent to Fontana Ammunition Storage Point to assume the duties of Assistant to Commanding Officer.

Civilian employees of the Ordnance Department as of January 1, 1943, 92; as of March 31, 1943, 115.

PERSONNEL AS OF MARCH 31, 1943

Commissioned:

| DATE OF ARRIVAL | NAME | DUTY | RANK |
|---|---|---|---|
| 7-26-42 | Ralph Anspach | Port Ord. Officer | Major |
| 1-18-43 | David F. Blankenhorn | Executive Officer | Major |
| 6-2-42 | Stanford C. Nelson | Shipping Officer | Major |
| 5-10-42 | Gordon B. Chapman | Motor Transport Officer | Capt. |
| 2-18-42 | John B. Harrison | Task Force Officer | Capt. |
| 7-24-42 | Millard Maynard | Armament Officer | Capt. |
| 1-20-43 | Edmund V. Normoyle | Motor Maint. Officer | Capt. |

-2-

vo 475/18119

Reproduced at the National Archives

PERSONNEL AS OF MARCH 31, 1943
(Continued)

| DATE OF ARRIVAL | NAME | DUTY | RANK |
|---|---|---|---|
| 6-16-42 | Frank N. Davis | Supply Officer | 1st Lt. |
| 2-1-43 | Wayne A. Fox | Camp Ordnance Officer Camp Anza | 1st Lt. |
| 12-22-42 | Raymond F. Hosier | Commanding Officer Fontana | 1st Lt. |
| 11-13-42 | Bryan H. Hyder | Asst. Camp Ord. Officer Camp Anza | 1st Lt. |
| 7-16-42 | Carl Koch | Asst. Task Force Officer | 1st Lt. |
| 11-9-42 | Alva D. Newburn | Motor Maint. Officer Camp Anza | 1st Lt. |
| 3-30-43 | Frank C. Gay | Asst. Shipping Officer | 2nd Lt. |
| 3-5-43 | Robert A. Glick | Asst. To Commanding Officer Fontana | 2nd L |

Non-Commissioned:

| | | | |
|---|---|---|---|
| 2-15-43 | Medie M. Nunn | Librarian | M/Sgt |
| 12-16-42 | Wilbur Sheets | Chief Clerk & Store-keeper - Camp Anza | T/Sgt |
| 12-31-42 | Charles Bigelow | Small Arms Repair Shop Camp Anza | T/3 Sgt. |
| 1-25-43 | John C. Huber | Issuing & Receiving Camp Anza | T/4 Sgt. |
| 1-27-43 | Wm. Maharidge | Small Arms Repair Shop Camp Anza | T/5 Cpl. |

CIVILIAN PERSONNEL

The growth in number of civilian personnel has paralleled the growth of the Port Ordnance Office. The number of Civilian Employees at the Port Ordnance Office by each month is as follows:

| January | 100 |
|---|---|
| February | 105 |
| March | 115 |

Property and Supply Branch

1. The Ordnance Property Officer maintains an adequate stock of motor vehicle parts for issue to the Ordnance Maintenance and Inspection Shop for the repair of vehicles prior to overseas shipment and for administrative vehicles. Reissues are made to the lower echelons of the Port when necessary.

2. A small port reserve of pistols, submachine guns, rifles, wrist watches, binoculars, ammunition, etc., is also maintained. These items are for reissue to casual officers and

-3-

oo 475/18119

Reproduced at the National Archives

enlisted men enroute overseas upon the presentation of orders calling for such equipment.

3. Requisitions are prepared in this office for Ordnance equipment for the various tactical organizations of the Port such as the 785th M.P. Bn., the 229th M.P. Co., War Department Patrol, Etc.

4. Property and expendable office supplies for the Port Ordnance Office are requisitioned, stored, and issued by this department.

5. Accurate records of all the above property are maintained in accordance with current regulations. A perpetual inventory which reflects the stock of ordnance supplies on hand is kept. Issues are made on tally outs, shipping tickets, and memorandum receipts.

6. This Department was organized in August, 1942. At the present time the operating personnel consists of five civilians, one enlisted man, one WAAC, and one officer in charge.

Task Force Branch

1. During the first three months of 1943 the Task Force personnel increased from one officer and three civilians to two officers and seven civilians.

2. Lt. Carl Koch was Task Force Liaison Officer from the first of the year until January 28th; Captain John B. Harrison was then appointed Task Force Liaison Officer and Lt. Koch acted as Assistant to the Task Force Officer.

3. Ten Troop Movements were handled during this period. On some of the movements this Port handled only the organizational equipment, others it handled the personnel and others it handled both the personnel and organizational equipment.

4. The duties performed by the department during the period were -

a Assisting the liaison officers of the Task Force units with their problems pertaining to the supply of Ordnance materiel, authorized, and the filling of all shortages.

b Maintained records of shipments of ordnance materiel to the Port for the Task Forces and for the Base Depots of the Task Forces.

c Contacted consignor depots to expedite shipments to meet sailing dates of vessels.

-4-

oo 475/18119

vessels.

    d  Prepared necessary reports listing Ordnance items shipped with Task Forces for overseas destinations.

    e  Directed the assignment of excess vehicles from Task Forces into the Reconsignment Pool.

    f  Calculated authorized allowances of Ordnance materiel lists from T/BA and T/O, for Task Forces.

    g  Verified shortage lists submitted by the Task Force against calculated materiel lists.

    h  Edited and transmitted to the Chief of Ordnance supplementary shortage lists prepared at this Port.

    5.  Motor vehicles made up the largest part of materiel handled.  Roughly, 3300 Ordnance general and special purpose vehicles were shipped to Task Forces during this period.

## Motor Transport Branch

A.  Activities

    1.  The Ordnance Motor Transport Service Shop, of the Army Port of Los Angeles, Wilmington, California, during the period from December, 1942, through March, 1943, has repaired, and otherwise serviced, approximately 1,950 United States Army vehicles, and has indexed and recorded, by W or U.S.A. number, approximately 4,600 boxed vehicles passing through this port.

    2.  Types of vehicles, which have been serviced and processed, including sedans, command cars, weapon carriers, buses and ambulances, trucks of from one-fourth to ten ton capacity, trailers of all types and sizes, tractors, cranes, and all types of heavy-duty equipment.  Included also have been items of equipment for specialized branches of the service.

    3.  All vehicles passing through this port have first been unloaded, by the Ordnance Motor Transport Service, then thoroughly inspected both for mechanical and general condition throughout.  All necessary repairs are made to ascertain that the vehicles are in perfect condition and any missing or defective parts or equipment are replaced.

    4.  Although the major function of the department is to service and prepare vehicles passing through this port, it has also performed complete maintenance repairs to vehicles assigned to organizations within the port.

-5-

oo475/18119



5. In order to properly make replacements with dispatch, it has been necessary to maintain a complete parts department and to keep in good condition shop equipment for the performance of this function.

6. After the vehicles have been completely serviced, they are further prepared for overseas shipment by spraying with rust-preventive, and otherwise taking necessary measures to insure arrival at destination in good condition.

7. This department has also inspected and prepared approximately 150 tanks.

B. Organization.

1. Roster of Officers, assigned and attached, and their duties

Captain Gordon B. Chapman, Motor Transport Officer
Captain E. V. Normoyle, Motor Maintenance Officer
1st Lt. Frank N. Davis, Supply Officer
1st Lt. Dewey A. Newburn, Motor Officer and Officer
in Charge of reception park

2. Number of assigned enlisted men on duty

As of March 31, 1943, there were ten enlisted men on duty with the Port Ordnance Office, attached to the Motor Transport Service Shop.

3. Number of Civilian employees

As of March 31, 1943, there were 51 civilian employees on the payroll.

4. Events of general interest which have transpired during the period.

a. Captain Gordon B. Chapman, Motor Transport Officer, returned from Rock Island, Illinois, on April 8, 1943, after having completed a course in Supervisory Leader Training at the Rock Island Arsenal, Special Order #38.

b. On March 8, 1943, 1st Lt. Frank N. Davis and Gerald R. Storch, reported, under Special Orders #40, to Ft. Mason, California, where they attended the Controlled Materials Plan Institute.

-6-

Case 5:09-cv-01864-PSG-SS    Document 1070-5    Filed 11/02/11    Page 82 of 174
Page ID #:62294
Reproduced at the National Archives

c. Captain E. V. Normoyle reported for duty on January 20, 1943, at which time he was appointed Motor Maintenance Officer.

d. 1st Lt. Alva D. Newburn, Automotive Inspection Officer, was transferred, January 15, 1943, under Special Order No. 9, to Camp Anza, where he assumed the duties of Motor Maintenance Officer.

e. During the week ending January 25, 1943, six men from this department were sent to Camp Anza to install shop equipment.

f. On March 9, 1943, Mr. Donald A. McAlpine, civilian technician, proceeded to Benicia Arsenal, Special Order No. 44, for a period of thirty days for training and experience in armament inspection and maintenance.

g. Mr. Bernard Dottl and Mr. Pete Paola returned to the Ordnance Office for duty on March 1, 1943, after having completed an extensive course of study in Ordnance Sponsored Packaging at the United States Forest Products Laboratory at Madison, Wisconsin, and another course in Tank Sealing at the Toledo Tank Depot at Toledo, Ohio. Letter Orders No. 5.

h. On February 9, 1943, this department completed moving its office, parts department, and shop to the new location at the Harbor District Warehouse.

C. Problems

(1) Problems encountered or solutions developed.

Lack of facilities for servicing and preparing vehicles under cover until procuring our present facilities.

(2) Unique or unusual operations

None

D. Methods

(1) Methods and changes of technique in operating procedure

No changes have been made in technique or operating procedure

-7-

SHR01142

E. Facilities

   (1) Amount of space occupied

     a. At the present time, this department is occupying approximately 28,090 square feet of floor space for the shop, parts department and office.

     b. A total of approximately 275,000 square feet of open storage space is being used for the storage of vehicles enroute to overseas bases.

     c. The above available space is being temporarily used pending construction of the motor maintenance shop.

   (2) Additions to equipment and/or changes in operating facilities

     This department has, as of the period covered by this report, approximately 95% of the equipment necessary to function as a fourth echelon shop.

F. Accomplishments

   (1) For the period from December, 1942, through March, 1943

     a. Approximately 1,950 vehicles were serviced and repaired.

     b. Indexed and recorded, by W or U.S.A. number, approximately 4,600 boxed vehicles.

     c. Inspected and prepared approximately 150 tanks.

     d. Number of vehicles received: 911

     e. Number of vehicles shipped: 709

Shipping Branch

   1. During the three months period ending March 31, 1943, there was an increase of activity in the Shipping Section. Personnel increased and each employee was trained to take care of a specific assignment, and in addition was made familiar with other functions so as to be able to take over other duties in case of an emergency.

   2. The procedure of processing Ordnance Materiel was improved so that reports and abstract manifests could be made out with greater dispatch.

-8-

Reproduced at the National Archives

3.    The functions of the Shipping Section has been divided into four groups.  Each group processing shipping records under the one system of Master Control Card, thereby making the interchange of personnel very flexible.  The work of handling these papers is divided into two divisions, Ammunition and General Supplies; all records being routed through the different groups.  Upon receiving shipping data, a complete record is made upon the Master Control Card.

4.    The processing of all papers on shipments of Vehicles is handled the same as Ordnance Materiel.  The Checkers on Piers pick them up on their tally-in reports, which are checked against reports of Vehicles to be shipped.

5.    As shipping papers are received relative to shipping orders they are recorded and processed, then fastened to a backing and kept in an active file until materiel is floated.  After floating, an abstract manifest is made, and all papers are withdrawn and placed in the dead file.

6.    This department acts in coordination with the ATS branch and Port Transportation Office in controlling and synchronizing the movement of High Explosive Ammunition into the Port for loading.  The Port Transportation Office is requested to divert all shipments of this type of Ammunition into Fontana Ammunition Storage Point when repships are received.  The information contained in the repship is sent to all concerned showing complete nomenclature description of Ammunition shipped with information as to the number of cars and number of days intransit from the Port.

7.    An Ammunition Pier is now being made ready.  Upon receiving instruction to use this Pier, the traffic control problem of moving cars of High Explosive Ammunition into the Port to be floated overseas will be greatly improved.

8.    The following figures of Ammunition and General Supply tonnage are shown as floated during this period:

| Month | | LONG TONS | | |
| --- | --- | --- | --- | --- |
| | | Ammunition | Gen. Supplies | Total |
| January | 1943 | 5,787 | 4,073 | 9,860 |
| February | 1943 | 2,553 | 1,446 | 3,999 |
| March | 1943 | 3,560 | 981 | 4,541 |

-9-

00475/18119

SHR01144

9.  Arrival of Ordnance General Supply Shipments LCL,
are delivered to a specific Pier in accordance with a code des-
tination shown where they are tallied-in by Ordnance Checkers,
except LCL Ammunition.  The former type of Materiel is checked
in at a specific Pier by the Ordnance Checkers and then diverted
to a spot set aside on another Pier for the particular destination.
LCL ammunition is handled separately.

Ammunition Inspection Section

1.  As of January 1, 1943, the Inspecting Department
consisted of the following personnel:

        1 Chief Ammunition Inspector
        1 Principal Ammunition Inspector
        2 Ammunition Inspectors at this Port.
        1 Ammunition Inspector at the Fontana Ammunition
          Storage Point.

This makes a total of 5 Ammunition Inspectors of various
grades and since that time, this force has been increased by
three more Inspectors making a total of eight on duty in this
area.

2.  The duties of this department consist of the
following:

    a.  To cooperate with the Army Transport Service in
        planning the segregation and storage of ammunition
        and explosives aboard ships in accordance with the
        latest I.C.C. and safety regulations.

    b.  To spot check all ammunition shipments passing
        through this Port as to their serviceability,
        condition received, and to cooperate in the re-
        pairing or recoopering of any damaged ammunition
        crates, containers, or boxes.

3.  During the months of January, February, and March
of 1943, there has been a considerable increase in the tonnage
of ammunition shipped through this Port for overseas destina-
tions.  Of this amount, there has been an exceptionally small
quantity of ammunition or explosives that were rejected for
shipments overseas.  The only item completely rejected and
destroyed was approximately 100 pounds of smokeless powder
which was packed in 25-pound powder cans.  These cans were
crushed and broken open to such an extent that the powder had
sifted out between the stack of cans on to the floor of the car.

4.  It is expected that the ammunition loading pier

-10-

oo475/18119

Reproduced at the National Archives



located at the Long Beach Terminal will be ready for use with-
in the next thirty days. This will eliminate the extreme haz-
ard of loading ammunition and explosives of all types across
docks in congested areas, within close proximity of oil company
storage areas, active oil wells, and other installations of im-
portance. Ammunition loading has been a considerable problem
at this Port due to the fact that when a ship is scheduled to
take ammunition, the explosive content usually runs into the
amount whereby all areas within a radius of one mile could be
classified as being within the structural damage explosive area.

    5. This department is working in close cooperation
with the Coast Guard and the Navy Department and is often
called upon for advice and cooperation in the identification and
handling of ammunition or explosives of various types.

    6. Due to the increased shipping of ammunition in
the areas covered at this Port, it is felt more inspectors
should be assigned to this department. At least seventeen
inspectors are needed at this Port, with an additional three
inspectors assigned to the Fontana Ammunition Storage Point.
This will enable the Inspecting Department to give a contin-
ious 24-hour service to the Port.

Fontana Ammunition Storage Point

    1. The first quarter of the year showed an increased
amount of activity at the Ammunition Storage Point.

    2. The handling of ammunition for overseas shipment
is shown in the following table:

| | January | February | March |
|---|---|---|---|
| In | 78 | 54 | 76 |
| Unloaded | 17 | 18 | 61 |
| Out | 36 | 69 | 20 |

    A thirty-ton gasoline locomotive was received on
the reservation and, although too small to do an efficient
job, did materially facilitate the handling of the cars.

    3. During this period three igloos and the open
storage area were set aside for D.T.C., and during the month
of February the 261st Ordnance Maintenance Company (AA) was
stationed on the reservation with a strength of five officers,
one W.O. and 146 Enlisted Men. During the month of March
the 622nd Ordnance Company (AM) with three officers and 190
Enlisted Men were stationed on the reservation. Both of these

-11-

0-0475/18119

Reproduced at the National Archives

companies were under the jurisdiction of D.T.C. However, the
ammunition company was utilized and thus received valuable
training in the handling of live ammunition and explosives.
During March 72 cars of simulated ammunition for D.T.C. was
received and unloaded in open storage. The personnel at the
Storage Point gave all possible assistance to D.T.C. in aid-
ing the troops in ammunition handling.

## Ordnance Activities in Staging Area, Camp Anza

1. During the week of January 2, 1943 the camp Ord-
nance at Camp Anza, Arlington, California was established
under the direction of the Port Commander, Commanding Officer
- Camp Anza, and Port Ordnance Officer. Camp Anza is better
known as the Arlington Staging Area. Camp Anza is located in
the San Bernadino Valley, Riverside County about 65 miles
north east by east of Wilmington, California and about one
(1) mile from Arlington, California. Camp Anza was named in
honor of Captain Dela Anza, a Spanish explorer.

2. During the month of February the Motor Maintenance
Shop was completed. Some 1,500 square yards of concrete were
laid. Machinery and equipment were received and installed.
The parts department, wash rack, and other insulations were
completed. Lt. Newburn is in charge, with a staff of eight
(8) mechanics and two (2) clerks. During the three months
ending March 31st, 106 vehicles were inspected, serviced and
repaired. The shop is located in building No. 1144 of the
Camp.

3. Small Arms Maintenance Shop was completed and in
operation January 10, 1943. During January 10, 11, and 12th
4,735 rifles, cal..30, M1903 were inspected and 1,356 were
repaired. 1,575 rifles were issued by the Camp Ordnance
Officer to a task unit which arrived at the Staging Area with-
out arms. Capt. Burkett and Capt. Kleese of Fort Mason arrived
with 35 enlisted men to assist in the inspection of task force
above mentioned. T/S 4th Gr. Charles Bigelow with two assist-
ants handled all reports and furnished the necessary spare
parts from the parts department which is maintained in the
Small Arms Maintenance Shop. This shop is located in building
No. 1145 of the camp.

4. During February, 1943 there were no troop move-
ments in or out of the Staging Area. During this month complete
inventory of all spare parts and accessories was made. Requisitions
were submitted on Benicia Arsenal to replenish the port reserve
and necessary stocks in preparation for the next movement.

5. During March a second task force arrived at the
Staging Area. 4,290 rifles, U.S. cal..30, M1903 and cal..30,

oo475/18119

SHR01147

Reproduced at the National Archives

M1 were inspected, and 1,275 were repaired. Pistols, Cal..45, M1911, sub-machine guns, cal..45, binoculars, and watches, and 844 rifles, U.S. cal..30, M1903A3 were issued. The inspection was conducted by Capt. Kleese and the eight enlisted men from Fort Mason, California, and arrangements were made by Major Blankenhorn and Brigader General Simpson, Commanding Officer of Santa Anita Training Center, for a complement of 30 men, one (1) Warrant Officer, and twenty-nine (29) enlisted men. All inspections were conducted on a 100% basis. Organizations moved through the inspectors. One recorder was assigned to each two inspectors recording all defects.

6.  The lack of tools, equipment, and spare parts has, in the past, been our greatest handicap. Trained mechanics as small arms repairmen have also been a handicap. There is a new school being conducted at Camp Anza Staging Area to train Ordnance personnel to become small arms mechanics. Recently a purchase has been made of tools and equipment for the Small Arms Maintenance Shop for the Camp Anza Staging Area.

7.  The library maintained by the Camp Ordnance Office carries a wide variety of Standard Nomenclature Lists, Training and Technical Manuals for issue to units passing through the Staging Area.

8.  A port reserve of major items of small arms is maintained at the camp for the purpose of making up shortages in equipment of units passing through the Staging Area. Benicia Arsenal is designated as issuing arsenal for Camp Anza Staging Area.

9.  The following small arms records are maintained for each inspection:

     a.  Items inspected.

     b.  Number inspected.

     c.  Number repaired.

     d.  Number replaced.

     e.  Per cent repaired based on 100 weapons.

     f.  Record of force movement number.

10.  Ordnance personnel at Camp Anza during January, February, and March consisted of the following:

     a.  Capt. Millard Maynard
        Camp Ordnance Officer

-13-

oo 475/1819

Reproduced at the National Archives

b. 1st Lt. Bryan H. Hyder
Assistant Ordnance Officer

c. 1st Lt. Alva D. Newburn
Motor Maintenance Officer

Enlisted Personnel:

d. Six (6) enlisted men

Civilian Personnel:

e. Fourteen (14) Civilians

For the Port Ordnance Officer:



DAVID F. BLANKENHORN
Major, Ord. Dept.
Assistant

-14-

00475/18119

EXHIBIT M



LOS ANGELES BACKUP STORAGE FACILITY
AMMUNITION BACK-UP STORAGE
FONTANA, CALIFORNIA
GENERAL LAYOUT PLAN

SHR01793

EXHIBIT N

1   IGNACIA S. MORENO
    Assistant Attorney General
2   Environment & Natural Resources Division

3   MICHAEL C. AUGUSTINI (D.C. Bar No. 452526)
    michael.augustini@usdoj.gov
4   ROCHELLE L. RUSSELL (Cal. Bar No. 244992)
    rochelle.russell@usdoj.gov
5   LESLIE M. HILL (D.C. Bar No. 476008)
    leslie.hill@usdoj.gov
6   KIM SMACZNIAK (N.Y. Bar No. 4782637)
    kim.smaczniak@usdoj.gov
7   Environment & Natural Resources Division
    Environmental Defense Section
8   U.S. Department of Justice
    P.O. Box 23986
9   Washington, DC 20026-3986
    Telephone: (202) 616-6519
10  Facsimile: (202) 514-8865

11  *Attorneys for Defendant United States Department*
12  *of Defense*

13              **UNITED STATES DISTRICT COURT**

14       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

16  CITY OF COLTON, a California            Case No. ED CV 09-01864 PSG (SSx)
    municipal corporation,                  (consolidated)
17
                  Plaintiff,
18                                           **RESPONSE TO ASTRO**
    v.                                       **PYROTECHNIC INC.'S FIRST SET**
19                                           **OF INTERROGATORIES TO THE**
    AMERICAN PROMOTIONAL                     **UNITED STATES OF AMERICA**
20  EVENTS, INC., et al.,

21                Defendants.

22

23       **RESPONSE TO ASTRO PYROTECHNIC INC.'S FIRST SET OF**
         **INTERROGATORIES TO THE UNITED STATES OF AMERICA**

24

25          Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure,

26  Defendant United States hereby provides its responses and objections to Plaintiff

27  Astro Pyrotechnics, Inc.'s ("Astro") First Set of Interrogatories to the United States

28  of America (the "Requests").

## **GENERAL OBJECTIONS**

Defendant makes the following General Objections, whether or not separately set forth in response to each Interrogatory, to each and every Interrogatory made in the Requests, as set forth herein and incorporated specifically into each of the responses below:

1.     Defendant has not completed its investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial.  Accordingly, this Response is based only on currently available information.  Defendant reserves the right to amend or supplement this Response if different or additional information is subsequently discovered, or if the relevance, significance, or applicability of information currently known is subsequently ascertained.  Nothing in this Response shall be construed as, or considered to be, final or exhaustive, nor shall this Response prejudice the Defendant's right to further discovery, research, analysis, or presentation of evidence at trial.

2.     The United States objects to the Requests insofar as they purport to impose obligations on the United States inconsistent with or in addition to those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Civil Rules of the U.S. District Court for the Central District of California, applicable case management orders, and any other provision of law.

3.     Defendant objects to the Interrogatories to the extent that they seek information that is not relevant to the subject matter of this case or not reasonably calculated to lead to the discovery of admissible evidence.

4.     The United States objects to the Requests to the extent that they seek information protected by the attorney-client privilege, the pre-decisional or deliberative process privilege, the work-product doctrine, any state or federal right of privacy, and other applicable privileges or exemptions from disclosure

1  recognized by federal or state law.  Inadvertent disclosure of any privileged or

2  protected information shall not constitute a waiver of any privilege nor a waiver of

3  any rights the United States may have to secure the return of such material and/or

4  object to the use of such material, including the use in any subsequent proceedings

5  in this case or at trial.

6      5.    No admission of any nature whatsoever is to be implied or inferred

7  from these Responses.  By objecting or responding to each Request, the United

8  States does not admit that any requested information is discoverable, or that such

9  information is admissible in this case.  All evidentiary objections are reserved and

10  may be interposed at trial.

11     6.    The United States objects to the Requests to the extent that they seek

12  information that is irrelevant or not reasonably calculated to lead to the discovery of

13  admissible evidence.

14     7.    The United States objects to the Requests to the extent that they seek

15  information or documents not in its possession, custody or control.

16     8.    The United States objects to the Requests to the extent that they seek

17  classified, confidential, private or personal information, proprietary information

18  and/or trade secrets.

19     9.    The United States objects to the Requests to the extent that they seek

20  information in public records or that is equally available to Astro.  Any information

21  or documents that the United States has obtained at the direction of counsel from

22  the public domain are privileged work product inasmuch as the particular

23  documents chosen for copying by legal representatives would reflect counsel's

24  impressions and thought processes.

25     11.   The United States objects to the Requests to the extent that they seek

26  or call for a legal conclusion.

27     12.   The United States objects to the Requests to the extent that they seek

28  information that is not described with reasonable particularity, unlimited as to time,

1    and are overly broad, unduly burdensome, and oppressive.

2        13.    The United States objects to the Requests to the extent that they

3    require the review or analysis of records and documents where such review or

4    analysis would be unduly burdensome, duplicative, cumulative, or require the

5    disclosure of work product or other protected information.

6        14.    The United States objects to the Requests to the extent that they seek

7    to elicit information concerning the identity or activities of consultants who have

8    not been retained or formally designated as testifying expert witnesses.

9        15.    The United States objects to the Requests to the extent that they are

10   ambiguous, vague, unclear, or not susceptible to a commonly understood meaning.

11       16.    The United States objects to the Definitions as compound, confusing,

12   vague, ambiguous, calling for legal conclusions, and containing undefined or

13   uncertain terms.

14       17.    The United States objects to the definitions of "United States"

15   "YOUR," and "YOURS" on the grounds that they are/is vague, ambiguous, overly

16   broad, and unduly burdensome.  The United States also objects to these definitions

17   to the extent that they include attorneys, contractors, and consultants and seek

18   information protected from discovery by the attorney-client privilege, the work-

19   product doctrine, the joint defense privilege, or any other applicable privilege or

20   confidentiality protection.  The opinions of testifying experts will be disclosed in

21   the manner and at the time specified in the Federal Rules of Civil Procedure and

22   case management orders.

23       18.    The United States objects to the Requests as overly broad, unduly

24   burdensome, irrelevant, immaterial and not reasonably calculated to lead to the

25   discovery of admissible evidence, insofar as they seek information regarding

26   release, handling, storage, disposal at any location other than the Rialto

27   Ammunition Back-Up Supply Point in Rialto, California.

28

## RESPONSES

Subject to and without waiving the foregoing general objections, the United States responds as follows:

**INTERROGATORY NO. 1**

IDENTIFY all surviving members of the 622nd Ordnance Ammunition Company stationed at the RABSP from approximately March 1943 to July 1943, including, but not limited to, Earl Bethscheider, Earl Brown, Jr., Felix Burrus; Edwin Campbell, Sr., Horace Capri, Gerald Carrier, Joe Chambers, Seymour Cohen, Maynard Connors, George Corazza, Edelvis Duncan, Sam Ellis, Charles Feinn, Bob Fromme, Earl Gabbert, Baltazar Garcia, Lawrence Gerrish, Bill Goff, Richard Gomez, Enrique Gonzales, Frank Gravino, Herl Guinn, James Hensley, Antonio Hernandez, Gilberto Hernandez, James Hibbs, Max Hoffner, Carl Johnson, Jr., Marv Kennedy, Sam Knupp, Jr., Henry Kroeker, George Kruessel, Jasper Land, Ignacio Leal, Fred Liebetrau, Bob Little, Juan Livas, Bill Logan, Bernie Mahoney, Luis Martinez, Angelo Marzetto, Jr., John McDonough, Ben Mitchell, Louis Mitchell, Adam Morales, Bill Neal, Joe Neidorflor, Paul Nickels, George Nottenagle, Joe Owens, June Paret, Joe Persky, Jim Petersen, Robert Peterson, Ralph Petrovich, Willie Prellop, Frank Pullen, Martin Redmond, Cleo Reeves, Charles Ritchey, Eusebio Romo, Jr., Robert Schoos, Bill Seeley, John Sepo, George Smith, Stan Solberg, Vic Stevens, John Stuart, Jacob Stuertz, Carl Swanson, Herb Taylor, Jim Thompson, Carl Tindel, Charles Wands, Harry West, Earl Williams, and, Guadalupe Ynclan.

**RESPONSE TO INTERROGATORY NO. 1**

The United States incorporates by reference each of its General Objections set forth as though set forth herein in full.  The United States further objects to Request No. 1 as overly broad and unduly burdensome.  The United States further objects to the Request as vague and ambiguous particularly to the extent that it relates to "surviving members."

1    Subject to and without waiving the foregoing objections, the United States

2    states the following:

3    First, in 2004, when preparing the Final Report Operational History 1941-

4    1945 Rialto Ammunition Back-Up Storage Point, Rialto, California, Prepared for

5    the U.S. Army Corps of Engineers, Los Angeles District (the "Final Report

6    Operational History"), the United States sought to identify individuals stationed at

7    the RABSP.   The process of identifying and locating individuals is described in the

8    Final Report Operational History.  As a result of that search, the United States

9    identified the following individuals:

10    (1)    Mr. Ralph V. Thompson was a Staff Sergeant with the 622nd

11    Ordnance Ammunition Company.  His last known address and telephone number

12    is:

13    Ralph V. Thompson

14    4706 Mystik Road

15    Oceanside, CA 92056

16    Ph. (760) 724-0858

17    (2)    The United States previously disclosed the name and last known

18    address of Aaron P. Holt, a Technical Sergeant with the 622nd Ordnance

19    Ammunition Company, Fontana Ammunition Storage Point for the Los Angeles

20    Port of Embarkation, from approximately April 1943 - August 1943.  Since that

21    disclosure, the United States believes that Mr. Holt has died.

22    Second, the United States does not maintain records of individuals that are

23    "surviving members of the 622nd Ordnance Ammunition Company stationed at the

24    RABSP."  The United States does not maintain records that would allow it to

25    identify surviving servicemembers based on the name of the unit individuals served

26    in during World War II such as the 622nd Ordnance Ammunition Company.

27

28

**INTERROGATORY NO.2:**

IDENTIFY all surviving U.S. Army officers stationed at the RABSP from 1941 to 1946.

**RESPONSE TO INTERROGATORY NO. 2**

The United States incorporates by reference each of its General Objections set forth as though set forth herein in full.  The United States further objects to Request No. 2 as overly broad and unduly burdensome.  The United States further objects to the Request as vague and ambiguous particularly to the extent that it relates to "surviving U.S. Army officers."

Subject to and without waiving the foregoing objections, the United States states that it does not maintain records of the "surviving U.S. Army officers stationed at the RABSP from 1941 to 1946."  The United States does not maintain records that would allow it to identify the surviving servicemembers based on the name of the duty station during World War II such as the RABSP.

**INTERROGATORY NO.3:**

DESCRIBE the criteria for determining the echelon maintenance category of the RABSP pursuant to the November 1942 Army Technical Order regulating the use of TCE.

**RESPONSE TO INTERROGATORY NO. 3**

The United States incorporates by reference each of its General Objections set forth as though set forth herein in full.  The United States further objects to Request No. 3 as vague, ambiguous, and undefined particularly to the extent that it refers to the "the November 1942 Army Technical Order regulating the use of TCE."  The United States states that it has searched the database of documents produced in this matter and has not located a document entitled "the November 1942 Army Technical Order regulating the use of TCE," the DEFINITIONS provided with these Requests do not define the term, the referenced document is not attached to the Request, and a complete title, date, and organizational or individual

1  author has not been provided.  However, counsel for the United States is aware of a

2  document entitled "Airplanes and Maintenance Parts, General  - Cleaning of

3  Aeronautical Equipment, Technical Order No. 01-1-1" issued by the War

4  Department and dated November 12, 1942 which describes the cleaning of

5  airplanes.

6          Subject to and without waiving the foregoing objections and assuming that

7  Defendant Astro is referring to the document entitled "Airplanes and Maintenance

8  Parts, General - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

9  issued by the War Department and dated November 12, 1942, the United States

10  states that the RABSP was not an aviation facility and there were no airplanes

11  located at the RABSP.  Accordingly, there are no "criteria for determining the

12  echelon maintenance category of the RABSP pursuant to" the technical order.

13  **INTERROGATORY NO.4:**

14          DESCRIBE the criteria for determining the echelon maintenance category of

15  the RABSP pursuant to the April 1944 Army Technical Order regulating the use of

16  TCE.

17  **RESPONSE TO INTERROGATORY NO. 4**

18          The United States incorporates by reference each of its General Objections

19  set forth as though set forth herein in full.  The United States further objects to

20  Request No. 4 because the term " the April 1944 Army Technical Order regulating

21  the use of TCE" is vague, ambiguous, and undefined.   The United States avers that

22  it has searched the database of documents produced in this matter and has not

23  located a document entitled "the April 1944 Army Technical Order regulating the

24  use of TCE," the DEFINITIONS provided with these Requests do not define the

25  term, the referenced document is not attached to the request, and a complete title,

26  date, and organizational or individual author has not been provided.

27  **INTERROGATORY NO.5:**

28          What was the echelon maintenance category for the RABSP pursuant to the

1  November 1942 Army Technical Order regulating the use of TCE?

2  **RESPONSE TO INTERROGATORY NO. 5**

3       The United States incorporates by reference each of its General Objections

4  set forth as though set forth herein in full. The United States further objects to

5  Request No. 5 as vague, ambiguous, and undefined particularly to the extent that it

6  refers to the "the November 1942 Army Technical Order regulating the use of

7  TCE." The United States states that it has searched the database of documents

8  produced in this matter and has not located a document entitled "the November

9  1942 Army Technical Order regulating the use of TCE," the DEFINITIONS

10  provided with these Requests do not define the term, the referenced document is not

11  attached to the request, and a complete title, date, and organizational or individual

12  author has not been provided. However, counsel for the United States is aware of a

13  document entitled "Airplanes and Maintenance Parts, General - Cleaning of

14  Aeronautical Equipment, Technical Order No. 01-1-1" issued by the War

15  Department and dated November 12, 1942 which describes the the cleaning of

16  airplanes. Subject to and without waiving the foregoing objections and assuming

17  that Defendant Astro is referring to the document entitled "Airplanes and

18  Maintenance Parts, General - Cleaning of Aeronautical Equipment, Technical Order

19  No. 01-1-1" issued by the War Department and dated November 12, 1942, the

20  United States states that the RABSP was not an aviation facility and there were no

21  airplanes located at the RABSP. Accordingly, there is no "echelon maintenance

22  category for the RABSP" pursuant to the technical order.

23  **INTERROGATORY NO.6:**

24       What was the echelon maintenance category for the RABSP pursuant to the

25  April 1944 Army Technical Order regulating the use of TCE?

26  **RESPONSE TO INTERROGATORY NO. 6**

27       The United States incorporates by reference each of its General Objections

28  set forth as though set forth herein in full. The United States further objects to

1    Request No. 6 because the term "the April 1944 Army Technical Order regulating

2    the use of TCE" is vague, ambiguous, and undefined.   The United States avers that

3    it has searched the database of documents produced in this matter and has not

4    located a document entitled "the April 1944 Army Technical Order regulating the

5    use of TCE," the DEFINITIONS provided with these Requests do not define the

6    term, the referenced document is not attached to the request, and a complete title,

7    date, and organizational or individual author has not been provided.

8    **INTERROGATORY NO.7:**

9         What was the echelon maintenance category for Camp Anza pursuant to the

10   November 1942 Army Technical Order regulating the use of TCE?

11   **RESPONSE TO INTERROGATORY NO. 7**

12        The United States incorporates by reference each of its General Objections

13   set forth as though set forth herein in full.  The United States further objects to

14   Request No. 7 as overbroad, unduly burdensome, and not related to the claim or

15   defense of any party to this litigation particularly to the extent that it is not related

16   to the RABSP.  Camp Anza was a troop staging area and debarkation center located

17   in the City of Riverside is unrelated to the present litigation.  The United States

18   further objects to this Request as vague, ambiguous, and undefined particularly to

19   the extent that it refers to the "the November 1942 Army Technical Order

20   regulating the use of TCE."  The United States states that it has searched the

21   database of documents produced in this matter and has not located a document

22   entitled "the November 1942 Army Technical Order regulating the use of TCE," the

23   DEFINITIONS provided with these Requests do not define the term, the referenced

24   document is not attached to the Request, and a complete title, date, and

25   organizational or individual author has not been provided.  However, counsel for

26   the United States is aware of a document entitled "Airplanes and Maintenance

27   Parts, General  - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

28   issued by the War Department and dated November 12, 1942 which describes the

1  cleaning of airplanes.

2       Subject to and without waiving the foregoing objections and assuming that

3  Defendant Astro is referring to the document entitled "Airplanes and Maintenance

4  Parts, General - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

5  issued by the War Department and dated November 12, 1942, the United States

6  states that Camp Anza was not an aviation facility and there were no airplanes

7  located at the Camp Anza.  Accordingly, there are no "criteria for determining the

8  echelon maintenance category of the Camp Anza pursuant to" the technical order.

9  **INTERROGATORY NO.8:**

10       What was the echelon maintenance category for Camp Anza pursuant to the

11  April 1944 Army Technical Order regulating the use of TCE?

12  **RESPONSE TO INTERROGATORY NO. 8**

13       The United States incorporates by reference each of its General Objections

14  set forth as though set forth herein in full.  The United States further objects to

15  Request No. 8 because the term "the April 1944 Army Technical Order regulating

16  the use of TCE" is vague, ambiguous, and undefined.   The United States avers that

17  it has searched the database of documents produced in this matter and has not

18  located a document entitled "the April 1944 Army Technical Order regulating the

19  use of TCE," the DEFINITIONS provided with these Requests do not define the

20  term, the referenced document is not attached to the request, and a complete title,

21  date, and organizational or individual author has not been provided.

22  **INTERROGATORY NO.9:**

23       What was the echelon maintenance category for Camp Young pursuant to the

24  November 1942 Army Technical Order regulating the use of TCE?

25  **RESPONSE TO INTERROGATORY NO. 9**

26       The United States incorporates by reference each of its General Objections

27  set forth as though set forth herein in full.  The United States objects to Request No.

28  9 as overbroad, unduly burdensome, and not related to the claim or defense of any

1  party to this litigation particularly to the extent that it is not related to the RABSP.

2  Camp Young was the headquarters for the Desert Training Center (also called the

3  California Arizona Maneuver Area) located south of Indio, California in Riverside

4  County and is unrelated to the present litigation.  The United States further objects

5  to this Request as vague, ambiguous, and undefined particularly to the extent that it

6  refers to the "the November 1942 Army Technical Order regulating the use of

7  TCE."  The United States states that it has searched the database of documents

8  produced in this matter and has not located a document entitled "the November

9  1942 Army Technical Order regulating the use of TCE," the DEFINITIONS

10  provided with these Requests do not define the term, the referenced document is not

11  attached to the Request, and a complete title, date, and organizational or individual

12  author has not been provided.  However, counsel for the United States is aware of a

13  document entitled "Airplanes and Maintenance Parts, General  - Cleaning of

14  Aeronautical Equipment, Technical Order No. 01-1-1" issued by the War

15  Department and dated November 12, 1942 which describes the cleaning of

16  airplanes.

17       Subject to and without waiving the foregoing objections and assuming that

18  Defendant Astro is referring to the document entitled "Airplanes and Maintenance

19  Parts, General - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

20  issued by the War Department and dated November 12, 1942, the United States

21  states that Camp Young was not an aviation facility and there were no airplanes

22  located at the Camp Young.  Accordingly, there are no "criteria for determining the

23  echelon maintenance category of the Camp Young pursuant to" the technical order.

24  **INTERROGATORY NO. 10:**

25       What was the echelon maintenance category for Camp Young pursuant to the

26  April 1944 Army Technical Order regulating the use of TCE?

27  **RESPONSE TO INTERROGATORY NO. 10**

28       The United States incorporates by reference each of its General Objections

1   set forth as though set forth herein in full.  The United States further objects to

2   Request No. 10 because the term "the April 1944 Army Technical Order regulating

3   the use of TCE" is vague, ambiguous, and undefined.  The United States avers that

4   it has searched the database of documents produced in this matter and has not

5   located a document entitled "the April 1944 Army Technical Order regulating the

6   use of TCE," the DEFINITIONS provided with these Requests do not define the

7   term, the referenced document is not attached to the request, and a complete title,

8   date, and organizational or individual author has not been provided.

9   **INTERROGATORY NO.11:**

10      What was the echelon maintenance category for the San Bernardino Engineer

11  Depot including Camp Ono pursuant to the November 1942 Army Technical Order

12  regulating the use of TCE?

13  **RESPONSE TO INTERROGATORY NO. 11**

14      The United States incorporates by reference each of its General Objections

15  set forth as though set forth herein in full.  The United States further objects to

16  Request No. 11 as overbroad, unduly burdensome, and not related to the claim or

17  defense of any party to this litigation particularly to the extent that it is not related

18  to the RABSP.  The San Bernardino Engineer Depot was a supply depot and Camp

19  Ono was a prisoner of war camp on the San Bernardino Engineer Depot located in

20  the City of San Bernardino.  Neither is related to the present litigation.  The United

21  States further objects to this Request as vague, ambiguous, and undefined

22  particularly to the extent that it refers to the "the November 1942 Army Technical

23  Order regulating the use of TCE."  The United States states that it has searched the

24  database of documents produced in this matter and has not located a document

25  entitled "the November 1942 Army Technical Order regulating the use of TCE," the

26  DEFINITIONS provided with these Requests do not define the term, the referenced

27  document is not attached to the Request, and a complete title, date, and

28  organizational or individual author has not been provided.  However, counsel for

1   the United States is aware of a document entitled "Airplanes and Maintenance

2   Parts, General  - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

3   issued by the War Department and dated November 12, 1942 which describes the

4   cleaning of airplanes.

5          Subject to and without waiving the foregoing objections and assuming that

6   Defendant Astro is referring to the document entitled "Airplanes and Maintenance

7   Parts, General - Cleaning of Aeronautical Equipment, Technical Order No. 01-1-1"

8   issued by the War Department and dated November 12, 1942, the United States

9   states that the San Bernardino Engineer Depot was not an aviation facility and there

10  were no airplanes located at the San Bernardino Engineer Depot.  Accordingly,

11  there are no "criteria for determining the echelon maintenance category of the San

12  Bernardino Engineer Depot pursuant to" the technical order.

13  **INTERROGATORY NO. 12:**

14         What was the echelon maintenance category for the San Bernardino Engineer

15  Depot including Camp Ono pursuant to the April 1944 Army Technical Order

16  regulating the use of TCE?

17  **RESPONSE TO INTERROGATORY NO. 12**

18         The United States incorporates by reference each of its General Objections

19  set forth as though set forth herein in full.  The United States further objects to

20  Request No. 12 because the term "the April 1944 Army Technical Order regulating

21  the use of TCE" is vague, ambiguous, and undefined.  The United States avers that

22  it has searched the database of documents produced in this matter and has not

23  located a document entitled "the April 1944 Army Technical Order regulating the

24  use of TCE," the DEFINITIONS provided with these Requests do not define the

25  term, the referenced document is not attached to the request, and a complete title,

26  date, and organizational or individual author has not been provided.

27

28

1  **INTERROGATORY NO. 13:**

2      DESCRIBE all facts REGARDING YOUR use of TCE during World War II

3  at the RABSP.

4  **RESPONSE TO INTERROGATORY NO. 13**

5      The United States incorporates by reference each of its General Objections

6  set forth as though set forth herein in full.  The United States objects to Request No.

7  13 as vague and ambiguous to the extent it relates to "use" of TCE.  Subject to and

8  without waiving the foregoing objections, the Department of Defense states that it

9  is not aware of any evidence of TCE use at the RABSP during World War II.

10  **INTERROGATORY NO. 14:**

11      DESCRIBE all facts REGARDING YOUR waste handling and DISPOSAL

12  practices during World War II at the RABSP.

13  **RESPONSE TO INTERROGATORY NO. 14**

14      The United States incorporates by reference each of its General Objections

15  set forth as though set forth herein in full.  The United States further objects to

16  Request No. 14 as overbroad, unduly burdensome, and not related to the claim or

17  defense of any party to this litigation particularly to the extent that it relates to

18  "waste."  The United States further objects to the Request as vague and ambiguous

19  to the extent it relates to "waste handling and disposal."

20      Subject to and without waiving the foregoing objection, the United States

21  states that, as described in the Final Report Operational History, former

22  servicemembers then-Captain Mr. Robert Weyand and then Technical Sergeant

23  Aaron Holt have described that small quantities of damaged wood bracing, or

24  dunnage, was burned on occasion in the area of the RABSP.  Further, the United

25  States is not aware of any evidence of "waste handling or disposal" of any

26  contaminants of concern at the RASBP during WWII.

27

28

**INTERROGATORY NO. 15:**

DESCRIBE all facts REGARDING YOUR handling and DISPOSAL practices for TCE during World War II at the RABSP.

**RESPONSE TO INTERROGATORY NO. 15**

The United States incorporates by reference each of its General Objections set forth as though set forth herein in full. The United States further objects to Request No. 15 as vague and ambiguous to the extent that it relates to "handling and DISPOSAL practices" for TCE. Subject to and without waiving the foregoing objections, the United States states that it is not aware of any evidence of TCE use, handling, or disposal at the RABSP during World War II.

**INTERROGATORY NO. 16:**

DESCRIBE all facts REGARDING YOUR handling and DISPOSAL practices for ORDNANCE (whether DAMAGED or otherwise) during World War II at the RABSP.

**RESPONSE TO INTERROGATORY NO. 16**

The United States incorporates by reference each of its General Objections set forth as though set forth herein in full. The United States further objects to Request No. 16 as vague and ambiguous particularly to the extent it relates to "handling" and "disposal practices."

Subject to and without waiving the foregoing objection, the United States states that ammunition was to be safely handled according to the following standard operating procedure:

(1)    Segregate cars to conform with quantity - distance safety factors.

(2)    Provide security protection.

(3)    Open and inspect cars for condition of lading and evidence of sabotage. Recooper broken cases. Correct defective lading.

(4)    Notify Ordnance Officer or Chemical Warfare Officer respectively, of any overage, shortage, or damage of ammunition.

1      (5)    Close car doors, and securely affix numbered seals before release to

2             the [Los Angeles Port of Embarkation] area.

3      (6)    Notify Port Transportation Division, Ammunition Inspection Section,

4             Ordnance Office, and/or Chemical Office, as pertains, by the most

5             expeditious means, of the car numbers, seal numbers, and expected

6             and actual time of departure of ammunition from Rialto.

7  *See, e.g.,* SHR00011-0013, SHR00014, SHR00016, SHR00378-81, SHR01310-11,

8  SHR01365-66, SHR01369-82.

9      Further, the United States states that it is not presently aware of any evidence

10  describing facts regarding the disposal of ordnance, damaged or otherwise, during

11  World War II at the RABSP.

12

13                        As to objections,

14

15  Dated:  February 2, 2011          /s/

16                        MICHAEL C. AUGUSTINI
                                ROCHELLE L. RUSSELL

17                        LESLIE M. HILL
                        Environment & Natural Resources Division

18                        Environmental Defense Section
                        U.S. Department of Justice

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION**

I, Joshua R. Holmes, certify on behalf of the U.S. Army Corps of Engineers, that the factual assertions in the foregoing responses to Interrogatory No. 1, to the extent it relates to the Final Report Operation History, and Nos. 3 – 16 are true and correct to the best of my knowledge.

2/2/2011
Dated

Joshua R. Holmes
Assistant District Counsel
U.S. Army Corps of Engineers
Sacramento District
1325 J Street
Sacramento, CA 95814

I, Carrie Greco, certify on behalf of the U.S. Army, that the factual assertions in the foregoing responses to Interrogatory No. 1, except to the extent it relates to the Final Report Operational History, and No. 2 are true and correct to the best of my knowledge.

Dated

Carrie Greco
Litigation Attorney
Army Environmental Law Division
901 N. Stuart Street, Suite 700
Arlington, VA 22203-1837

1

2                                    **CERTIFICATION**

3

4          I, Carrie Greco, certify on behalf of the U.S. Army, that the factual assertions

5   in the foregoing responses to Interrogatory No. 1, except to the extent it relates to

6
    the Final Report Operational History, and No. 2 are true and correct to the best of
7

8   my knowledge.

9

10

11

12   _2 Feb 2011_                        _Carrie Dreio_

13

14   Dated                              Carrie Greco
                                        Litigation Attorney
15                                      Army Environmental Law Division
                                        901 N. Stuart Street, Suite 700
16                                      Arlington, VA 22203-1837

17

18

19

20

21

22

23

24

25

26

27

28

19

## CERTIFICATE OF SERVICE

I certify that on February 2, 2011, a true and correct copy of the foregoing **RESPONSE TO ASTRO PYROTECHNIC INC.'S FIRST SET OF INTERROGATORIES TO THE UNITED STATES OF AMERICA** was served pursuant to Civil L.R. 5-3 and General Order No. 08-02 through the Court's Electronic Filing System and by posting it directly on Lexis Nexis File and Serve at http://fileandserve.lexisnexis.com, as agreed by the parties and order by the Court in the Order of January 20, 2010.

/s/
Leslie M. Hill

EXHIBIT O

# GIBSON DUNN

Gibson, Dunn & C

333 South Grand
Los Angeles, CA 9
Tel 213.229.7000
www.gibsondunn.com

Feb 7 2011
6:31PM

Patrick W. Dennis
Direct: 213.229.7567
Fax: 213.229.6567
PDennis@gibsondunn.com

Client: T 35819-00001

February 7, 2011

VIA LEXIS NEXIS FILE AND SERVE

Michael C. Augustini
United States Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Rochelle L. Russell
United States Department of Justice
Environmental and Natural Resources Divison
301 Howard Street, Suite 1050
San Francisco, California 94105

Re:  City of Colton v. American Promotional Events, Inc.

Dear Mr. Augustini and Ms. Russell:

Now that the stay on discovery has been lifted and in light of the pre-trial discovery
schedule, Goodrich Corporation ("Goodrich") intends to notice the deposition of certain
individuals with information regarding the Rialto Ammunition Back-up Storage Point
("RABSP"). Consistent with the Parties' prior practice, and in order to coordinate with the
currently-planned deposition scheduling call, we request that you participate in the
deposition scheduling call on Wednesday, February 9, 2011 at 1:00 pm PST using the
following dial-in number and passcode:

Dial In:       (877) 363-0528

Passcode:    9393 483#

Please be prepared to discuss available dates for the deposition of Joshua Holmes; Gil
Gonzalez, Carrie Greco; and the Custodian of Records for the documents you intend to
produce in response to Goodrich Corporation's Request For Production of Documents, Set
One.

# GIBSON DUNN

Michael C. Augustini
Rochelle L. Russell
February 7, 2011
Page 2

Very truly yours,

Patrick W. Dennis

PWD/hhk

cc: Jamie MacAyeal
    All Parties Via Lexis Nexis File and Serve

101019081.DOC

EXHIBIT P

**From:** Augustini, Michael (ENRD) [mailto:Michael.Augustini@usdoj.gov]
**Sent:** Wednesday, February 16, 2011 3:58 PM
**To:** Dennis, Patrick W.
**Subject:** Rialto Depositions

Case 5:09-cv-01864-PSG-SS   Document 1070-5   Filed 11/02/11   Page 117 of 174
Page ID #:62329

Dear Pat,

I wanted to get back to you regarding Goodrich's request for deposition dates.

Gill Gonzalez is available for a deposition on March 8, March 10, or March 11 in Los Angeles. As you know, he is an admin at the Army Corps' offices in Los Angeles. I cannot represent to you that he has any relevant information pertaining to this case. Although he is considered to be the custodian of the Army Corps' file regarding the RABSP report, we have produced the file in the litigation. To be candid, we do not believe that deposing Mr. Gonzalez would be a worthwhile use of anyone's time. If Goodrich nevertheless chooses to proceed with the deposition, we are willing to make him available on one of the above dates.

I also have been working to provide a response to Goodrich's request for the depositions of Carrie Greco and Josh Holmes. As of COB, I do not have authorization from the agencies to provide dates. The process is taking longer than anticipated because Ms. Greco and Mr. Holmes are attorneys and their depositions implicate attorney-client privilege and work product issues. Also, Mr. Holmes and Ms. Greco were not personally involved in the preparation of the RABSP report and do not have first-hand knowledge of the historical facts dating back to World War II. Based on these concerns, I think it might be useful to discuss what Goodrich really wants to accomplish with these depositions. There may be more appropriate witnesses, or the issues of interest could be better addressed through a 30(b)(6) deposition.

I will call you tomorrow to follow up on this, or feel free to contact me at your convenience.

Regards,

Mike Augustini

From: Dennis, Patrick W.
Sent: Friday, February 18, 2011 12:53 PM
To: Michael.Augustini@usdoj.gov <Michael.Augustini@usdoj.gov>
Cc: Dintzer, Jeffrey D.; DSolinger@HGNLaw.com <DSolinger@HGNLaw.com>
Subject: Rialto Depositions

Mike - this email responds to yours from Wednesday afternoon.

First, we'll take Gil Gonzalez' deposition on March 8 in our Los Angeles office and I'll serve a notice on Tuesday.

Second, we do want dates for the other two witnesses.  They signed certifications of your client's interrogatory responses and we want to ask them about that among other things.  Please advise whether you will produce them in LA, or not.

Last, we will use FRCP 30(b)(6) as we deem appropriate, but please advise whether it is still your position whether we can only serve one such notice on your client in this case.  If that is still your position we'll need to bring it to the Court's attention to get it resolved.

Thanks,

Pat
-------------------------
Sent using BlackBerry

EXHIBIT Q

# GIBSON DUNN

Gibson, Dunn & C

333 South Grand
Los Angeles, CA 9(
Tel 213.229.7000
www.gibsondunn.com

36086582

Feb 22 2011
6:17PM

Patrick W. Dennis
Direct 213.229.7567
Fax: 213.229.6567
PDennis@gibsondunn.com

Client: 35814-00001

February 22, 2011

**VIA LEXIS NEXIS FILE & SERVE**

Michael C. Augustini
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Re: *City of Colton v. American Promotional Events, Inc. — West, et al.,*
*Case No. ED CV 09-01864 PSG (SSx) and Consolidated Actions*

Dear Mr. Augustini:

I am writing to follow up on your e-mail from February 16, 2011 and to confirm the details of my e-mail in response, dated February 18, 2011.

First, we will take the deposition of Gill Gonzalez on March 8, 2011 in the Los Angeles office of Gibson, Dunn, & Crutcher. We will serve a notice of the deposition today.

Second, we still want dates for the depositions of Carrie Greco and Joshua Holmes. Given that they signed certifications on behalf of the U.S. Army and the U.S. Army Corps of Engineers in response to Astro Pyrotechnic Inc.'s first set of interrogatories, we would like to ask them about those certifications and other issues. Along with dates, please advise as to whether you agree to produce them in Los Angeles.

Finally, rest assured that we will make full use of F.R.C.P. 30(b)(6) as we deem appropriate. However, please advise whether it is still your position that we can only serve one such notice on your client in this case. If that is still your position, then we will need to bring the issue to the Court's attention for a resolution as soon as possible.

Sincerely,

Patrick W. Dennis

EXHIBIT R





**U.S. Department of Justice**

Environment and Natural Resources Division

*Environmental Defense Section*
*P.O. Box 23986*
*Washington, DC 20026-3986*

*Telephone (202) 616-6519*
*Facsimile (202) 514-8865*

March 4, 2011

Patrick W. Dennis, Esq.
Gibson Dunn & Crutcher LLP
33 South Grand Avenue
Los Angeles, CA 90071-3197

    Re:   <u>City of Colton v. American Promotional Events, Inc., et al.</u>

Dear Mr. Dennis:

    I am writing in response to your most recent letter and to follow up on our prior communications regarding Goodrich's request for the depositions of Joshua Holmes and Carrie Greco. As previously explained, Mr. Holmes and Ms. Greco are both attorneys whose involvement in this matter has been to represent the Army in litigation. They have no percipient knowledge of relevant facts, were not personally involved in the preparation of the Army Corps' report regarding the operations at the Rialto Ammunition Backup Storage Point ("RABSP") during World War II, and are not designated as expert witnesses. Their work product prepared in the course of representing the Army in this case is protected, and all their attorney-client communications are privileged.

    The federal courts have recognized the potential disruption of the attorney-client relationship when a party seeks to take the deposition of an opposing attorney. *See, e.g., Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987); *Johnson v. Couturier*, 261 F.R.D. 188, 193 (E.D. Cal. 2009); *Mustang Marketing, Inc. v. Chevron Products Co.*, 2006 WL 5105559, at * 3 (C.D. Cal. Feb. 28, 2006) (recognizing "general presumption" against calling opposing lawyers to testify). Courts thus place the burden on the party requesting the deposition of opposing counsel to prove three elements to demonstrate that there is a legitimate need for the deposition: (1) no other means exist to obtain the information sought, (2) the information sought is relevant and not privileged, and (3) the information is crucial to the preparation of the requesting party's case. *Shelton*, 805 F.2d at 1327 (drawing limitations from a California case); *Johnson*, 261 F.R.D. at 193 (finding that an attorney's deposition was unwarranted because documents were the "primary sources" of information in the case). With respect to Mr. Holmes and Ms. Greco, Goodrich has failed to make the required showing.

    The sole justification that Goodrich has offered for the depositions is that Mr. Holmes and Ms. Greco provided a certification for the response to Astro Pyrotechnic's interrogatories. We do not believe that the certification of their agency's response is a sufficient basis for these

two attorney depositions. Ms. Greco's signature pertains only to the responses to Interrogatories 1 and 2, and the information conveyed in those responses regarding the surviving Army personnel stationed at the RABSP is available to you. If the Army is able to locate additional surviving members, we would supplement our response. With regard to the other interrogatories, as previously explained, Mr. Holmes was not personally involved in the preparation of the RABSP report on behalf of the Army Corps of Engineers and does not have first-hand knowledge of the historical facts dating back to World War II.

The United States has produced both the RABSP report itself and the documents compiled when the report was prepared in 2004, and those materials are available to Goodrich and the other litigants in the Rialto-Colton matter. Neither Mr. Holmes nor Ms. Greco has non-privileged information that cannot be obtained through other more appropriate means, such as review of the documents produced by the Army on the matters addressed in the responses to the interrogatories, submission of affidavits from or depositions of records custodians, or deposition of fact witnesses. In these circumstances, Goodrich's bare demand to depose these two Army attorneys is insufficient to overcome the general presumption that lawyers should not be called to testify in cases where their client is a party. *See Bybee Farms LLC v. Snake River Sugar Co.*, 2008 WL 820186, *4 (E.D. Wash. March 26, 2008) (concluding that a deposition regarding the "basis" for counsel's verification of written discovery responses was not crucial to the preparation of the case).

Notwithstanding our views regarding the deposition of Mr. Holmes and Ms. Greco, we are endeavoring to accommodate Goodrich's deposition request for Army witnesses. Specifically, the Army has been working diligently to identify alternative, non-attorney witnesses who can testify regarding the issues addressed in the interrogatory responses. We will provide their names and potential deposition dates as soon as we are able to confirm them, most likely early next week. In sum, we believe that Goodrich should go forward with these witness' depositions first and that those depositions should vitiate the need to depose the Army's litigation counsel. *See Nocal, Inc. v. Sahercat Ventures, Inc.*, 2004 WL 3174427, at * 2 (N.D. Cal. Nov. 15, 2004) (granting a motion to quash a deposition subpoena directed to an attorney where plaintiff had made no "attempt to depose other parties").

Sincerely,

Michael C. Augustini

2

EXHIBIT S

# GIBSON DUNN

Gibson, Dunn & C.
333 South Grand
Los Angeles, CA 9
Tel 213.229.7000
www.gibsondunn.com

Patrick W. Dennis
Direct: 213.229.7567
Fax: 213.229.6567
PDennis@gibsondunn.com

Client: 35814-00001

March 8, 2011

**VIA LEXIS NEXIS FILE & SERVE**

Michael C. Augustini
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Re:    *City of Colton v. American Promotional Events, Inc. – West, et al.,*
       *Case No. ED CV 09-01864 PSG (SSx) and Consolidated Actions*

Dear Mr. Augustini:

      We were disappointed to receive your letter on Friday afternoon indicating that you would not provide dates for the depositions of Joshua Holmes and Carrie Greco. We disagree with your position regarding taking the depositions of the verifiers of responses to interrogatories. A party is entitled to take the deposition of any individual who verifies discovery responses—that is, in part, the point of the verification. In order to verify their answers, these parties were required to become familiar with the facts they verified, and we are entitled to ask them questions regarding their knowledge of those facts. *See generally* Cal. Practice Guide: Federal Civil Procedure Before Trial Ch. 11-IV (B) § 1770 (The Rutter Group 2010) (noting that attorneys can verify answers to interrogatories but that "it may entitle the propounding party to take the attorney's deposition"); *F.D.I.C. v. Fidelity & Deposit Co. of Md.*, 2000 WL 1175626, at *5 (S.D. Cal. 2000) (finding, under California law, that "[i]f the officer or agent signing the response on behalf of that party is an attorney acting in that capacity for the party, that party waives any lawyer-client privilege and any protection for work product . . . during any subsequent discovery from that attorney concerning the identity of the sources of the information contained in the response").

      Further, the three-part test in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) which you cite in support of your position is not the law in the Central District of California or the Ninth Circuit. *See Younger MFG, Co. v. Kaenon, Inc.*, 247 F.R.D. 586, 588 (C.D. Cal. 2007) (rejecting the Eighth Circuit's reasoning in *Shelton* and adopting the Second Circuit approach whereby "the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but . . . is a circumstance to be considered"). In *Younger*, the court allowed the deposition of defendant's general counsel to go forward because the defendant "ha[d] not met its burden to show plaintiff's deposition of [counsel] [wa]s for harassment or that all the information plaintiff [sought] from [counsel] [wa]s protected by the attorney-client privilege or work product doctrine." *Id.*

# GIBSON DUNN

Michael C. Augustini
March 8, 2011
Page 2

In addition, you have still failed to provide us with dates for the deposition of the Custodian of Records for the documents you produced in response to Goodrich Corporation's Request for Production of Documents, Set One. Thus, this letter serves as our notice that we intend to meet and confer with you on these two issues on March 10, 2011 at 8:00 a.m. PST using the following dial-in number and passcode:

Dial In:      (888) 735-0245
Passcode:   7716338#

Finally, Goodrich Corporation intends to take the depositions of Jeff Armentrout and Allan Curlee, both of whom are identified as the U.S. Army Corps of Engineers' points of contact for the "Final Report Operational History 1941-1945 Rialto Ammunition Back-Up Storage Point" produced by Science Application International Corporation in January 2004. Please provide us with dates that these witnesses will be available by March 11, 2011 and advise as to whether you agree to produce them in Los Angeles.

We look forward to your cooperation and a timely response.

Sincerely,

for

Patrick W. Dennis

EXHIBIT T

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| CITY OF COLTON, a California municipal corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. ED CV ) 09-01864 PSG (SSx) |
| AMERICAN PROMOTIONAL EVENTS, INC.; et al., | ) ) [Consolidated with ) Case Nos. CV |
| Defendants. | ) 09-06630 PSG (SSx), ) CV 09-06632 PSG |
| | ) (SSx), CV 09-07501 |
| AND CONSOLIDATED ACTIONS | ) PSG (SSx) and ) CV 09-07508 PSG |
| | ) (SSx)]; |
| UNITED STATES OF AMERICA, | ) ) Case No. CV |
| Plaintiff, | ) 10-00824 PSG (SSx) ) |
| vs. | ) ) |
| GOODRICH CORPORATION, et al., | ) ) |
| Defendants. | ) ) |

REPORTER'S TRANSCRIPT OF TELEPHONIC MEET AND

CONFER at 8:04 a.m., on Thursday, March 10, 2011,

before Mary K. Medley, CSR 9557.

Hutchings Number 308684



**HUTCHINGS**℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429
**800.697.3210** 323.888.6300
FAX: 323.888.6333 • www.hutchings.com

```
1    APPEARANCES OF COUNSEL:

2

3    Attorneys for WHITTAKER:

4    DONGELL LAWRENCE FINNEY

5    BY CHRISTOPHER T. JOHNSON

6    707 Wilshire Boulevard, 45th Floor

7    Los Angeles, California 90017-3609

8

9    For Defendants COUNTY OF SAN BERNARDINO, ROBERTSON'S

10   READY MIX, INC.; ZAMBELLI FIREWORKS MANUFACTURING

11   COMPANY, INC.; ZAMBELLI FIREWORKS COMPANY AKA ZAMBELLI

12   FIREWORKS INTERNATIONALE; ZAMBELLI FIREWORKS

13   MANUFACTURING; and THE SCHULZ PARTIES:

14   GALLAGHER & GALLAGHER

15   BY MEGAN S. MEADOWS

16   1925 Century Park East, Suite 950

17   Los Angeles, California 90067

18

19

20

21

22

23

24

25
```

2

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    For GOODRICH CORPORATION:

 4    GIBSON, DUNN & CRUTCHER LLP

 5    BY PATRICK W. DENNIS

 6    -and-

 7    BY KIMBERLY A. NORTMAN

 8    -and-

 9    BY ELIZABETH BURNSIDE

10    333 South Grand Avenue, Suite 4600

11    Los Angeles, California 90071-3197

12

13    For PYRO SPECTACULARS, INC. and ASTRO PYROTECHNICS,

14    INC.:

15    HUNSUCKER GOODSTEIN & NELSON PC

16    BY DAVID C. SOLINGER

17    21800 Oxnard Street, Suite 780

18    Woodland Hills, California 91367

19

20    For BLACK & DECKER INC.; EMHART INDUSTRIES, INC.,

21    KWIKSET CORPORATION, KWIKSET LOCKS, INC.:

22    MILES & STOCKBRIDGE, P.C.

23    BY JOSEPH L. BEAVERS

24    10 Light Street

25    Baltimore, Maryland 21202
```

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

```
 1     APPEARANCES OF COUNSEL (Continued):

 2

 3     For THE UNITED STATES OF AMERICA:

 4     U.S. DEPARTMENT OF JUSTICE

 5     BY MICHAEL C. AUGUSTINI

 6     -and-

 7     BY LESLIE HILL

 8     P.O. Box 23986

 9     Washington, D.C., 20026-3986

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

08:04  1        MR. DENNIS:  This is a telephonic meet and confer

       2   based upon our letter.

       3        This is Pat Dennis speaking.  Our letter of March 8

       4   to Michael Augustini -- My letter to Mr. Augustini

08:05  5   involves issues related to depositions.

       6        Mike, I don't know if you want to start.  I'm happy

       7   to kind of lay out our position, although I think it's

       8   in the letter.

       9        Do you want to start by responding to the letter?

08:05  10       MR. AUGUSTINI:  Sure.

       11       I was going through the issues.  We disagree with

       12   the applicability of the Shelton case.  You cited the

       13   Younger case from the central district.

       14       My letter of March 4th, 2011 cited the Mustang

08:05  15   Marketing case from the central district, which relied

       16   on the Shelton test and cited a northern district of

       17   California case that also adopted that case.  So we

       18   disagree on that point.

       19       There's probably no need to go through the

08:06  20   individual cases, but I would note that the FDIC case

       21   that you cite, the footnote that you quote part of in

       22   your letter indicates that an attorney who did the

       23   verification of an interrogatory response in that case

       24   was not allowed to be deposed.

08:06  25       So the disputed issue in that case was about a

                                    5

08:06    1    30(b)(6) deposition.  And we don't think that case

         2    supports your position that the depositions of the army

         3    and army corps attorneys in this case should go forward.

         4         But I guess to get to the rub of it, what we're

08:07    5    proposing, as I laid out in my letter, is some

         6    alternative witnesses that, you know, are not attorneys.

         7         If you can discuss the substance of the responses,

         8    the facts and the responses, and I'm happy to identify

         9    who those people are and tell you, you know, where

08:07   10    they're located and discuss possible dates for those

        11    depositions.

        12         You want me to go into that now?

        13         MR. DENNIS:  Why don't we do that.

        14         I am going to tell you right now, I don't think

08:07   15    that we will be able to agree that lawyers who verify

        16    interrogatory responses are not subject to deposition

        17    for the basis of those verifications, and that there may

        18    be a waiver of privilege with respect to the basis for

        19    the verification.

08:08   20         I think that is the law here in the central

        21    district.  And I'm not prepared to tell you I'm going to

        22    give up the idea of taking their depositions, but I

        23    think it would be helpful to hear the names of the

        24    individuals you believe have that information and

08:08   25    that -- understand how you would intend to make them

                                    6

08:08   1    available, Mike.

        2         MR. AUGUSTINI:   Okay.  Well, first of all, you

        3    know, we consulted with the army and the army corps

        4    regarding, you know, who they think would have the

08:08   5    factual knowledge that you're looking for.

        6         And the first name we were provided is Gerald

        7    Vincent.  He was the chief -- or is the chief of the

        8    FUDS program in Sacramento district.

        9         And I think his name came up at the deposition of

08:09   10   Gill Gonzalez this week.  And he was involved with

        11   the -- He was there at the time of the preparation of

        12   the report that the corps prepared in regard to the

        13   Rialto Ammunition Back-Up Storage Point.  So he at least

        14   has some personal involvement, unlike the current corps

08:09   15   attorney, Mr. Holmes.  He was not there at the time the

        16   report was prepared.

        17        And with respect to Interrogatory 1 and 13 through

        18   16, which is essentially the ones that draw from the

        19   army corps' 2005 report, the second person is Stanley

08:10   20   Bauer.

        21        He is a FUDS program manager with the U.S. Army

        22   Corps of Engineers in Omaha, Nebraska and he has

        23   knowledge of military technical orders.  And those are

        24   addressed in Interrogatories 3 through 12.  And he'd be

08:10   25   available for deposition on those issues.

                                      7

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

08:10    1          The third witness that the army and the army corps

         2    propose as alternatives is named Dean Hiza, H-I-Z-A.

         3    He's a human resource specialist with the army at

         4    Fort Knox, Kentucky.

08:10    5          And he would be able to speak to the issues

         6    addressed in Interrogatory 1 and 2, which is does the

         7    army have any information about where any of the army

         8    veterans who were stationed at the RASP during World War

         9    II are located.

08:11    10         There's also -- This is jumping ahead to your

         11   letter.  You've requested some additional depositions,

         12   Jeffrey Armentrout and Allan Curlee.

         13         MR. DENNIS:  Right.

         14         MR. AUGUSTINI:  And on this short notice, I'm not

08:11    15   able to give you dates for those, but I think, as you

         16   know, Mr. Armentrout is in the Los Angeles district of

         17   the army corps.

         18         And we've asked for his availability and expect,

         19   you know, that we would be able to offer you dates for

08:11    20   his deposition, to the extent that you want to take

         21   that.

         22         Allan Curlee was the army corps attorney at the

         23   time of the preparation of the report, and so his

         24   deposition would involve, you know, the same kinds of

08:12    25   issues that we're -- we have with respect to Ms. Greco

                                        8

08:12    1    and Mr. Holmes.  But he's no longer with the army corps.

2    And we had some indication that he may be a civilian

3    attorney with the air force in Texas currently, but we

4    haven't been able to verify whether that's correct since

08:12    5    your letter two days ago.

6        So, you know, I'm -- my thinking is that Jeffrey

7    Armentrout, we should have dates for a deposition in

8    Los Angeles, you know, shortly.

9        And the other witnesses, as I mentioned, terms of

08:13    10    locations, with regard to Mr. Bauer, I mentioned he's in

11    Omaha.

12        Mr. Hiza is in Fort Knox, outside of Louisville,

13    Kentucky.

14        And -- And Mr. Vincent, unfortunately, is -- was

08:13    15    shipped -- was sent overseas to Afghanistan, I guess

16    just within the past couple of days.  But -- And so I

17    have not had a chance to contact him or speak to him

18    regarding this.

19        But I understand that before he left, he understood

08:14    20    that he -- there was a request and a possibility that he

21    may be deposed in this case and that he's willing to do

22    so by whatever logistical means are possible to connect

23    him up by phone or video conference while he's on duty

24    in Afghanistan.

08:14    25        MR. DENNIS:  Are you through?

9

08:14    1        MR. AUGUSTINI:  Yes, unless you have questions.

         2        MR. DENNIS:  No, I do.

         3        First of all, one of the things we've been asking

         4   for, and I think it's repeated in that letter, is to

08:14    5   know the identity of and be able to have a deposition of

         6   the custodian of records that were produced recently.  I

         7   think it's the 30,000-or-so pages that were uploaded

         8   into Encore a week or so ago.

         9        MR. AUGUSTINI:  Right.

08:15   10        MR. DENNIS:  Are any of the individuals you

        11   identified that custodian?

        12        MR. AUGUSTINI:  I -- I don't believe so.

        13        MR. DENNIS:  Are you going to make that custodian

        14   available to us?  I mean, that was part of the meet and

08:15   15   confer today.

        16        MR. AUGUSTINI:  Yeah, I know.

        17        We talked about this, I know, a few weeks ago.

        18   And, frankly, I'm still unclear about what you would

        19   want from those depositions because the custodian for

08:15   20   the army corps' file in Los Angeles was Gill Gonzalez

        21   and that deposition was conducted this week.  The --

        22        MR. DENNIS:  But I don't think there's any dispute

        23   that Gonzalez knew nothing about and has no custodial

        24   responsibilities with respect to this 30,000 pages.

08:16   25        MR. AUGUSTINI:  Well, I think some of the materials

                                    10

08:16    1    in that production -- the most recent production did

         2    supplement the materials that were missing, the

         3    so-called missing materials from the corps report, you

         4    know, different pages.

08:16    5        I think there was a problem with one document that

         6    was not double-sided, was copied, was a single-sided

         7    copy.  And so there are some of those -- some documents

         8    that relate to the report are in the production.

         9        But putting that aside, I'm not sure what you're

08:17   10    requesting for those depositions.  So, for example, some

        11    of the documents come from public archives.  There isn't

        12    a person who's the custodian of those documents.

        13        Similarly, a lot of the records, given the age of

        14    the documents, have been transitioned into federal

08:17   15    records centers so there isn't a person who -- it's not

        16    an individual's files.  It's documents that were

        17    collected from a records center.

        18        And so, you know, that's -- I'm not sure if it's

        19    just the terminology or what you're actually looking for

08:17   20    on these issues.

        21        MR. DENNIS:  Well, Mike, I'm -- what I'm trying to

        22    get at is to find out who at the army corps or within

        23    the Department of Defense has those documents in their

        24    possession or understandings, what they are, and where

08:18   25    they were retrieved from, and where they currently

                                      11

08:18    1    reside.  And I assume there's somebody who can answer

         2    those questions.

         3         MR. AUGUSTINI:  So it's -- it seems like what

         4    you're looking for is someone with knowledge of what was

08:18    5    done to search for documents.

         6         MR. DENNIS:  Well, that would help, that's part of

         7    it, yep.

         8         MR. AUGUSTINI:  And, I mean, I know that there's a

         9    dispute about how 30(b)(6) depositions are conducted

08:18   10    that the master has before her now, but is that,

        11    essentially, what you're -- the kind of deposition that

        12    you'd like to take?

        13         MR. DENNIS:  I think, in essence, it is.

        14         Now, I'm happy to put the categories into a

08:19   15    30(b)(6) format.  I think there's a dispute right now,

        16    as you alluded to, as to whether or not the parties get

        17    more than one of those.

        18         And if your position is if we were to put what I'm

        19    talking about into a 30(b)(6), but that would be the

08:19   20    only 30(b)(6) we get to serve on the government, then,

        21    you know, I'm not going to agree to that.

        22         Do you have a position on that today?

        23         MR. AUGUSTINI:  I think that we'll probably know

        24    tomorrow whether the master is going to rule on that one

08:19   25    way or the other.

                                    12

08:19    1        But I guess my question would be -- I mean, I think

         2    it actually is more of a 30(b)(6) type of a deposition.

         3    But how many of those would you intend to do about --

         4    you know, normally, I mean, the document collection

08:20    5    process is ongoing because we have additional sets of

         6    document requests from Goodrich that we're having to

         7    deal with now.

         8        So would you agree to just one of these types of

         9    30(b)(6) document depositions, or are you going to want

08:20   10    to be doing them one after another, you know, sort of as

        11    each document -- set of document requests comes in?

        12        MR. DENNIS:  Well, my understanding, until I got

        13    Leslie's letter last week, is that because you had never

        14    told me that it was going to be a rolling production on

08:20   15    DOD documents, that we were going to have a production

        16    one time in response to those document demands.

        17        And what I was asking for and what I'm still asking

        18    for is the deposition of somebody who knows what

        19    documents were pulled, and how they are currently

08:20   20    maintained, and where they came from.  I -- You know, I

        21    have no idea.

        22        I haven't responded yet to Leslie's letter.  And

        23    we're probably going to have to meet and confer over

        24    that because I have no idea what you guys have in mind

08:21   25    when you say a rolling production.

                                    13

08:21   1          I don't know if we're going to see, you know,

        2   documents reeling in for the next six months and there's

        3   another hundred thousand pages, in which case there's no

        4   way, Mike, that I'm in a position today to tell you what

08:21   5   will satisfy me.  I have no idea what's coming.

        6          MR. AUGUSTINI:  Why don't you consider this:  You

        7   could serve an interrogatory asking us where we searched

        8   for documents, where they came from and -- I mean, as

        9   you can imagine, you know, we're searching across

08:21  10   multiple agencies.  There are a lot of people involved

       11   in the process.  And that seems like an efficient way to

       12   get the information.

       13          MR. DENNIS:  Let me tell you the problem with that,

       14   Mike.  We've got a very ambitious discovery schedule.

08:22  15   If I serve an interrogatory on you today, it's 30 more

       16   days.

       17          And if we don't agree on the adequacy of the

       18   response through a meet and confer process, that starts

       19   in 30 days or more.

08:22  20          I think the quickest way to cut through is to sit

       21   down with somebody who knows what documents were

       22   surrounded, where they came from and how they're

       23   maintained, and spend a few hours with them just like

       24   you did with Gonzalez, and just get to the heart of it.

08:22  25          So I respect the fact that in many cases there

                                    14

          HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                          800.697.3210

08:22    1    might be the luxury of that time, but we don't have that

         2    kind of time.

         3        And I'll be frank with you, I don't think we've

         4    gotten -- it's just my position, so you know, but I

08:22    5    don't think we've gotten a lot of cooperation.

         6        So the prospect of, you know, drafting an

         7    interrogatory, serving it on you, waiting 30 days,

         8    getting an answer that may not be satisfactory, and then

         9    starting the meet and confer process in anticipation of

08:23   10    a motion, if necessary, to get a complete answer is not

        11    the way I want to go here.

        12        I think a custodian of records is a standard

        13    request when you -- particularly when you serve

        14    30,000 pages on us and tell us it's going to be a

08:23   15    rolling production to say I want to know who has

        16    knowledge about how those documents were collected and

        17    how they're maintained and where they came from.

        18        And if you're telling me, you know, you're not

        19    going to give me a custodian for that production, then

08:23   20    that's probably all I need to know and I can raise it

        21    with the magistrate judge.

        22        And to tell me that, you know, I can ask it in a

        23    30(b)(6), but your current position is I only get one of

        24    those, and I have to compromise now and tell you I'm

08:23   25    only going to get one with respect to any of your future

                                   15

```
08:23    1    rolling productions, that's not something I can agree
         2    to.  I don't think the judge is going to like that as a
         3    compromise.
         4        So I'm asking --
08:23    5        MR. AUGUSTINI:  Let me ask you this, then.
         6        MR. DENNIS:  Can I finish?
         7        MR. AUGUSTINI:  Sure.
         8        MR. DENNIS:  I'm just asking you if you're willing
         9    to produce a custodian for the 30,000 pages that were
08:24   10    just uploaded into Encore or not.
        11        MR. AUGUSTINI:  Yeah, I think if we can -- You're
        12    talking about one witness or one from each agency?
        13        MR. DENNIS:  If you tell me there are two or three
        14    people that are necessary to answer the question, then
08:24   15    tell me who they are, and how they break down, and we
        16    can decide if we have to take two or three people's
        17    depositions.
        18        MR. AUGUSTINI:  Okay.  Yeah, I'm not saying that
        19    we're refusing to produce a custodian.  But, you know,
08:24   20    I'm just trying to understand how it work -- whether you
        21    call it a 30(b)(6) deposition or not, what you're
        22    looking for is someone who can just explain how the
        23    document search was conducted and where the documents
        24    came from.
08:25   25        MR. DENNIS:  Right.
```

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

08:25  1          And what they are, you know, which is really that
       2     question, you know, what are we looking at, where do
       3     they come from, how are they maintained, how are they
       4     collected, exactly.
08:25  5          And I'm telling you, I -- based on your position,
       6     I -- you know, I'm not going to call it a 30(b)(6) and I
       7     don't think it is one.  I think it's a custodian of
       8     records deposition.
       9          MR. AUGUSTINI:  Okay.  We're also -- I mean, we're
08:25 10     attempting to pull that information together, you know,
      11     from the agencies.
      12          So are you amenable to receiving a letter from us
      13     if we can, you know, at least as a first step provide
      14     information about, you know, just on those things that
08:26 15     you were suggesting, where the documents came from, you
      16     know, tracking with the Bates stamp number in our
      17     production?
      18          MR. DENNIS:  You know, I'm not, Mike.  I -- I'm not
      19     willing to accept an attorney drafting a response.
08:26 20          I'd like to talk to a witness who's familiar with
      21     how they were collected, where they came from, how
      22     they're maintained and, really, what they are.
      23          And we made this clear a couple weeks ago.  We made
      24     it clear last week.  We've made it clear in the meet and
08:26 25     confer.  And if you don't want to give us a witness,

                                    17

          HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

08:26    1    tell me now.  And if you're going to give me a witness,
         2    let's agree on a process to get that witness or
         3    witnesses scheduled for deposition.
         4        MR. AUGUSTINI:  I think that we'll -- You know, I
08:26    5    expect that we'll be able to give you a witness.  So I'm
         6    not saying that this is -- that we have a dispute
         7    that's -- that needs to be given to the master.
         8        So, I mean, for purposes of today, I just don't --
         9    I can't tell you, you know, without having heard your
08:27    10   explanation of what you want to accomplish in the
         11   depositions, and then able to pass that on to the
         12   agencies to let them identify, you know, who they think
         13   the appropriate person would be for -- for these -- for
         14   this document production.  But that is something I'm
08:27    15   willing to follow up on and get back to you on as soon
         16   as possible, to let you know who that might be and when
         17   they could be deposed.
         18       MR. DENNIS:  Well, I'll tell you, we've been clear
         19   about this for a couple weeks.  We've been clear about
08:28    20   it last week in correspondence.  We were clear on
         21   Tuesday.
         22       And just so you understand our position, what I'm
         23   hearing you tell me is you're still thinking about it
         24   and you're going to send me something, and there's no
08:28    25   commitment when that's going to be, so I don't intend to

                                    18

08:28   1    meet and confer with you any more over this.

2        And if you're going to offer me a custodian, I

3    would urge you to do it quickly because I don't have a

4    person's name, and I don't have an offer of a deposition

08:28   5    at any time right now.

6       MR. AUGUSTINI:  I understand your position.

7       I don't think it was clear what you were requesting

8    from the prior communications.  So, you know, that

9    limited our ability to try to respond more quickly to

08:29  10    your request.  But --

11      MR. DENNIS:  You know, with all due respect, Mike,

12    there's nothing in your correspondence that says you

13    didn't know what I was talking about.

14       In fact, every letter I got from you guys on this

08:29  15    was dead silent on my request for a custodian.  So I

16    don't think that that makes any sense, to suggest you

17    never knew what I was talking about.  Just so you know.

18       And I'm not going to walk out of this call with

19    some sort of agreement that this was all ambiguous and

08:29  20    you didn't know what I meant, so --

21      MR. AUGUSTINI:  Here's what happened.  We had a

22    brief discussion about it a few weeks ago.

23       What I recall is, you said you would -- you know,

24    our production was being made to Encore.  You said you

08:29  25    would look at the documents that we produced and we'd

08:29    1    revisit the issue, and that's what we're doing today.

2    So, you know, we're trying to be responsive to your

3    requests.  You know, I will get back to you as soon as

4    possible now that, you know, I understand what it is

08:30    5    you're looking to do.

6    And I should be able to provide you the names of

7    witnesses and dates.  And if, you know, that -- I'd say,

8    you know, by sometime in the middle -- by next

9    Wednesday, I'd be able to get back to you with a

08:30    10    response.

11    But the people who are my contacts are not in the

12    office this week.  So, unfortunately, I haven't been

13    able to confer with them to give you more information as

14    of today.

08:30    15    But we did want to go forward with this meet and

16    confer.  And, like I said, I'll follow up with you on

17    Wednesday.

18    MR. DENNIS:  All right.  I disagree with that

19    approach because we talked to you before the due date

08:31    20    for the production, which was February 15.  We talked to

21    you the week before that.  So it was a month ago.

22    We made clear what we wanted.  The production was

23    two weeks late.  And we've never wavered in our

24    correspondence that we wanted a custodian.

08:31    25    So now you're telling me I'm going to get it about

20

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

08:31    1    a month, maybe six weeks after we first had the

         2    discussion.

         3        And I -- I'm telling you, I don't think that's

         4    appropriate.  I'm not agreeable to it, and I don't

08:31    5    intend to meet and confer with you any more over it.

         6    And we'll seek relief from the special master, if we

         7    need it.

         8        I would urge you to send me those names as soon as

         9    possible, because I think that's one way to resolve it.

08:31   10        But I don't think you're meeting and conferring

        11    with me in good faith, you now having ignored that

        12    request for a month.  And now it's been strung out --

        13    it'll be strung out for five or six weeks.

        14        So I don't think we need to further debate it.  I

08:32   15    mean, I understand your position.  But it's inconsistent

        16    with our discussions in correspondence and I can't tell

        17    you that I'm going to agree with that.  I don't agree

        18    with it.

        19        MR. AUGUSTINI:  Obviously, I disagree.

08:32   20        We're trying to meet and confer in good faith and

        21    not present every single issue to the special master,

        22    but that's what Goodrich seems to want to do.

        23        But that's fine, Pat, I understand your position.

        24    And like you, I said I will get back to you as soon as I

08:32   25    have more information.

                                 21

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

08:32    1          MR. DENNIS:  Mike, let's turn back to the depos

         2    that we did talk about.

         3          Is it your position with respect to Department of

         4    Defense witnesses that you're only going to produce them

08:32    5    where they reside or their place of work?

         6          MR. AUGUSTINI:  Yes, essentially that's correct,

         7    unless there's some other reason to do the depositions

         8    in a different location.

         9          That's been the rule in the case from the

08:33   10    beginning.  Goodrich insisted on the same rule when it

        11    came time for its depositions to occur.  Those occurred

        12    in North Carolina.  So I think the same rule applies to

        13    all of the witnesses.

        14          MR. DENNIS:  Okay.  Well, I'm not agreeable to it,

08:33   15    but I don't know that further discussion or debate is

        16    going to, you know, resolve it.

        17          I think that your witnesses are, just by the nature

        18    of your organization, going to be scattered all over the

        19    United States.  And if we have to take those witnesses'

08:33   20    depositions in all the places they live or reside, it is

        21    going to be tremendously inefficient and expensive on

        22    the parties.  But I don't know that further debate is

        23    going to get us there.  I just want to make sure I

        24    understand your position.

08:34   25          MR. AUGUSTINI:  Are you saying you're not -- you're

                                         22

08:34    1    not going to agree to take them where they're located?

         2        MR. DENNIS:  No, I'm saying I don't agree with your

         3    approach and I have to now decide if I'm going to take

         4    it to the special master, that's what I'm telling you.

08:34    5        MR. AUGUSTINI:  Well, you haven't cited any

         6    authority for making all of the witnesses that you want

         7    to depose come to Los Angeles.

         8        MR. DENNIS:  Well, I think it's, you know, on a

         9    case-by-case basis.  It's always based on efficiency.

08:34   10        And I think here, with all the parties now, as we

        11    wrap up this litigation and go through the discovery

        12    we're going to take over the next year, I think that,

        13    you know, flying eight or ten lawyers around the country

        14    to visit wherever a DOD witness lives or resides is

08:34   15    inefficient.

        16        And I don't think it takes case law to resolve it.

        17    I think that's just a typical response and way of

        18    handling it.

        19        So -- But I understand your position is they're

08:35   20    only going to be produced in the places they reside or

        21    work; correct?

        22        MR. AUGUSTINI:  Out of all the hundreds of

        23    depositions that were taken, do you know of any party

        24    that brought a witness to Los Angeles?

08:35   25        MR. DENNIS:  I think there's multiple examples, but

                                      23

              HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                800.697.3210

08:35    1    I didn't come today with those in front of me, Mike.

2    MR. AUGUSTINI:  All right.  I mean, because I think

3    that the rule that you're suggesting is inconsistent

4    with the way the depositions have been done.

08:35    5    People have gone to Florida, they've gone, you

6    know, all over the country.  And that's why there's a

7    telephone connection.  If people don't want to make the

8    trip, they can participate by telephone.  We've done

9    that ourselves, because we're in D.C., when the

08:35    10    depositions are occurring in California.  So that's --

11    that's where we stand.

12    MR. DENNIS:  Okay.  So let me just -- let's just

13    wrap up on those witnesses.  So Vincent -- And can you

14    remind me, Mike, what were the categories of the

08:36    15    interrogatories that you're telling me you think he has

16    substantive knowledge of?

17    MR. AUGUSTINI:  Mr. Vincent was the chief of FUDS

18    in the Sacramento district, and he was involved to some

19    extent in -- you know, he was there at the time the

08:36    20    report was prepared.

21    So what I have here is Interrogatory 1 and 13

22    through 16 touch on the facts set forth in the army

23    corps report regarding the backup storage point.

24    Stanley Bauer is knowledgeable of military

08:36    25    technical orders.  Those are referenced in

24

08:37   1       Interrogatories 3 through 12.

        2           And I'd just note there, it was one of the -- one

        3       of the technical orders that was mentioned in the

        4       interrogatory is, I think -- as we said in the response,

08:37   5       we don't know what that was referring to.

        6           So if somebody has a copy of it or can clarify that

        7       issue, that would also be helpful before we embark on

        8       this process.

        9           So, again, Bauer was Interrogatories 3 through 12

08:37   10      regarding the military technical orders.

        11          And Dean Hiza is a human resources person with the

        12      army and that addresses the first two interrogatories

        13      regarding contact information for veterans.

        14          MR. DENNIS:  And it sounds like you're willing to

08:38   15      make Bauer available in Omaha, Nebraska.

        16          MR. AUGUSTINI:  Yes.  That's where he's located.

        17          MR. DENNIS:  And Hiza available in Kentucky?

        18          MR. AUGUSTINI:  He is at Fort Knox, which is

        19      probably closest to Louisville.

08:38   20          MR. DENNIS:  And Vincent is serving in Afghanistan;

        21      is that right?

        22          MR. AUGUSTINI:  Yes.

        23          MR. DENNIS:  Do you know how long his tour is

        24      there?

08:38   25          MR. AUGUSTINI:  I've been told it's for a year.

                                        25

08:38    1          MR. DENNIS:  And you say he just shipped out?

         2          MR. AUGUSTINI:  He -- That's my understanding, in

         3    the last -- the last few days.

         4          And I would add, it's -- there is a -- an army

08:39    5    corps office in the place where he's located.  And I've

         6    been told that he should have access to his -- you know,

         7    to his e-mail and his files, essentially, so that he'd

         8    be able to look at materials.

         9          MR. DENNIS:  Mike, if you're suggesting that --

08:39   10    Your idea is that we take him by videotape -- I'm sorry,

        11    video conferencing or something like that?

        12          MR. AUGUSTINI:  I think that'd be the quickest,

        13    yes.

        14          MR. DENNIS:  All right.  Do they not come home for

08:39   15    leave at any time during that one year?

        16          MR. AUGUSTINI:  I did ask that, and I gather that

        17    he may -- he may get to come home at least for a couple

        18    of weeks.

        19          But, you know, since your letter the other day, we

08:40   20    have been making efforts to try to contact him and try

        21    to get more information about that.

        22          You know, I don't know.  I mean, he may have just

        23    arrived there.  And I'm not sure he's completely set up

        24    there yet, to be honest.

08:40   25          MR. DENNIS:  Yeah.  And your position with respect

                                          26

                HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                    800.697.3210

08:40    1    to the two lawyers, that kind of was the start of all

         2    this, is that you won't make them available for

         3    deposition; is that correct?

         4        MR. AUGUSTINI:  Well, our position is as an initial

08:40    5    matter, the alternative witness -- you should proceed to

         6    take the depositions of the alternative witnesses and

         7    that may obviate the need to take the depositions of the

         8    attorneys, who did the certification of the

         9    interrogatory response for the reasons that I put in my

08:41   10    March 4th letter.

        11        And, you know, if -- you know, if that is not

        12    acceptable, then -- so I think what we're proposing is

        13    that we should table the issue of Josh Holmes and Carrie

        14    Greco's deposition, at least until after you've done the

08:41   15    other depositions.

        16        MR. DENNIS:  Let me ask you a question, Mike.  Why

        17    didn't you have these individuals you're just talking

        18    about, the non-lawyers, verify the interrogatory

        19    responses?

08:42   20        MR. AUGUSTINI:  You know, I think that they

        21    probably could have verified them.  You know, the

        22    verifications themselves, you know, don't indicate that,

        23    you know, the attorneys had any specialized knowledge or

        24    personal knowledge of the facts.  But, you know, they're

08:42   25    true and correct, to the best of our knowledge.

                                    27

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                800.697.3210

08:42    1          And, you know, I'm sure that, you know, you have

         2    access to the documents and the report.  So the

         3    attorneys don't really have anything to add to those

         4    documents or the report, but -- and they certainly

08:43    5    didn't expect that a party would be wanting to take

         6    their deposition, given their limited knowledge.

         7          MR. DENNIS:  I just -- I gotta tell ya', and I

         8    won't belabor it, but I don't think, from what I've

         9    heard and what I've seen in writing from you, that it

08:43   10    was appropriate.  And I don't think those lawyers had

        11    the requisite knowledge to sign.

        12          And I just don't -- I'm telling you right now,

        13    Mike, I don't see any way I can avoid taking those

        14    depositions.  Those interrogatory responses are pretty

08:43   15    critical and I just -- I get the sense from you that

        16    those lawyers really had no basis to make those

        17    verifications.

        18          I'm just giving you my position.  And that's a big

        19    concern to me in this case.  So I don't think that when

08:43   20    a party has its lawyers sign verifications, and then

        21    when we're asking to take those depositions to

        22    understand what the basis for that verification is,

        23    we're told there's actually fact witnesses out there who

        24    would be better, I don't think the party understands --

08:44   25    I don't think you guys understand the significance of

                                      28

08:44   1    those verifications.

        2        And I'm -- I'm not stepping away from this call --

        3    I don't want to leave you with any idea here that I am

        4    still not interested in taking those lawyers'

08:44   5    depositions.

        6        I think we've met and conferred on the issue, and

        7    we've tried to resolve it, and I don't think there's

        8    more we can talk about.  I'm just not agreeable that

        9    that's sufficient as we step away from the call.

08:44   10       I'm going to give it some consideration, but the

        11   problem is, the verification means something.  And it

        12   means there should have been some diligence done.  And

        13   when that diligence is done by a verifier, that verifier

        14   needs to be prepared to explain what that is.  That's my

08:45   15   understanding of the law, anyway.

        16       And it sounds like you're telling me they're not

        17   going to be able to tell us that or they're not going to

        18   tell us that because they're going to claim it's

        19   privileged.

08:45   20       But my understanding of the case law and my

        21   understanding as a lawyer is, you can't hide behind

        22   that.  It's not appropriate.

        23       MR. AUGUSTINI:  We've cited cases where -- that are

        24   directly on point where just because someone does a

08:45   25   verification does not mean that you're entitled to a

29

08:45 1  deposition.

2    But putting that aside for purposes of today and

3  discussing alternatives, would you be willing to

4  consider a limited deposition of Mr. Holmes and

08:45 5  Ms. Greco regarding the scope of the verifications?

6    MR. DENNIS:  Well, I don't know what you mean by

7  "limited."

8    My proposed compromise was to try to limit the

9  amount of time, because everything I'm hearing is

08:46 10  they're either not going to have much information or

11  they're going to take privilege claims during the

12  deposition.  So I'm probably not going to get a lot of

13  information.

14    MR. AUGUSTINI:  Well, that's what I'm trying to --

08:46 15  I mean, for example, you know, our communications with

16  the army attorneys are attorney-client privileged.  You

17  know, they're -- they are -- play a role in the case

18  that goes beyond the certification of the interrogatory

19  response.

08:46 20    And so, you know, do you intend to go into those

21  issues if you take their depositions, or are you willing

22  to agree, you know, in advance that the scope of the

23  deposition of the attorneys would be limited to the

24  basis for the certifications?

08:47 25    MR. DENNIS:  Well, I don't know that I can agree to

30

08:47    1    that in advance only because I don't know what they did

2    to properly prepare themselves to give the verification.

3        I mean, I understand what you're saying in concept,

4    but let me offer you, you know, a hypothetical as to why

08:47    5    it would be difficult for me to agree to that in

6    advance.

7        Perhaps all of their communications with you have

8    been providing them with the information they used to

9    support that verification.  So if that's what the

08:47    10   foundation testimony shows, I can't agree in advance

11   that we're not entitled to know what you've been talking

12   about.

13       But let me tell you, from what you're telling me, I

14   think we could agree on some relatively tight time

08:48    15   limits, because I suspect what you're going to say in

16   the deposition is if I ask those questions, you're just

17   going to tell me -- instruct the witness not to answer.

18       And so I don't know that an agreement in advance

19   from me that I won't ask those questions or that I think

08:48    20   those are properly objected to makes any sense for me.

21       But it does make sense to me that maybe, given what

22   you're telling me, we just try to limit these in time

23   and stake out what they did know when they made the

24   verification that you're willing to let them testify

08:48    25   about, and then stake out what the rest of the privilege

31

08:48    1    claim is going to be, and that may not take very long.

2    MR. AUGUSTINI:  I think it's less efficient to -- I

3    mean, it's not so much a question of time.  I mean, if

4    it's limited to the scope of their certification, it's

08:48    5    hard to imagine how much time -- you could spend very

6    long time conducting that deposition.

7    But it's just as you say, if you're intending to

8    inquire about discussions that Department of Justice has

9    had with the army counsel, what you're saying, really,

08:49    10    is that you -- you're not agreeing to -- you want all

11    that information.  You're not going to agree to limit

12    the scope.  You'd be forcing us to make those objections

13    at the depositions.  And that's going to be a much more

14    inefficient way of dealing with them.

08:49    15    MR. DENNIS:  But, Mike, if -- I don't know what

16    these people are going to say.  But you understand the

17    position I'm in.  What if this lawyer just says, "The

18    whole basis I have for that verification is based on

19    communications with Mr. Augustini and we're not going to

08:49    20    go into that.  So, you know, game over."  Well, okay.

21    That's going to be a pretty short Q and A.

22    And you -- you understand I can't say in advance

23    "Well, I'm just not going to ask you any question about

24    communications with Mr. Augustini," because I don't know

08:50    25    if I'm going to get that kind of an answer from the

32

08:50 1  witness.

2    If the witness were to give me that kind of an

3  answer, you've effectively said, you know, I have to

4  agree in advance I can't even ask that question.

08:50 5    I do want to depose them because they verified

6  responses, and I want to ask about what the basis of

7  that verification is.  But where that leads, I don't

8  know.

9    And to arbitrarily say there are certain questions

08:50 10 I can't ask as a result, I can't agree to.

11    MR. SOLINGER:  This is David Solinger.

12    Mike, also with regard to Josh Holmes, he was

13  involved, I know, with the FOIA responses and the

14  exhibits to the DERP-FUDS report.

08:50 15    So I might want to do maybe a limited inquiry, but

16  I might want to know something additional, because he

17  and I had some contact as well, as you know.

18    MR. AUGUSTINI:  I don't -- I mean, that's separate

19  from the interrogatory certifications.

08:51 20    MR. SOLINGER:  It is, but it would be the same

21  witness is what I'm saying.

22    MR. AUGUSTINI:  I don't think that, you know, if

23  he's supporting the FOIA office, with regard to a FOIA

24  response as an attorney, that you're entitled to go into

08:51 25 what he did as a lawyer in connection with those

33

08:51    1    requests.

         2        MR. SOLINGER:  We have to explore that.

         3        MR. AUGUSTINI:  And that's -- I mean, there's been

         4    no waiver with regard to that.  I mean, I haven't seen

08:51    5    anything in the letters or heard anything today.

         6        MR. SOLINGER:  And that part wasn't teed up, but

         7    since we're talking topics for these particular

         8    deponents, and Joshua Holmes is on the table, I'm

         9    furthering what Pat's sort of saying but slightly

08:51   10    different, as far as subject matter might come up.

        11        MR. DENNIS:  Mike, what I'm willing to agree to is

        12    that we want to take these depositions to ask them about

        13    their verifications.  That's why we asked for those

        14    witnesses and that's what I would intend to cover.

08:52   15        There may be other areas of examination that other

        16    lawyers, Mr. Solinger here, want, and maybe we can agree

        17    to include those in the deposition for efficiency's

        18    sake.  And, you know, you're certainly entitled to

        19    assert objections during the deposition.

08:52   20        So if what you're saying is you'll make these

        21    lawyers available as long as we agree the -- as long as

        22    the examination is limited to certain topics and one of

        23    the topics is the basis for their verification, I think

        24    I can agree to that.

08:52   25        The place where I'm -- just want to make sure

                                    34

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

08:52    1    you -- you understand our position is, I don't know

         2    where that leads because I don't know what these people

         3    did.

         4        And if all they've really done is ultimately gather

08:53    5    information in order to make the verification, then you

         6    know that there may be a fair amount of questioning to

         7    go through.  But I'm happy to be clear with you that was

         8    the basis for the deposition.

         9        There may be other reasons why their depositions

08:53   10    need to be taken and, you know, we may just have to

        11    reserve.  If their names come up again, we'll take them

        12    again.

        13        But at this point, the point of my putting their

        14    names out there is, they verified interrogatory

08:53   15    responses and I want to ask them what the basis for that

        16    verification was.

        17        MR. SOLINGER:  Let me just add one more thing.  I

        18    would not let -- Mike, let my comment about the FOIA,

        19    let you -- interfere with you putting them up relative

08:53   20    to Pat's line of inquiry.  We can deal with that another

        21    day or we can talk about that too.  So let that not be

        22    an obstacle.

        23        MR. AUGUSTINI:  Well, as you can imagine, it is a

        24    sensitive area for our clients because of the

08:54   25    attorney-client/attorney work product issues.

                                        35

                HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                  800.697.3210

08:54    1              How about if I try to put together a stipulation

         2    that would satisfy everybody's needs along the lines of

         3    what we discussed.  I think it's worth an effort to at

         4    least see if we can reach an agreement on this.

08:54    5              MR. DENNIS:  Mike, it's worth an effort.  Here's my

         6    concern.  And I appreciate your effort to try to make

         7    this happen, and I'm willing to entertain it, but I

         8    think we need to move quickly.

         9              We are very -- We are really concerned about the

08:54   10    time.  We did tee this up quite a while ago.  We had a

        11    up and down on the meet and confer already.  And I

        12    just -- I want to make sure we quickly try to resolve

        13    it.

        14              If you have a suggested approach on the stipulation

08:55   15    and want to send it, I think it's a very short

        16    stipulation, so it shouldn't take long.

        17              Let's agree right now on when you're going to send

        18    it to me and we'll get back to you very quickly.  And if

        19    we can't reach agreement, we're teed up for the

08:55   20    magistrate or to try to reach some other compromise.

        21              MR. AUGUSTINI:  Yeah.  I wish -- I'm very sensitive

        22    to trying to get this done as soon as possible.

        23              Obviously, I'll have to coordinate with all of

        24    those client agencies, but I'm thinking that at least --

08:55   25    I'm out of the office tomorrow, unfortunately, on a

                                      36

08:55    1    vacation day.  But I can get this -- a draft together

         2    and get it to my clients today and send you back

         3    something on Monday.

         4        MR. DENNIS:  You're going to send it to me Monday?

08:56    5        MR. AUGUSTINI:  Yeah.

         6        MR. DENNIS:  Okay.  I'll look for it Monday.

         7        We'll either, you know, be very close or get it

         8    resolved by correspondence, which I think we need to

         9    post the other parties, because other parties have an

08:56   10    interest.

        11        And if we can't reach agreement quickly -- by

        12    "quickly," if you're in the office next week, we ought

        13    to be able to reach an agreement by Wednesday.  And if

        14    not, we'll be clear with you about what our next step is

08:56   15    and we'll move on.  But I appreciate it and I think we

        16    can resolve it, agree on a scope.

        17        My biggest concern is, I can't agree in advance

        18    that -- if the covering the basis for the verification

        19    leads to various issues or areas of inquiry, I can't

08:56   20    agree in advance I'm not going to ask those questions.

        21        And I think you'd be protected because you can say

        22    during the deposition, you know, "I'm asserting a

        23    privilege over that," and we'll have the fight after the

        24    deposition as a result.

08:56   25        MR. AUGUSTINI:  Just one more procedural thing.  To

                                    37

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

08:57  1    the extent we're unable to work it out next week, you

       2    know -- and hopefully we can, that's certainly our

       3    desire -- can we agree if we need to seek a protective

       4    order relating to these depositions, that we've

08:57  5    discussed it thoroughly now and so when -- however it's

       6    to be teed up to the special master, you know, in other

       7    words, either through a motion to compel or a motion for

       8    protective order, that we satisfied her requirements

       9    instead of redoing everything next week?

08:57  10        MR. DENNIS:  You mean in terms of the obligation to

       11   meet and confer?

       12        MR. AUGUSTINI:  Yes.  For either, you know, as the

       13   moving party.

       14        MR. DENNIS:  Yeah.  Yeah, I'm okay with that.

08:57  15        Does anybody else have an objection?

       16        I'm okay with -- I think we've met and conferred

       17   over our request.  And if you're saying can we confer in

       18   a meet and confer should you want to move for protective

       19   order, I think Goodrich would be agreeable to that.

08:58  20        MR. SOLINGER:  We have no -- Pyro has no problem

       21   with that.

       22        MR. BEAVERS:  Emhart has no problem with that.

       23        MR. AUGUSTINI:  That's certainly more efficient.

       24        MR. DENNIS:  I will say, I don't know what the

08:58  25   schedule would be to brief and have that heard and

                                    38

08:58    1    resolved.

2    But I'm just going to register with you that if we

3    can't reach agreement by mid next week and you want to

4    move for a protective order, one of our issues is going

08:58    5    to be getting that done very quickly.

6    MR. AUGUSTINI:  Right.

7    MR. SOLINGER:  Where did we leave off with Allan

8    Curlee?  Sorry about that.

9    MR. AUGUSTINI:  With Allan Curlee, in the last day

08:58    10    or two, we have not been able to make any contact with

11    him.

12    You know, he is a -- an attorney.  And so, you

13    know, you hadn't done any certification of interrogatory

14    responses, so he's in a different position --

08:59    15    MR. SOLINGER:  Right.  But Pat had, I think in one

16    of his letters -- listed him in the letter of March 8.

17    MR. AUGUSTINI:  Yeah.  And so I can't speak to his

18    status today because we haven't -- we don't know -- we

19    don't know for sure where he is.

08:59    20    But, you know, we have some indication that he's a

21    civil attorney with the air force in Texas.  So we have

22    to contact him first and then -- respond.

23    And the same with respect to Armentrout.  But since

24    he's not an attorney, I don't expect that we'll have a

08:59    25    problem getting deposition dates in the near future.

39

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

08:59    1        MR. DENNIS:  Hey, Mike, as long as we're on --

2    sounds like we're about to wrap up, as long as we're on,

3    there's a Gerald -- I think it's Schwalbe, whose name

4    came up in Mr. Gonzalez' deposition earlier this week.

08:59    5        And I'll send you a letter as well, but I wanted to

6    put that out there.  I think he's retired from the

7    Huntsville Division.  And I think he may have been the

8    principal investigator for the 1994 report that the

9    Huntsville Division produced.

09:00    10        And if you could -- Again, I'll follow up with a

11    letter, but I just want you to know if you could start

12    to make inquiry about his availability for a deposition,

13    I'd really appreciate it.

14        MR. AUGUSTINI:  If you could, yeah.  If you have --

09:00    15    Even if you just send me an e-mail the correct spelling

16    and -- Huntsville Army Corps of Engineers?

17        MR. DENNIS:  Yes.

18        MR. AUGUSTINI:  Yeah.  We'll send you -- I'll send

19    you a letter.  I'll get it posted today.

09:00    20        MR. DENNIS:  I'll look for a proposed stip on

21    Monday and we'll try to get it resolved by mid next

22    week.

23        MR. AUGUSTINI:  Okay.  Sounds good.

24        MR. BEAVERS:  Guys, this is Joe Beavers.

09:00    25        Just one quick question.  Irregardless of whether

40

09:01    1    this gets worked out by stipulation, is the government

         2    going to go ahead and get dates for these other

         3    witnesses, Vincent, Bauer, Hiza and Armentrout?  I'm

         4    sorry if I missed that.

09:01    5         MR. AUGUSTINI:  Yeah, if you're -- if you want

         6    dates for those witnesses.

         7         MR. DENNIS:  Yeah, I think we better get dates.

         8         I'm not sure what we're going to do on the location

         9    issue and I'm certainly not agreeable today that they'll

09:01   10    be -- that it'll be sufficient to take them.

        11         But I gotta tell ya', most of them sound like

        12    witnesses that we probably would need to depose anyway,

        13    so it might be good to get dates on their availability

        14    and see if we can't at least move that process along.

09:01   15         MR. BEAVERS:  Yeah, I agree.  Regardless of the

        16    location dispute and these other disputes, I think we

        17    should -- given the schedule, we need to get the dates

        18    now, sooner rather than later.

        19         MR. AUGUSTINI:  Okay.  I mean, I think that

09:02   20    they're -- they can be made available in the week of --

        21    the first or second week of April.

        22         And it might make sense, given that they're both in

        23    the central United States, to try to schedule them in

        24    one week if people are traveling.

09:02   25         And so I guess what I would need is, you know,

                                    41

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                              800.697.3210

09:03    1    whether that's -- whether that's something the parties

2    think is a good idea so I can coordinate the scheduling

3    on both of them.

4        MR. DENNIS:  Mike, did you say the first or second

09:03    5    week, or is there one, you know, they're both available?

6        MR. AUGUSTINI:  I believe they're both available,

7    you know, in the latter part.  So, in other words, the

8    sixth or seventh of April or the 13th or 14th, that's

9    the following week.

09:03    10        MR. BEAVERS:  We're talking about more than just

11    two witnesses; right?

12        MR. AUGUSTINI:  Well, that's for Mr. Hiza in

13    Kentucky and Mr. Bauer in Omaha.

14        I -- Due to Mr. Vincent's deployment overseas --

09:04    15        MR. BEAVERS:  Right.

16        MR. AUGUSTINI:  -- anything for you today.  But I

17    will follow up on that.

18        MR. SOLINGER:  When we're done talking dates, I

19    have a couple questions about Bauer, Mike.

09:04    20        MR. BEAVERS:  While we are still on dates, I know

21    coverage in these cases is very tough with the amount of

22    lawyers, and especially with travel.

23        But for me, who will be covering these depos for

24    us, the 13th and the 14th don't work.  I have depos out

09:04    25    of town in another matter.

42

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

09:04    1         The 6th and the 7th do work.  So to the extent we

         2    have dates, I'll just throw that out there now.

         3         MR. AUGUSTINI:  We need to coordinate further on

         4    the dates to figure out what the -- what a plan -- I

09:05    5    mean, you know, I'm willing to work with people's

         6    schedules, but obviously I need to hear from the parties

         7    who --

         8         MR. SOLINGER:  Pyro's okay with those dates.

         9         MR. BEAVERS:  Guys, this is Joe.

09:05   10         For some reason with -- my line just went mute.

        11    Did you hear what I said about the 6th and the 7th and

        12    the 13th and the 14th?

        13         MR. AUGUSTINI:  Yes.

        14         MR. BEAVERS:  And did somebody follow up on that?

09:05   15    It went mute right after that.

        16         MR. AUGUSTINI:  There was silence.

        17         MR. BEAVERS:  Oh, okay.  I thought it just went

        18    mute.

        19         MR. DENNIS:  I'm back.  I apologize.

09:05   20         So I understand, we're to be considering dates, the

        21    6th and 7th of April and the 13th and 14th of April; is

        22    that right, Mike?

        23         MR. AUGUSTINI:  Yeah.  I -- You know, I can ask for

        24    other dates if those don't work, but I can't without

09:06   25    hearing from you all first --

                                    43

09:06    1            MR. SOLINGER:  I'm looking at -- Never mind.

         2            MS. BURNSIDE:  Mike, this is Elizabeth Burnside at

         3    Gibson.

         4        I know on the 13th and 14th of April currently

09:06    5    there's the deposition of Kathleen Sollier, so I know

         6    that's a potential conflict, you know, if parties need

         7    to attend both.

         8            MR. AUGUSTINI:  Right.

         9            MS. BURNSIDE:  It won't be from our perspective.

09:06   10            MR. SOLINGER:  Nor from Pyro.  We're fine.

        11            MR. DENNIS:  I think what we're going to have to do

        12    on the dates, Mike, is just -- I think we've got them

        13    down, and we're going to have to write you back and let

        14    you know if those will work.

09:06   15            MR. AUGUSTINI:  Obviously if you want us to try to

        16    get other dates, we're amenable to that.  We just need

        17    to know kind of what you -- what you have in mind.

        18        I do think it's efficient to try to coordinate the

        19    two given their locations, but --

09:07   20            MR. DENNIS:  Yeah.  One thing about those

        21    witnesses.  I presume for a guy like Hiza, for example,

        22    what we should agree to do is that if we're going to

        23    take his deposition to cover what he may know about

        24    those interrogatories, we probably ought to take his

09:07   25    deposition on every other issue as well; correct?

                                    44

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                            800.697.3210

09:07   1          MR. AUGUSTINI:  I think that we would want there to
        2     be one deposition of him.  And no one -- I'm assuming no
        3     one has interest in going back to Louisville, Kentucky
        4     for a second round.  So I think that would be most
09:07   5     efficient.
        6          MR. DENNIS:  The only -- And, you know, this leads
        7     to the issue in Leslie's letter, which I've got to write
        8     back to, and we probably are going to have to meet and
        9     confer next week.  But when you have a rolling
09:07  10     production, it's not clear to me that we're going to
       11     have everything we need to know what we want to depose
       12     the guy on.
       13          So I just -- You know, I don't know Hiza's -- I'm
       14     just using him as an example for this discussion.  I
09:08  15     don't know all of Hiza's role in this.  And so I'm
       16     really not prepared to tell you that, you know, we could
       17     complete a deposition in April, since I don't know today
       18     what his role is on other issues.
       19          I think we could complete it just with respect to
09:08  20     interrogatories, but I think that's pretty inefficient,
       21     if the guy has another role.  So that's something I
       22     gotta take into consideration when we, you know, lock in
       23     on dates.
       24          But, look, I think -- at least my view is, we've
09:08  25     finished the meet and confer today.

                                    45

        HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                          800.697.3210

09:08    1         MR. SOLINGER:  I have an additional inquiry before

         2    you end it.

         3         MR. DENNIS:  Okay.  Go ahead, David.

         4         MR. SOLINGER:  On Bauer, Mike, is he knowledgeable

09:08    5    about all military manuals or just certain technical

         6    orders?

         7         MR. AUGUSTINI:  You know, I haven't spoken to him

         8    personally, but -- so I'm afraid I can't --

         9         MR. SOLINGER:  Can you find out?  Because that will

09:09   10    certainly affect the deposition and length, and what we

        11    have to do to prepare.

        12         MR. AUGUSTINI:  Yeah.

        13         MR. SOLINGER:  Was he a witness in the Steadfast

        14    case?

09:09   15         MR. AUGUSTINI:  No.

        16         MR. SOLINGER:  Okay.  Now, when you're saying the

        17    technical orders, because I don't have the rogs right in

        18    front of me, is that the 1942 that's referenced?  I

        19    think that's what it is, but I don't have it right in

09:09   20    front of me.

        21         MR. AUGUSTINI:  Yeah, there's a November '42 army

        22    technical order and then an April '44 army technical

        23    order.

        24         MR. SOLINGER:  Okay.  And that was --

09:09   25         MR. AUGUSTINI:  That, I believe, we indicated in

                                    46

           HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                            800.697.3210

09:09    1    response -- don't know what that interrogatory is

         2    referring to --

         3         MR. SOLINGER:  Right.  As I recall.

         4         MR. AUGUSTINI:  If you have a copy of that or you

09:10    5    can clarify what it is that's being referred to in that

         6    interrogatory, it would be very helpful to have it

         7    before the deposition.  But as it stands now, our

         8    response is what it is.

         9         MR. SOLINGER:  Yeah.  I think the response was that

09:10   10    you said you had something regarding aviation manuals

        11    similar to that date or technical order, as I recall.

        12         I'll give you a call and we'll talk, Mike, on that.

        13         MR. AUGUSTINI:  Good.

        14         MR. DENNIS:  Is there anything more we need to

09:10   15    discuss from any of the other lawyers on the phone?

        16         MR. AUGUSTINI:  Just -- We can go off the record.

        17         I'd just like to order a copy of the transcript.

        18         MR. DENNIS:  If that's it, I think we can finish

        19    the meet and confer, and appreciate everybody

09:11   20    participating.

        21         MR. AUGUSTINI:  Thank you.

        22         (The proceedings concluded at 9:11 a.m.)

        23                        ***

        24

        25

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210